# EXHIBIT 10

BEFORE THE ARKANSAS STATE PLANT BOARD

* * * * * * * * *

IN THE MATTER OF:

DONALD MASTERS

* * * * * * * * *

BE IT REMEMBERED that on the 8th day of July, 2016, at 12:15 p.m., before the Arkansas State Plant Board, # One Natural Resource Drive, Little Rock, Arkansas, the above caption claim came on for Hearing and testimony was introduced as follows:

APPEARANCES:

MS. GRACE ELLEN RICE
OFFICE OF THE ATTORNEY GENERAL
Attorney at Law
111 Center Street
Little Rock, AR 72201

*** On Behalf of the Board ***

BOARD MEMBERS:

Mr. Otis Howe, III, Chairman
Ms. Peggy Johnson, Hearing Officer
Mr. Jammy Turner
Mr. Ray Vester
Mr. Danny Finch
Mr. Greg Hay
Mr. Dennie Stokes
Mr. Rick Cartwright
Mr. Larry Jayroe
Mr. Robert Campbell
Ms. Mary Eaton - via telephone
Mr. Kyle Baltz

ORIGINAL

# I N D E X


| | Page |
|---|---|
| Opening Statement By Hearing Officer Johnson . . . . . . . | 5 |
| COURT REPORTERS CERTIFICATE . . . . . . . . . . . . . . | 24 |


## E X H I B I T S


EXHIBIT A
Order and Notice of Hearing

EXHIBIT B
Chronology and Summary

EXHIBIT ONE (1)
Request for Investigation

EXHIBIT TWO (2)
Request for Investigation Consent Form

EXHBIT THREE (3)
Photographic Documentation

EXHIBIT FOUR (4)
Inspector Generated Map of Area

EXHIBIT FIVE (5)
Notice of Inspection

EXHIBIT SIX (6)
Certified Applicator Records Inspection

EXHIBIT SEVEN (7)
Certified Applicator Records Inspection

EXHIBIT EIGHT (8)
Certified Applicator Records Inspection

EXHIBIT NINE (9)
Certified Applicator Records Inspection

EXHIBIT 10
Certified Applicator Records Inspection

EXHIBIT 11
Certified Applicator Records Inspection

EXHIBIT 12
Missouri Department of Agriculture Investigation/ Inspection Statement

EXHIBIT 13
Missouri Department of Agriculture Investigation/ Inspection Statement

EXHIBIT 14
Notice of Inspection

EXHIBIT 15
Pesticide Dealers Records Inspection

EXHIBIT 16
Pesticide Dealers Records Inspection

EXHBITI 17
Pesticide Dealers Records Inspection

EXHIBIT 18
Pesticide Dealers Records Inspection

EXHIBIT 19
Missouri Department of Agriculture Private Applicator License

EXHIBIT 20
Narrative

EXHIBIT 21
Report of Investigation

EXHIBIT 22
Product Label for Strut

EXHIBIT 23
Bollgard II XtendFlex Cotton Label

CAPTION

The hearing in re of DONALD MASTERS, was taken before me, Linda Parker, within and for Pulaski County, State of Arkansas, duly commissioned and acting, at the Arkansas State Plant Board, #One Natural Drive, Little Rock, Arkansas, beginning at the hour of 12:15 p.m. on Friday, July 8, 2016, by agreement of counsel in accordance with the provision of Act 335, 1953, Act of Arkansas, as amended, at which time the taking of the hearing was commenced.

PROCEEDINGS

HEARING OFFICER JOHNSON: All right, we are before the Pesticide Committee of the Arkansas State Plant Board in the matter of Donald E. Masters' Farm. Mr. Donald Masters is present today.

MR. MASTERS: Yes, ma'am.

HEARING OFFICER JOHNSON: Good afternoon. Thank you for being present. And he's before the Board and of course Ms. Grace Ellen Rice is the attorney representing the State Plant Board. This matter is before the State Plant Board to determine whether there has been a violation of the rules and regulations that govern the Arkansas State Plant Board and Pesticide Committee, and whether Mr. Masters used pesticide in a manner inconsistent with the labeling registered with the Environmental Protection Agency or Plant Board for that pesticide. I will ask first of all, will there be testimony in this matter today, Ms. Rice?

MS. RICE: Probably.

HEARING OFFICER JOHNSON: Okay.

MS. RICE: Yes. I'm going to have three witnesses.

HEARING OFFICER JOHNSON: All right. And who will they be?

MS. RICE: Leigh Gibson, Jerri Gann and Mike Hill -- Michael Hill.

HEARING OFFICER JOHNSON: Okay. And of course, Mr. Masters, will you be giving testimony?

MR. MASTERS: Myself.

HEARING OFFICER JOHNSON: Okay. Well, then let's raise your right hand -- all four of you. Do you swear or affirm the testimony today will be the truth, the whole truth and nothing but the truth?

(ALL WITNESSES ANSWERED AFFIRMATIVELY)

HEARING OFFICER JOHNSON: All right. With regard to exhibits, Ms. Rice, you have what looks like to be Exhibit A through Exhibit 16. It shows A, B and then 1 through 16.

MS. RICE: That is correct.

MR. MASTERS: What's that for?

HEARING OFFICER JOHNSON: And on this hearing.

MR. MASTERS: Oh.

HEARING OFFICER JOHNSON: Mr. Masters, you've been given a copy of it. He's looking through it now. And Mr. Masters --

MR. MASTERS: It's the same thing I got back in the winter, wasn't it?

HEARING OFFICER JOHNSON: Right.

MR. MASTERS: Right.

HEARING OFFICER JOHNSON: That's what I was going to say. Most of this you probably have already received. Do you have any objection to this being considered by the Board -- by the Committee today?

MR. MASTERS: No.

HEARING OFFICER JOHNSON: All right. You need to speak up so they can hear you.

MR. MASTERS: No, I do not have any objections.

HEARING OFFICER JOHNSON: Thank you. Thank you.

(THEREUPON, Plant Board Exhibits One (1) through 16 were marked for identification and appended.)

MR. MASTERS: I've already signed them. Are these the ones I signed and sent back?

HEARING OFFICER JOHNSON: Oh, was this a consent form?

MR. MASTERS: I signed --

MS. RICE: I'm going to let Ms. Nichols explain that.

MS. NICHOLS: We sent out an original consent agreement awhile back and staff recommendation. The Committee rejected our recommendation, moved to up certain violations to $1,000.00, but then opted to have Mr. Masters come in on one violation, similar to the last case, not exactly the same, but there were multiple violations. But we sent additional

settlement agreements back out where the fine was raise and were -- a certain violation we asked him to come in.

MR. MASTERS: Okay. I signed those and said I was guilty, right? They were signed documents said I was guilty.

HEARING OFFICER JOHNSON: All right. Did he sign those?

MR. MASTERS: Yes.

HEARING OFFICER JOHNSON: The new documents?

MS. NICHOLS: The new ones that have a $1,000.00?

MR. MASTERS: I don't know about -- I've already received one deal that I remember. I got it back in December or January. I don't know when it was.

MS. NICHOLS: Now you've received some updated ones since then.

HEARING OFFICER JOHNSON: So, are you saying that the documents you sent Mr. Masters were basically what was amounted to a consent agreement telling him that the Staff has rejected the first --

MR. MASTERS: Yeah.

HEARING OFFICER JOHNSON: -- set of --

MR. VESTER: The Committee.

HEARING OFFICER JOHNSON: -- the Committee, I'm

sorry.

MR. MASTERS: Okay.

HEARING OFFICER JOHNSON: The Committee has rejected the first disciplinary -- findings and disciplinary settlement offer, basically.

MR. MASTERS: Said they rejected --

HEARING OFFICER JOHNSON: They rejected --

MR. MASTERS: The Board rejected.

HEARING OFFICER JOHNSON: -- and imposing a fine, a penalty of $1,000.00.

MS. NICHOLS: And requested him to come in on one violation.

HEARING OFFICER JOHNSON: Okay.

MS. RICE: It was not a request. It was mandatory.

MS. NICHOLS: Mandatory.

HEARING OFFICER JOHNSON: Mandatory. I'm sorry. And the violation that he is here on today is --

MS. NICHOLS: It is for an over the top application of -- let me read this real quick before I state incorrectly. An over the top application of Strut to about 200 acres at 32 ounces an acre.

MR. MASTERS: That's right.

HEARING OFFICER JOHNSON: All right. Is that what you admitted to?

MR. MASTERS: I told them I did.

HEARING OFFICER JOHNSON: Okay.

MR. MASTERS: About 14 months ago or 15 months ago.

HEARING OFFICER JOHNSON: All right. So, I'm not understanding exactly. If he admitted to this prior --

MR. MASTERS: Why am I here?

MS. NICHOLS: The Committee asked that you come in or required that he come in. I think they have some questions as to why -- they considered this a grievous and they wanted to know -- from what I understand, why this application was made at this rate.

MR. HOWE: Exactly right.

MR. MASTERS: Well, you think I just grabbed it out of the air? You think the boy that just left here just grabbed those figures out of the air and did it. Somebody told him to, right?

MR. FINCH: Who told you to?

MR. MASTERS: You know who did. I'm not going to say it.

MR. FINCH: Monsanto?

MR. MASTERS: A few words may incriminate myself. Why sure.

MR. FINCH: So, Monsanto told you to spray this Strut --

MR. MASTERS: Well --

MR. FINCH: -- directly over the top and it wouldn't hurt a thing?

MR. MASTERS: Right. And the cotton is developed and it didn't hurt the cotton one dab, but they told us it would be legal, but you know it's not legal. Now, this is January of '15 that it's not legal right now, but it will be by May at the latest. So, we planted it, we sprayed it, then everybody commenced to saying, "Oh, it's not legal no more. It's not legal." Well, it -- I'm just like the rest of you. I didn't read the writing. Dicamba, I've used it on corn. Clarity, which is a more refined Dicamba that's some of the other. There's two formulations of Dicamba. One, the salts in them are a little different. And I can't remember exactly what they were, but Clarity is the one that's a little more better to spray over cotton than the other cheaper variety is.

MR. FINCH: But who's your rep?

MR. MASTERS: I'm not going to say, because he was just doing what somebody told him.

MR. FINCH: So, Monsanto told him to go out and

tell you?

MR. MASTERS: Well, they developed the cotton. They spent a lot of money developing the cotton.

MR. FINCH: I'm sure they did.

MR. MASTERS: And they wanted the seed sold. Now, all Monsanto -- that DPL variety had on the sack "Do not spray with Dicamba." Okay?

MR. FINCH: But this guy told you to spray it?

MR. MASTERS: But well -- yes, but there was another company that sold Dicamba cotton that is just a plain sack and didn't say a thing in the world about spraying over the top or anything else.

MR. FINCH: Did Monsanto go and compensate your neighbors that you drifted over on their beans?

MR. MASTERS: Well, now I farm in Missouri, mainly and I have them a mile north and south and four miles east and west. And I don't have too many neighbors.

MR. FINCH: I'm pretty close to you.

MR. MASTERS: Where are you at?

MR. FINCH: I'm south of 18 highway.

MR. MASTERS: South of 18?

MR. FINCH: Yeah. I know where this complaint come from.

MR. MASTERS: Well, you are -- from where I farm

in Missouri, I'm five miles north of Leachville.

MR. FINCH: But the complaint came off the 160 in --

MR. MASTERS: Well, down there in Gordan. I mean off --

MR. FINCH: Did you compensate Mr. Wallace?

MR. MASTERS: No, because he -- I damaged 10 acres of his beans, at least. And I told him I would pay ever what he wanted on the beans, but he asked me $100,000.00 for his cotton. Well, his cotton wasn't damaged. Ask what kind of cotton he's got this year? What kind of cotton did Mike plant this year?

MR. FINCH: They planted 1518 because they knew you was going to spray Dicamba again.

MR. MASTERS: But I didn't spray Dicamba on it. There's no Dicamba ever been sprayed on that cotton. And the Plant Board came. First thing out of the box they had a complaint, they came to me. I told them to go look at the field. And they -- if they found Dicamba they put it there, because I didn't.

MR. FINCH: So, you didn't use it this year?

MR. MASTERS: No. You can spray Liberty, which isn't near as good, it cost a lot more, over that same cotton. If you -- you can spray with Roundup, Liberty or Dicamba.

MR. FINCH: So, we really don't need this Dicamba technology.

MR. MASTERS: No, no, no, no. No. No. I said, you can spray Liberty, but it's not near as good. You know as well as I do, if you farm, that Liberty -- you can spray it one day and it may work pretty good. Next day it may not even look like you even sprayed it. It's very light sensitive. You've got to have a lot of heat and sunshine. I've got some Liberty beans this year and I've sprayed them twice and I thought I done a good job, but the weeds are coming back. Now, some boys have better luck with Liberty than I do, but it will kind of beat it down a little bit. Now, they say there's a new Liberty coming out and what it is, it's a Clarity with a drift pardon in it. And they said they used it up in Missouri and they sprayed, you know rows of soybeans and rows of cotton right side by side and it hadn't -- if it didn't get on it, it didn't damage it.

MR. FINCH: Are you talking about Dicamba or Liberty?

MR. VESTER: Dicamba.

MR. MASTERS: Dicamba.

MR. FINCH: You said Clarity.

MR. MASTERS: Okay. You boys might have made me

nervous. I might have slipped my tongue. You know what I mean don't you?

MR. JAYROE: Yeah.

MR. MASTERS: Okay. You've been on the hot seat before?

MR. JAYROE: Yes, sir. I have.

HEARING OFFICER JOHNSON: We thank you for your candor, Mr. Masters.

MR. MASTERS: Okay. So, I haven't denied anything and the issue with Mr. Wallace is I told him I'd pay him for the beans. Besides him there was a neighbor right joining me on the south end, Keith Jackson, and I damaged his beans. And I paid him. He gave me the figure and I paid him what he asked. And Mr. Wallace says I damaged his cotton. Of course his problem is, he planted the wrong variety of cotton and it got a virus and it didn't make cotton like it was supposed to. And Gentlemen, if you know that, you know that that Stoneville variety of cotton didn't make. Nobody didn't make it. Now, why we're talking about it, I -- you think that I just sprayed his? I had regular beans around my cotton fields. I sprayed it for my own purpose, right beside of it. One row was cotton, one row of beans. I sprayed right down the top of it -- the cotton, and where I

did not get it sprayed directly on it, there was no difference in yield. Now, if you spray it on top of the non Dicamba beans, it will kill the bean and it will pucker the leaves for a quarter of a mile, but it won't take the yield.

MR. FINCH: So, you're saying you think it might be a little volatile?

MR. MASTERS: No more volatile than 245T. No more volatile --

MR. FINCH: I'll have to agree.

MR. MASTERS: Yeah. Well, we used to use that all the time.

MR. FINCH: I'll have to agree.

MR. MASTERS: But, if you use a -- it depends on what you put it out with and what kind of retardant you put in it.

MR. FINCH: Did the volatility go in all four directions from that cotton field?

MR. MASTERS: From the cotton field? What I seen, it mainly follows the stream of the wind. Now, I don't think -- you know it's like the old stuff that turned everything white. It don't --

MR. FINCH: Command.

MR. VESTER: Command.

MR. MASTERS: Command. It doesn't come up from

the ground after a rain and move, what I've seen with my experience of it. Because I've got one section over there that's -- I go a mile north and -- two miles north, south and four miles east and west. And I haven't noticed it doing that and I've got another place that's a mile by four miles. But -- and it's all rice country over there. But for my own purposes I wanted to see what it done to the beans. It is, as he said, a volatile chemical until they get one that doesn't move, it's a danger. And you can harm a crop with it.

MR. FINCH: Do you realize that there may not ever be a label on it due to the fact of misuse?

MR. MASTERS: Well, I've heard that, but if they develop a chemical that doesn't move, probably it will be labeled. Now, you know the Roundup will move also. It will drift and 20 years ago when Roundup crops first started being used, that there were a lot of lawsuits and problems over people that had Roundup ready crops spraying over -- going over on my non Roundup ready crops. And you know that all got worked out. So, I don't know what --

MR. FINCH: Would you have planted this -- would you have bought this cotton had you known that Montsanto would come in or EPA might come in and

destroy that crop because you did an off label application? Would you have planted that crop?

MR. MASTERS: No. And I wouldn't have planted that crop if they hadn't told me that it would probably be -- in other words, they pretty well assured me that in '15, that before May, that it would be legal. You could spray over the top of it and be just fine.

MR. VESTER: We ain't got there yet.

MR. MASTERS: But it's not legal today.

MR. VESTER: No.

MR. MASTERS: And the soybeans that they developed, that you can spray Dicamba over, the elevators have said they are not going to buy the bean with the Dicamba gene in it, even if you didn't spray Dicamba over it.

MR. VESTER: Export issues.

MR. MASTERS: Well, that's what I told the -- that's the kind --

MR. VESTER: Who wants a crop you can't sell?

MR. MASTERS: That's got to do with money over a company wanting to buy Monstanto. So, it all comes back to money. Well, like I say I ain't not admitting anything; that I did what I did and it was a mistake, but anyway I did it.

HEARING OFFICER JOHNSON: Mr. Masters has pretty much given his testimony. I mean he's been sworn in, everybody has and the Board asked him questions and they -- now, did you want to ask him any questions or add anything to that, Ms. Rice?

MS. RICE: No. We appreciate that you came down today and you made it down.

MR. MASTERS: And got lost.

MS. RICE: I knew you got lost. We're glad you're here.

HEARING OFFICER JOHNSON: That's what I was pretty much thinking myself. The Board has pretty much heard all it needs to hear or the Committee has heard what it needs to hear to make a decision on this matter. I don't think much is in dispute. Mr. Masters has been very candid and you know he pretty much said --

MR. MASTERS: Well, ain't that what I told y'all when y'all come to see me a couple years ago? I told you --

MS. NICHOLS: Yes, sir.

MR. MASTERS: -- what I done.

MS. NICHOLS: And on the phone with me.

MR. MASTERS: And you can see very simply where it crossed his bean field.

MR. ?: We're ready for a motion.

HEARING OFFICER JOHNSON: All right. Well, we can do this on the record. It's not a problem. Is the Board ready to entertain a motion with respect to the allegations of fact contained in the order and notice of hearing on Mr. Masters' farms; allegation one through four.

MR. HOWE: Six.

HEARING OFFICER JOHNSON: Excuse me. One through six.

MR. VESTER: So moved.

MR. FINCH: Second.

HEARING OFFICER JOHNSON: All right.

MR. HOWE: We've got a motion and a second. Is there any discussion? We find these allegations and facts correct. All in favor please say "aye."

(ALL COMMITTEE MEMBERS ANSWERED "AYE.")

MR. HOWE: Or raise your hand. Do you want a hand raise?

HEARING OFFICER JOHNSON: No, that's fine. Yeah. It looks like it's unanimous. Any opposed, speak up. Then it is unanimous.

MR. HOWE: I'm sorry, I keep doing this.

HEARING OFFICER JOHNSON: The Board has found the allegations and fact one through six have been

proven. And with respect to any disciplinary action that the Board -- the Committee wants to impose, do I hear a motion?

MR. FINCH: I move to not accept Staff's recommendation and set the penalty at $1,000.00.

MR. STOKES: I second.

MR. HOWE: We've got a motion and a second. So, you want hands raised?

HEARING OFFICER JOHNSON: Well -- all in favor of the motion --

MR. HOWE: Was there any discussion on that? Anybody have anything to say on that? Okay.

HEARING OFFICER JOHNSON: All in favor signify by raising your hand. Any opposed? Motion unanimously approved. The Board has found the allegations and fact to be substantiated by the testimony today and has imposed a penalty of $1,000.00.

MR. MASTERS: Is that $1,000.00 per cap or total?

HEARING OFFICER JOHNSON: It's $1,000.00 in total.

MR. HOWE: No, no, no.

MS. NICHOLS: According to this allegation it is -- the previous one we sent you, those are still

1,000 unless you would like to contest them, but we haven't heard from you on that.

MR. MASTERS: So, my total bill is what?

MS. NICHOLS: I'd have to have the others in front of you -- in front of me. I can give you call later today or Monday and let you know for sure.

MR. MASTERS: Can I leave you a check today?

MS. NICHOLS: No. Don't pay us yet.

MR. MASTERS: Okay.

MS. NICHOLS: Our Board has to approve it. I'll let you know when you have to pay it.

MR. MASTERS: So, this is not the final end? It may not be rejected -- this proposal may be rejected?

MS. NICHOLS: It may be, but this is the maximum they can fine you. They can't go any higher.

HEARING OFFICER JOHNSON: The only thing the Board can do is go lower.

MR. MASTERS: Okay.

HEARING OFFICER JOHNSON: The ultimate State Plant Board has the authority to --

MR. VESTER: The Board has to vote on it.

HEARING OFFICER JOHNSON: But the absolute most that it can be is 1,000 for this today and then how many others?

MS. NICHOLS: Per current -- I don't remember

how many he had off the top of my head, because they're not in front of me.

HEARING OFFICER JOHNSON: Okay. But she's going to check that out.

MS. NICHOLS: I will let you know.

HEARING OFFICER JOHNSON: All right. Well, that's the Board's decision. Thank you Mr. Masters for traveling all this way and I appreciate your candor today and --

MS. NICHOLS: You're done with her, not me.

MR. MASTERS: Do what?

HEARING OFFICER JOHNSON: We're done with you, Mr. Masters.

MR. MASTERS: Done with me. All right. Good deal.

HEARING OFFICER JOHNSON: Thank you, sir.

MS. NICHOLS: Thank you, Mr. Masters.

(The deposition was concluded at 12:35 p.m.)