**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

SMOKEY ALLEY FARM PARTNERSHIP; AMORE FARMS; JTM FARMS; KENNETH LORETTA GARRETT QUALLS FARM PARTNERSHIP; QUALLS LAND CO.; MICHAEL BAIONI; MCLEMORE FARMS LLC; P+E PARTNERS; KEMP FARMS; BUCKSKIN FARMS; JOHN P. BAIONI FARMS; HENRY D. AND JEFF FINCH FARMS; H+H FARM PARTNERSHIP; VINCENT FARMS; ROBERT TERRY FARMS; MORRISON PARTNERS; COOPER FAMILY FARMS PARTNERSHIP; SPEISER FARM INC.; ROBERT DELANEY; JERRY STOGSDILL; HEINCO FARMS; MATTIS FARMS; RANDY FENDRICK; LGO FARMS PARTNERSHIP; HUNTER TREE FARMS; HEITMANN FARMS INC., and HEITMANN BROTHERS, LLC,

*Plaintiffs*,

v.

MONSANTO COMPANY, BASF CORPORATION, E.I. DUPONT DE NEMOURS AND COMPANY, and PIONEER HI-BRED INTERNATIONAL INC.,

*Defendants*.

Case No.: 4:17-cv-02031-JMB

***JURY TRIAL DEMANDED***

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Smokey Alley Farm Partnership, Amore Farms, JTM Farm, Kenneth Loretta Garrett Qualls Farm Partnership, Qualls Land Co., Michael Baioni, McLemore Farms LLC, P+E Partners, Kemp Farms, Buckskin Farms, John P. Baioni Farms, Henry D. and Jeff Finch Farms, H+H Farm Partnership, Vincent Farms, Robert Terry Farms, Morrison Partners, Cooper Family

Farms Partnership, Speiser Farm Inc., Robert Delaney, Jerry Stogsdill, Heinco Farms, Mattis Farms, Randy Fendrick, LGO Farms Partnership, Hunter Tree Farms, Heitmann Farms, Inc. and Heitmann Brothers, LLC (together, "Plaintiffs"), by their undersigned attorneys, on their own behalf and on behalf of all others similarly situated, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, bring this action against Monsanto Company ("Monsanto"); BASF Corporation ("BASF"); and E.I. DuPont De Nemours and Company and Pioneer Hi-Bred International Inc. ("Pioneer) (together, "DuPont"), and allege as follows:

## NATURE OF THE CASE

1. This is not an anti-GMO lawsuit; it's a lawsuit about corporate greed, a rush to market, and the resulting fallout.

2. With a global population expected to exceed nine billion by 2050, food production must grow 70% to feed the world.

3. While there are some that believe organic or non-GMO crops are a better choice, the math is clear…without GMO crops, there will not be enough food to feed the world.

4. Despite this reality, the biotech industry has repeatedly proven there are risks of harm if GMO crops are not handled responsibly. From the Starlink corn recall in 2000 (when over 300 food products were found to contain a GMO corn that had not been approved for human consumption),[1] to Bayer's contamination of the U.S.'s natural long-grain rice in 2006 with an unapproved GMO,[2] to Syngenta's premature release of Viptera corn in 2014 (prior to approval by

---

[1] Ex. 1, Starlink Corn Recall Wikipedia entry (Downloaded June 22, 2017 from https://en.wikipedia.org/wiki/StarLink_corn_recall).

[2] Ex. 2, "Genetic rice lawsuit in St. Louis settled for $750 million," St. Louis Post-Dispatch (July 2, 2011) (Downloaded June 22, 2017 from http://www.stltoday.com/news/local/metro/genetic-rice-lawsuit-in-st-louis-settled-for-million/article_38270243-c82f-5682-ba3b-8f8e24b85a92.html).

a major importer which led to a crash in corn prices and $1.4 billion settlement),[3] history has shown that when biotech companies put greed and profit before responsibility, harm occurs across the entire market.

5. Part of acting responsibly requires biotechnology companies to avoid the premature release of genetic traits into the market. This why biotechnology and agriculture companies have pledged to their stakeholders that they will act responsibly when introducing new bio-engineered genetic traits.

6. Although the Defendants here pledged to act responsibly, Defendants acted selfishly, focused on profits, and ignored their responsibilities to the market.

7. The GMO products at issue are Monsanto's Roundup Ready 2 Xtend Soybeans ("Xtend soybeans")[4] and Bollgard II XtendFlex cotton ("XtendFlex cotton") (together, "Xtend products" or "Xtend seeds"), which are utilized in conjunction with the Defendants' dicamba herbicides (Monsanto's XtendiMax® Herbicide with VaporGrip® Technology ("XtendiMax"), BASF's Engenia herbicide ("Engenia") and DuPont's FeXapan™ herbicide Plus VaporGrip® Technology("FeXapan")). Defendants' seeds and dicamba herbicides are marketed together as a "crop system."

8. Monsanto marketed its Xtend products as "blockbusters" that would provide desperate farmers meaningful relief from ever increasing weed pressure.

9. The fundamental technological advance of Xtend is a genetic modification which results in resistance to the herbicide dicamba. This genetic resistance provides an advantage: after planting Xtend soybeans or XtendFlex cotton, dicamba herbicide could be applied post-

[3] Ex. 3, "Syngenta Said to Pay More Than $1.4 Billion in Cord Accord," AgWeb (Sept. 26, 2017) (Downloaded Nov. 2, 2017 from available).
[4] DuPont also sells a brand of Xtend soybeans via a license from Monsanto.

emergence, or, colloquially, "over-the-top." The alleged result: clean, almost weed-less fields except for Xtend soybean and XtendFlex cotton plants.[5]







The addition of genetic resistance to dicamba offers a benefit to farmers struggling with weed control. This benefit, however, comes with a cost: dicamba is known to volatilize and drift, which results in the damage and death to neighboring crops, trees, and plants not resistant to dicamba. This can be seen in the below photo, showing dicamba damage to fields on the left side of the road, whereas the crops on the right side were dicamba resistant.[6]

[5] Ex. 4, "Tips on applying dicamba/glyphosate tank mix on Xtend soybeans," Manitoba Co-Operator (July 6, 2015) (Downloaded July 13, 2017 from http://www.npr.org/sections/thesalt/2016/08/01/487809643/crime-in-the-fields-how-monsanto-and-scofflaw-farmers-hurt-soybeans-in-arkansas

[6] Ex. 5, "GMO-herbicide drift disaster threatens non-GMO, fruit, and vegetables farms throughout the South," The Organic & Non-GMO Report (Aug. 25, 2016) (Downloaded July 13, 2017 from http://non-gmoreport.com/articles/gmo-herbicide-drift-disaster-threatens-non-gmo-fruit-vegetable-farms-throughout-south/).



10. Prior to November 2016, it was illegal to use dicamba for over-the-top applications on Xtend products due to the risk of damage to non-target crops, trees, and plants due to dicamba volatilization and drift.

11. To take advantage of the Xtend products genetic resistance (*i.e.*, the reason farmers would buy such products), Monsanto, BASF and DuPont needed to develop and seek approval by the Environmental Protection Agency ("EPA") for new formulations of dicamba that were not yet on the market—formulations that would allegedly not volatilize or drift.

12. Initially, Monsanto stated it would not release its Xtend products until the EPA approved an over-the-top dicamba herbicide formulation.[7]

13. Greed, however, won out over responsibility. In 2015, although it lacked EPA approvals for over-the-top applications of dicamba, Monsanto released its XtendFlex cotton to farmers on a "limited" basis.[8]

---

[7] Ex. 6, Nov. 28, 2012 Monsanto Press Release (Downloaded June 22, 2017 from http://news.monsanto.com/press-release/strong-harvest-results-demonstrate-monsanto-companys-position-industry-yield-leader-ch).

[8] Ex. 7, "EPA to Approve Dicamba for Use on Roundup Ready 2 Xtend Soybeans," No-Till Farmer (April 2016) (Downloaded on June 22, 2017 and available at: https://www.no-tillfarmer.com/articles/5632-epa-to-approve-dicamba-for-use-on-roundup-ready-2-xtend-soybeans).

14. Monsanto did so despite warnings from farmers and industry experts. For example, in 2014, a coalition of farmers named Save Our Crops Coalition warned Monsanto that premature release of dicamba resistant traits would pose a risk to crops in the Midwest:

> Vegetable farmers in the Midwest, where large amounts of corn and soybeans are grown, will be at "high risk" because they'll be in close proximity to fields being sprayed with 2,4-D and dicamba…[9]

15. Monsanto's "plan" to prevent drift and volatilization damage to non-target crops and plants was, despite years of marketing Xtend products' dicamba tolerance, simply to publicly tell XtendFlex purchasers not to use dicamba.

16. This tactic failed. Farmers sprayed dicamba over-the-top of their XtendFlex cotton in 2015. *See, e.g.*, Ex. 9, Excerpts from AR State Plant Board Complaint, Case File#15-204. This resulted in the death and damage of non-target crops and plants.

17. Monsanto's "plan" failed for multiple reasons. First, while publicly stating it was instructing farmers *not* to apply dicamba over the top of its XtendFlex cotton, Monsanto seed representatives instructed farmers to do the opposite: they taught farmers how to illegally spray their fields with then available dicamba formulations (none of which were approved for over-the-top application).

18. For example, a 2015 purchaser of XtendFlex Cotton testified before the Arkansas Plant Board that a Monsanto seed representative told him how to spray dicamba over-the-top of his Xtend crops, even when it was illegal to do so. This spraying of dicamba led to off-target damage of another's crops in Arkansas.

> MS. NICHOLS: The Committee asked that you come in or required that he come in. I think they have some questions as to why they considered this a grievous and they wanted to know -- from what I understand, *why this application was made at this rate.*

[9] Ex. 8, "Monsanto in dispute with veggie farmers over herbicide," USA Today (March 2014) (Downloaded on July 13, 2017 from http://www.usatoday.com/story/news/nation/2014/03/13/monsanto-dow-agrosciences-herbicides-save-our-crops/6015519/).

> MR. HOWE: Exactly right.
> MR. MASTERS: *Well, you think I just grabbed it out of the air? You think the boy that just left here just grabbed those figures out of the air and did it. Somebody told him to, right?*
> MR. FINCH: *Who told you to?*
> MR. MASTERS: *You know who did. I'm not going to say it.*
> MR. FINCH: *Monsanto?*
> MR. MASTERS: *A few words may incriminate myself. Why sure.*
> MR. FINCH: *So, Monsanto told you to spray this Strut --*
> MR. MASTERS: Well --
> MR. FINCH: -- *directly over the top and it wouldn't hurt a thing?*
> MR. MASTERS: *Right. And the cotton is developed and it didn't hurt the cotton one dab, but they told us it would be legal, but you know it's not legal. Now, this is January of '15 that it's not legal right now, but it will be by May at the latest.* So, we planted it, we sprayed it, then everybody commenced to saying, "Oh, it's not legal no more. It's not legal." Well, it -- I'm just like the rest of you. I didn't read the writing. Dicamba, I've used it on corn. Clarity, which is a more refined Dicamba that's some of the other. There's two formulations of Dicamba. One, the salts in them are a little different. And I can't remember exactly what they were, but Clarity is the one that's a little more better to spray over cotton than the other cheaper variety is.
> MR. FINCH: *But who's your rep?*
> MR. MASTERS: *I'm not going to say, because he was just doing what somebody told him.*

Ex. 10, In the Matter of Don Masters at Tr. at 10-12 (emphasis added).

> MR. FINCH: Would you have planted this – would you have bought this cotton had you known that Montsanto [sic] would come in or EPA might come in and destroy that crop because you did an off label application? Would you have planted that crop?
> MR. MASTERS: No. And I wouldn't have planted that crop if they hadn't told me that it would probably be -- in other words, they pretty well assured me that in '15, that before May, that it would be legal. You could spray over the top of it and be just fine.

*Id.* at 17-18. This was Monsanto's real plan: publicly appear as if it were complying, while allowing its seed representatives to encourage farmers to do the opposite in person. Their sales pitch: assure purchasers that off-label and illegal uses of dicamba would "be just fine." *Id.*

19. Second, Monsanto's "plan" failed because weed pressure is one of the largest concerns for farmers. Faced with such pressures, and years of Monsanto bragging about the

benefits of its Xtend products, it's unrealistic to believe there would be no damage to non-target crops due to off-label application of dicamba.

20. Third, because no non-volatizing or drift-free dicamba formulations were approved by the EPA in 2015 (and thus no non-volatizing or drift free dicamba formulations available to farmers), any use of dicamba over-the-top of XtendFlex products *would* result in damage to non-target crops or plants.

21. Fourth, the penalties for improper use of dicamba were so small as to be nonexistent. In some states, the *maximum* fine was $1,000.[10] Considering how dicamba use would allegedly improve their Xtend crop yield, many farmers took the risk, simply writing off a potential $1,000 fine, as a cost of doing business…*if* they'd get caught.

22. Considering the average size of a cotton farm is over 1,000 acres, the average fine would amount to less than $1 an acre.[11]

23. Fifth, Monsanto's warning system was flawed. Monsanto focused solely on the consequences to the farmers/applicators themselves: a minimal fine. Monsanto's warnings failed to explain that *any* over-the-top application of 2015 dicamba formulations on its Xtend products would lead to drift/volatilization *and* damage to non-target crops and plants. Monsanto's warnings were silent in this regard, and, accordingly, ineffective.

24. Despite the need for new (and then unavailable) dicamba formulations, Monsanto misled, or at a minimum confused, its farmer/customer base for years by touting its Xtend products would have dicamba resistance – period – although use of other formulations would lead to non-

---

[10] Ex. 11, "As EPA label for dicamba-tolerant soybeans lags behind availability of seed, reports of drift injury flourish," University of Arkansas Division of Agriculture Cooperative Extension Service (Downloaded on July 13, from http://www.uaex.edu/media-resources/news/july2016/07-15-2016-Ark-dicamba-drift-injuries.aspx).

[11] In 2007, the United States Department of Agriculture determined that the average cotton farm was 1,312 acres in size, compared to 418 acres of an average farm. Ex. 12, "2007 Census of Agriculture, Cotton Industry," U.S. Dept. of Agriculture, Nat'l Agricultural Statistics Service (Downloaded from https://www.agcensus.usda.gov/Publications/2007/Online_Highlights/Fact_Sheets/Production/cotton.pdf).

target crop and plant damage. This was reinforced when Monsanto seed representatives informed its customers how to spray then available dicamba formulations over-the-top of XtendFlex seed in 2015 when no non-drifting/non-volatilizing formulas were available. See, e.g., Ex. 10 at 17-18.

25. After the damage caused to non-target crops and plants by over-the-top dicamba applications to XtendFlex cotton in 2015, Monsanto had no reasonable basis to expect anything less than additional drift and volatilization damage should it continue offering Xtend products, especially prior to EPA approval of non-drifting/non-volatilizing dicamba formulations.

26. Once again, Monsanto had the opportunity to act responsibly. Monsanto could have withheld further release of Xtend products until EPA approvals for non-drifting/non-volatilizing dicamba formulations were issued.

27. Monsanto chose not to. Instead, it rolled the dice on a second release of XtendFlex cotton and a major release of Xtend soybeans for the 2016 planting season. Its public reasoning: approvals were "imminent," so farmers would be able to use new and approved formulations of dicamba for the 2016 season.[12]

28. Monsanto again gambled, and lost. When it shipped its major release of Xtend soybeans and second season of XtendFlex cotton, it still lacked EPA approvals for over-the-top application of dicamba, and did not receive such approvals until after harvest.

29. Predictably, with a larger release, there was more misuse and more damage to non-target crops. Applications of dicamba over-the-top of Xtend soybeans led to tens of thousands of acres of non-target damaged and dying crops.[13]

---

[12] Ex. 13, MON Q1 2016 Results – Earnings Call Transcript, p. 24.

[13] Ex. 14, EPA Compliance Advisory (Aug. 2016) (Downloaded on July 14, 2017 from http://ifca.com/media/fifra-dicambacomplianceadvisory.pdf).

30. In 2016 in Missouri, Tennessee and Arkansas, there were at least 27, 44, and 26 filed complaints (respectively).[14]

31. In late 2016 and early 2017, Defendants won EPA approvals of their over-the-top dicamba formulations—but only for two years. However, in doing so, Defendants withheld crucial information from the EPA. For example, Monsanto relied on misleading volatility testing (*e.g.*, only testing volatility *relative* to other dicamba formulations and not determining a safe level of volatility). Also, despite allowing independent and unbiased testing by third parties (*i.e.*, universities) on the efficacy of its over-the-top dicamba formulations, it did not allow similar independent and unbiased tests on volatilization despite receiving multiple requests. When specifically asked about this on or about August 8, 2016, a Monsanto representative (Boyd Carey) stated to the Arkansas Plant Board such tests would not be allowed because the results might jeopardize Monsanto's registrations.

32. The result: the approved over-the-top dicamba formulations, even if properly applied, were *not* non-drifting or non-volatilizing.

33. In 2017, with issued EPA approvals, and despite two years of dicamba drift damage, Monsanto fully rolled out its Xtend soybean and XtendFlex cotton seeds, and its XtendiMax dicamba formulations to be sprayed over-the-top of its Xtend seeds. Similarly, BASF and DuPont released their own approved dicamba formulations for over-the-top use on Xtend products: Engenia and FeXapan (respectively). Through a license from Monsanto, DuPont also released a version of Xtend seeds marketed as Pioneer Xtend soybeans.

---

[14] Ex. 15, Dicamba Facts, MO Dept. of Agriculture (Downloaded June 22, 2017 from http://agriculture.mo.gov/plants/pesticides/dicamba-facts.php); Ex. 16, "Off-Target Trauma, States Dig Through Dicamba Claims," DTN Progressive Farmer (Aug. 2016) (Downloaded July 14, 2017 from https://www.dtnpf.com/agriculture/web/ag/news/article/2016/08/03/states-dig-dicamba-claims).

34. Unbeknownst to farmers and applicators, XtendiMax, Engenia and FeXapan—even when applied pursuant to their labels—were *not* non-volatizing.[15] For example, Dr. Kevin Bradley of the University of Missouri reported damage even when label instructions were followed.

**In 2017, off-site movement of dicamba has also occurred with:**

- Engenia, FeXapan, and XtendiMax
- Daytime spraying
- Proper sprayer set up

*Id.* Despite being touted by Defendants as safe for non-target crops and plants, they were not.

35. In his experiments, Dr. Bradley's initial test results showed that after proper spraying techniques, even the approved dicamba formulations show volatility:

> Formulations = Will be interesting to see how Engenia and XtendiMax compare to Banvel, but **initial results w/ air samples and indicator plants suggest that both can be detected in air after application**.
>
> Volatility = Much more to see with the remaining time points and air samples. **Indicator plants suggest volatilization is still occurring at least 24 hours after treatment.**

*Id.* at 28 (emphasis added).

36. Similarly, Dr. Thomas Mueller of the University of Tennessee Institute of Agriculture in July 2017 released test results finding, "This data indicates the dicamba (from Engenia) is moving from the site of application into the air immediately above the treated field" and "Given sensitivity of soybeans to POST dicamba, these data indicate that soybean injury in adjacent areas *should be expected* from vapor moment of dicamba after application." Ex. 18.[16]

---

[15] Ex. 17, Dicamba Injury Forum at 17, Dr. Kevin Bradley, University of Missouri (July 6, 2017) (Downloaded on July 14, 2017 from http://weedscience.missouri.edu/2017%20Dicamba%20Injury%20Forum.pdf).

[16] "Effect of adding Roundup PowerMax to Engenia on vapor losses under field conditions," Thomas Mueller, University of Tennessee (July 2017).

37. The reason for withholding independent testing on Defendants' over-the-top dicamba formulations is clear: independent, unbiased tests would have challenged in-house findings submitted by Defendants to the EPA, and jeopardized Defendants' registrations.

38. Predictably, with a larger roll out of Xtend products in 2017, the damage to non-target crops and plants has dramatically increased.

39. As of the filing of this amended complaint there have been over 2,708 *filed* complaints across the United States of dicamba damage, including 986 filed complaints in Arkansas, 132 in Tennessee, 310 in Missouri, 245 in Illinois and 250 in Minnesota.[17]




Figure 1. Official dicamba-related injury investigations as reported by state departments of agriculture (as of October 15, 2017).

As this only reports the number of filed complaints, the amount of actual damage is significantly more.

[17] Ex. 72, "A Final Report on Dicamba-injured Soybean Acres," Kevin Bradley, Integrated Pest Management Dept., University of Missouri (Oct. 31, 2017)(downloaded Oct. 31, 2017 from https://ipm.missouri.edu/IPCM/2017/10/final_report_dicamba_injured_soybean/).

40. In June 2017, both Arkansas and Missouri temporarily banned dicamba use for over-the-top applications, and Tennessee instituted emergency rules regarding over-the-top dicamba application.

41. Unlike the 2015 and 2016 damage, caused by illegal applications of dicamba, 2017 damage appears even when Engenia, FeXapan and XtendiMax instructions and labels are followed…to the extent they can be followed. See e.g., Ex. 17. As experts have explained, the majority of 2017 damage to non-target crops and fields is uniform, meaning the damage arises due to volatility. As Dr. Kevin Bradley of the University of Missouri Extension stated:

> The majority of fields I've been in are injured from one end to the other with no discernable difference in soybean symptomology. This suggests problems with off-site movement through volatility.

*Id*. at 13. Damage due to volatility is not due to applicator error or failure to follow instructions/labels; it arises due to a defect with the product. *Id.* at 13, 17, 28.

42. The problem is compounded in that Defendants drastically underplayed the risk of damage due to volatilization and temperature inversions to the EPA for their Xtend, Engenia and FeXapan products. Described in greater detail below, temperature inversions (cooler ground level temperatures) lift volatilized and very small droplets of dicamba from fields into the air, allowing them to travel in an inversion layer, sometimes for miles. As temperatures invert again (warmer temperatures at ground level this time), the entire inversion layer is deposited onto non-target fields. This results in widespread and uniform damage to non-target crops and plants seen in 2017.

43. Additionally, experts such as the University of Tennessee's Larry Steckel have criticized Defendants' labels and instructions (e.g., they do not allow for timely application), and questioned whether the technology itself is safe enough to be used under any conditions.

> The label associated with the approved low-volatility dicamba formulations called XtendiMax, FeXapan and Engenia are already complicated without further restrictions.

> "Following them as they are now is a Herculean task. Talk about threading the needle -- you can't spray when it's too windy. You can't spray under 3 miles per hour. You got to keep the boom down -- there are so many things," Steckel said. "It looks good on paper, but when a farmer or applicator is trying to actually execute that over thousands of acres covering several counties, it's almost impossible."

…

> He added that many farmers abandoned dicamba sprays and turned to other herbicide options to avoid hurting neighboring crops further. Depending on the weed control pressure and problems, that's a sacrifice and potential loss of income for those that bought into the technology, he agreed. "Mostly farmers want to do the right thing."
>
> "I'm just not sure we can steward this technology as it currently exists," he added.

Ex. 19. In a later article, Dr. Steckel expanded on the difficulty in following the label:

> [T]hough it looks straight forward on paper, it is extremely hard to follow the label. The best example of this is that you cannot spray when the wind is above 10 mph or below 3 mph. Just that stipulation when you have crops to spray timely in three different counties makes the logistics a nightmare.

Ex. 71.[18]

44. With labels that are difficult, if not impossible, to follow, improper spraying necessarily will follow application of even approved over-the-top dicamba formulations, leading to additional off-target damage. Regardless, given the now-shown volatility inherent even in the approved over-the-top formulations, non-target crop and plant damage was inevitable.

45. Ironically, and as a potential motivating factor, dicamba damage only helps sales of Xtend Soybeans, XtendFlex cotton and other upcoming Xtend products as well as the over-the-top dicamba formulations with which they are used.

46. The 2015 and 2016 premature releases and the disaster that is 2017 proves that whenever Xtend products are used, damage due to temperature inversions, dicamba drift and volatilization will follow. This creates and perpetuates the cycle of damage to non-target crops which do not have the Xtend dicamba resistance trait. The only solution for innocent farmers then

[18] "'I can't keep dicamba in the field,'" UTcrops News Blog (July 18, 2017) (Downloaded July 19, 2017 from http://news.utcrops.com/2017/07/cant-keep-dicamba-field/).

is to play defense: if they do not want their crops hurt by dicamba, they must also buy Xtend products with dicamba resistance *if they are available* for their crops and plants. It is a repeating cycle of increased sales and profits for Defendants.

47. As one farmer explained in 2016:

> "[Monsanto] knew that people would buy it just to protect themselves," Hayes says. "You're pretty well going to have to. It's a good marketing strategy, I guess. It kind of sucks for us.[19]

48. That sentiment continued in 2017 by another farmer whose field suffered damage despite his neighbor's taking the allegedly proper precautions:

> "I'm not against the technology because I've seen how it knocks out pigweed. Next year, I may have to go with a dicamba-tolerant soybean."[20]

49. Like with a fire-protection racket (where "firemen" only put out fires for property owners who pre-pay protection money), Defendants are in the dicamba-protection racket. Unlike pay-for-play firemen however, by also selling dicamba, Defendants' not only sell "fire protection," they also sell fire. Those who purchased Xtend then are protected from their use of fire (dicamba) which, due to its volatility, burns their neighbors' fields. And there's no better marketing for future sales for Defendants, than having a community gather to watch one of their neighbors' fields burn.

50. 1) Farmers of crops other than soybeans and cotton, 2) non-GMO/organic soybean and cotton farmers and 3) property owners with gardens, trees and ornamentals do not have such an option as the approved species of crops and plants with GMO dicamba resistance is limited. As dicamba can damage and kill numerous types of crops, trees, and plants, those without GMO dicamba resistance will be at risk of damage every year Xtend products are on the market.

---

[19] Ex. 20, "Monsanto Seeds Unleash Unintended Consequences Across U.S. Farms," Bloomberg (Sept. 1, 2016) (Downloaded July 14, 2017 from: http://www.bloomberg.com/news/articles/2016-09-01/a-soybean-killing-pesticide-spreads-across-america-s-farm-belt).

[20] Ex. 21, "Dicamba Drift Blowing Farm Trouble Again in 2017," AG Web (June 19, 2017) (Downloaded July 14, 2017 from https://www.agweb.com/article/dicamba-drift-blowing-farm-trouble-again-in-2017-naa-chris-bennett/).

51. Defendants have created a scenario pitting neighbors against neighbors. Sadly, in 2016, there was a homicide over dicamba drift.[21] Yet still, Defendants sold their products in 2017.

52. As the consequences of their actions were not only foreseeable, they were foretold, Defendants must now pay for putting greed above the best interests of the market.

53. After the filing of this lawsuit and in view of the millions of acres of damaged crops caused by their products in 2017, the EPA reached an agreement with the Defendants to revise their labels, which includes reclassifying their approved over-the-top dicamba herbicides as Restricted Use Pesticides, limiting to spraying when winds are below 10 mph, and reducing times of day when sprayings can occur. Ex. 88.[22] Notably, Restricted Use Pesticides, as defined by the EPA, are those that "have the potential to cause unreasonable adverse effects to the environment and injury to applicators or bystanders without added restrictions." Ex. 89.[23] The EPA changes to their labels are admissions that Defendants' products are and were unreasonably dangerous in 2017, that their prior labels and instructions were insufficient and that their 2017 products led to off-target crop, tree, and plant damage.

## PARTIES

54. Plaintiff Smokey Alley Farm Partnership ("Smokey Alley") grows soybeans in Earle, Arkansas. It farms approximately 4,000 acres, of which 1,400 acres were planted with non-dicamba resistant soybeans.

---

[21] Ex. 22, "Dicamba Movement Prompts Arkansas Shooting," Successful Farming (Oct. 28, 2016) (Downloaded June 29, 2017 from http://www.agriculture.com/news/crops/off-target-dicamba-movement-prompts-arkansas-shooting).
[22] "EPA and States' Collective Efforts Lead to Regulatory Action on Dicamba," EPA News Release, downloaded on Oct. 13, 2017 from https://www.epa.gov/newsreleases/epa-and-states-collective-efforts-lead-regulatory-action-dicamba.
[23] "Restricted Use Products (RUP) Report," from EPA.gov, downloaded Oct. 17, 2017 from https://www.epa.gov/pesticide-worker-safety/restricted-use-products-rup-report.

55. Plaintiff Amore Farms grows soybeans in Marion, Arkansas. It farms approximately 1900 acres of non-dicamba resistant soybeans.

56. Plaintiff JTM Farm grows soybeans in Crittenden County, Arkansas. It farms approximately 3,400 acres of non-dicamba resistant soybeans.

57. Plaintiff Kenneth Loretta Garrett Qualls Farm Partnership and Qualls Land Co. (together, "KLGQ Farm") grows soybeans and peanuts in Craighead County, Arkansas. KLGQ Farm grows approximately 220 acres of non-dicamba resistant soybeans and approximately 680 acres of peanuts.

58. Plaintiff McLemore Farms LLC ("McLemore Farms") grows soybeans in Crittenden County, Arkansas. It farms 1,026 acres of non-dicamba resistant soybeans.

59. Plaintiff Michael Baioni grows soybeans in Marion and Crawfordsville, Arkansas. He grows approximately 400 acres of soybeans.

60. Plaintiff P+E Partners grows soybeans in Marion County, Arkansas, and farms non-dicamba resistant soybeans.

61. Plaintiff Kemp Farms grows soybeans in East Prairie, Missouri. Kemp Farms grows approximately 660 acres of non-dicamba resistant soybeans.

62. Plaintiff Buckskin Farms grows soybeans in Crawfordsville, Arkansas. It farms approximately 1151 acres of non-dicamba resistant soybeans.

63. Plaintiff John P. Baioni Farms grows soybeans in Marion, Arkansas. John P. Baioni Farms grows approximately 725 acres of non-dicamba resistant soybeans.

64. Plaintiff Henry D. and Jeff Finch Farms ("Finch Farms") grows soybeans in Black Oak, Arkansas. It farms approximately 1850 acres of non-dicamba resistant soybeans.

65. Plaintiff H+H Farm Partnership grows soybeans in Earle, Arkansas. H+H Farm Partnership farms approximately 5,000 acres of non-dicamba resistant soybeans.

66. Plaintiff Vincent Farms grows soybeans in Crawfordsville, Arkansas. Vincent Farms grows approximately 4,761 acres of non-dicamba resistant soybeans.

67. Plaintiff Robert Terry Farms grows non-dicamba resistant soybeans and pumpkins in Earle, Arkansas.

68. Plaintiff Morrison Partners grows soybeans in Earle, Arkansas. Morrison Partners farms approximately 4,500 acres of non-dicamba resistant soybeans.

69. Plaintiff Cooper Family Farms Partnership farms non-dicamba resistant soybeans in Wynne, Arkansas.

70. Plaintiff Speiser Farm Inc. farms about 650 acres of non-dicamba resistant soybeans in Witt, Illinois.

71. Plaintiff Robert Delaney farms non-dicamba resistant soybeans in Kendall County, Illinois (in Seward and Lisbon Township).

72. Plaintiff Jerry Stogsdill farms about 250 acres of non-dicamba resistant soybeans in Black Oak and Caraway, Arkansas.

73. Plaintiff Heinco Farms grows approximately 1,700 acres of soybeans in Shickley, Nebraska, the vast majority of which are non-dicamba resistant.

74. Plaintiff Mattis Farms grows approximately 186 acres of non-dicamba resistant soybeans in Martinsville and West York, Illinois.

75. Plaintiff Randy Fendrick grows approximately 350 acres of organic soybeans in David City, Nebraska.

76. Plaintiff LGO Farms Partnership grows approximately 2500 acres of non-dicamba resistant soybeans in Truman, Arkansas.

77. Plaintiff Hunter Tree Farms raises shade trees (maples, oaks, lindens, conifers, birch, and red bud trees) for sale in O'Fallon, Missouri.

78. Plaintiffs Heitmann Farms. Inc. and Heitmann Brothers, LLC (together, "Heitmann Farms") grow approximately 1300 acres of non-dicamba resistant soybeans in Thayer County, Nebraska and Republic County, Kansas.

79. Defendant Monsanto Company is a Delaware corporation with a principle place of business in St. Louis, Missouri. It is a global provider of agricultural products, including seeds, herbicides, and fertilizers. Upon information and belief, the Xtend crop system, VaporGrip and XtendiMax were developed in this district.[24] Upon information and belief, XtendiMax was developed from a BASF product.[25]

80. Defendant BASF Corporation is a company organized and existing under the laws of Delaware, having a business address at 100 Park Avenue, Florham Park, New Jersey. BASF is the largest chemical producer in the world. BASF is authorized to do and does business in Texas and has facilities in Beaumont, Port Arthur, Pasadena, Channelview, Freeport, and Houston, Texas. In the United States, BASF sells its dicamba products through BASF Crop Protection, which is a division of BASF Corporation. Hereinafter, BASF Corporation will be referred to as "BASF".

81. BASF cooperates and joint ventures with Monsanto in research, development and marketing of herbicides and weed control products, including dicamba and the formulations at

---

[24] Inventors of VaporGrip discuss results of discovery at a St. Louis Cardinal's game. See https://www.youtube.com/watch?v=ikTtqOtUQC8 at 1:07-1:49 (Last available Nov. 2, 2017).
[25] *Id.* at 1-26 seconds.

issue in this action. In early 2009, Monsanto collaborated with BASF and agreed to a joint licensing agreement to accelerate the development of dicamba-based weed control products.[26] From this agreement, BASF developed Engenia. Ex. 96 at 137, 138.[27] Upon information and belief, the agreement was entered into in St. Louis, Missouri and BASF and Monsanto engaged in their research to develop and/or use the herbicides at issue in this action in St. Louis, Missouri. As described in this amended complaint, BASF collaborated with Monsanto to develop and release a dangerous crop system[28] that would result in damage to non-target crops, but in doing so, would ensure additional sales to both BASF and Monsanto.

82. On information and belief, Defendant DuPont is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware 19898.

83. On information and belief, Defendant Pioneer is an Iowa corporation with its principal place of business located in Polk County, at 7000 NW 62nd Ave., Johnston, Iowa 50131.

84. DuPont and Pioneer will be referred to collectively as "DuPont."

85. DuPont cooperates and joint ventures with Monsanto in research, development and marketing of herbicides and weed control products, including dicamba. In July 2016, Monsanto and DuPont announced a multi-year dicamba supply agreement for the U.S.[29] DuPont also has licensed a variety of Xtend soybean seeds from Monsanto. Like BASF, DuPont collaborated with

---

[26] Ex. 23, "BASF and Monsanto Formalize Agreement to Develop Dicamba-Based Formulation Technologies," MON Press Release (Jan. 2009) (Downloaded July 14, 2017 from https://monsanto.com/news-releases/basf-and-monsanto-formalize-agreement-to-develop-dicamba-based-formulation-technologies/).

[27] "Monsanto Petitions (10-188-01p and 12-185-01p) for Determinations of Nonregulated Status for Dicamba-Resistant Soybean and Cotton Varieties, Draft Environmental Impact Statement," 2014.

[28] Like Monsanto, BASF refers to the products at issue as a "system." See, e.g. Ex. 73, "BASF investments aid growers and local communities," BASF Press Release (March 2017) (downloaded Oct. 18, 2017 from https://www.basf.com/us/en/company/news-and-media/news-releases/2017/03/P-US-17-024.html) ("Engenia™ herbicide, BASF's newest innovation, is part of a complete weed control system, providing a simple and reliable herbicide option following a residual herbicide.")

[29] Ex. 24, "DuPont and Monsanto Sign Dicamba Supply Agreement" (July 7, 2016 Press Release)(Downloaded July 17, 2017 from http://www.dupont.com/products-and-services/crop-protection/soybean-protection/press-releases/dicamba.html).

Monsanto (as described in this amended complaint) to develop and release a dangerous crop system[30] that would result in damage to non-target crops, but in doing so, would ensure additional sales to both Monsanto and DuPont. Further, DuPont's over-the-top herbicide FeXapan is sold as FeXapan Herbicide *Plus VaporGrip*. VaporGrip is a proprietary technology developed by Monsanto upon information and belief in this district.

## JURISDICTION AND VENUE

86. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332 and supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

87. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Monsanto is headquartered in this district and transacted business in this district relating to the marketing, sales, and dissemination of its Xtend products and its dicamba formulations, including licensing those technologies to Defendants BASF and DuPont. Further, BASF and Monsanto collaborated on creating the relevant dicamba formulations, meaning BASF conducted work on the relevant dicamba formulations in this district.[31] Monsanto and BASF admitted that "[b]oth parties will participate in the development of innovative formulations for dicamba for use with herbicide-resistant cropping systems." Ex. 23. This was an active agreement[32] to develop, "[i]mproved formulations of dicamba…to complement this new combination of herbicide-resistant crops." *Id.* BASF admitted, it was "very excited to actively participate in developing innovative

---

[30] DuPont similarly refers to the products at issue as a "system." Ex. 74, DuPont Technical Information Update downloaded Oct. 18, 2017 from http://www.dupont.com/content/dam/dupont/products-and-services/crop-protection/documents/en_us/cp_PSD-123_K-29267.pdf. ("Weed management system that enables the use of a low-volatility dicamba, such as DuPont FeXapan herbicide plus VaporGrip Technology for cleaner fields at harvest.")
[31] *Id.*
[32] As the Press Release announcing Monsanto and BASF's work to develop the crop system at issue states, "Further details of the agreement were not disclosed." *Id.* In both of their motions to dismiss, neither Monsanto nor BASF produced the agreement. Regardless, it is this agreement that led to the Xtend Crop System and approved dicamba over-the-top formulations which caused the damage at issue in this action. Upon information and belief, BASF employees travelled to St. Louis to develop the products at issue in this action as well.

solutions for this next-generation cropping system for growers." *Id.* Upon information and belief, Monsanto and BASF conducted these activities at Monsanto's campus in this district. Further, BASF has an operation in Palmyra, Missouri (Marion County), in the Northern Division of the Eastern District.[33] It also appears that either DuPont, Pioneer or Pioneer Hi-Bred own and operate a commercial soybean seed production plant in New Madrid, Missouri, also in this district. Upon information and belief, DuPont's Xtend seeds were made, processed, tested or otherwise disseminated from this location.

88. Further, Defendants have and continue to market, sell, and/or otherwise disseminate Xtend products, Engenia and FeXapan in this district.

89. Defendants also upon information and belief derived substantial revenue from goods and products made in, used in, and sold from this district.

## FACTUAL ALLEGATIONS

***Plaintiffs***

***Smokey Alley***

90. Smokey Alley grows soybeans in Earle, Arkansas.

91. On or about June 15, 2017, dicamba damage was initially observed on Smokey Alley's soybeans (e.g., curling of leaves). For the next week, the dicamba damage/curling increased.

92. The dicamba damage was observed on approximately 500 acres.

93. Dicamba damage was still evident during the inspection of Smokey Alley's fields on September 7, 2017, by the agents of Monsanto, BASF, and DuPont.

94. As of this filing, the total dollar value of damage is not known.

---

[33] Ex. 25, BASF Fact Sheet for Hannibal (Palmyra), MO Site (Downloaded June 29, 2017 from https://www.basf.com/documents/us/en/Fact-Sheets/Hannibal-Missouri-SiteFactSheet.pdf).

95. Prior to observed damage, in mid-to-late May, Robert Gammill of Smokey Alley met with an Engenia sales representative. During that meeting the Engenia Sales representative stated Engenia molecules were like "bowling balls" and would not go anywhere as compared to other chemicals molecules that were like "softballs" or "baseballs."

96. Smokey Alley also purchased and planted Xtend soybeans in 2017. Xtend soybeans were planted as a defensive measure because neighbors on two sides of that particular field planted and grew Xtend soybeans in the 2017 season.

***Amore Farms***

97. Amore Farms grows soybeans in Marion, Arkansas.

98. On or about June 26, 2017, dicamba damage was initially observed on Amore Farms soybeans (e.g., curling of leaves, stunted growth).

99. Dicamba damage was observed on 1585 acres of soybeans.

100. Dicamba damage was still evident during the inspection of Amore Farms' fields on September 6, 2017, by the agents of Monsanto, BASF, and DuPont.

101. Due to the dicamba damage, Amore Farms' soybeans grew slower, and required an additional herbicide application.

102. The damaged soybeans were Liberty Link and a Roundup Ready product (without the Xtend trait). Amore Farms utilized the Liberty Link in fields with pigweed problems, while the Roundup Ready product was utilized in fields where there were no pigweed problems (the yield potential was slightly better). However, due to damage by Xtend, next year Amore Farms likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

103. As of this filing, the total dollar value of damage is not known.

***JTM Farm***

104. JTM Farm grows soybeans in Crittenden County, Arkansas.

105. On or about June 15-20, 2017, dicamba damage was initially observed on JTM Farm's soybeans (e.g., curling of leaves and stunted growth).

106. JTM Farm grows 3,400 acres of soybeans, and dicamba damage was observed in all its soybean fields.

107. Dicamba damage was still evident during the inspection of JTM Farm's fields on September 7, 2017, by the agents of Monsanto, BASF, and DuPont.

108. The damaged soybeans were Asgrow and Pioneer products, purchased by JTM Farm in part because it did not need to pay the extra expense for the Xtend trait (e.g., has always been able to control pigweed). However, due to damage by Xtend, next year JTM Farm likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

109. As of this filing, the total dollar value of damage is not known.

***KLGQ Farm***

110. KLGQ Farm grows soybeans and peanuts in Craighead County, Arkansas.

111. On or about June 12-15, 2017, dicamba damage was initially observed on KLGQ Farm's soybeans (e.g., leaf curling, stunted growth).

112. KLGQ Farm grows 220 acres of non-dicamba resistant soybeans, all of which showed dicamba damage. KLGQ farms also planted Xtend soybeans as well.

113. Dicamba damage was still evident during the inspection of KLGQ Farm fields on September 8, 2017, by the agents of Monsanto, BASF, and DuPont.

114. KLGQ Farm grows 680 acres of peanuts. Tissue samples of KLGQ Farm's peanuts showed the presence of dicamba.

115. KLGQ also grows cotton, and this year planted XtendFlex cotton.

116. The damaged soybeans were Roundup Ready 2. KLGQ Farm used these soybeans because they were less expensive but still had high yields. However, due to damage by Xtend, next year KLGQ Farm likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

117. As of this filing, the total dollar value of damage is not known.

***McLemore Farms***

118. McLemore Farms grows soybeans in Crittenden County, Arkansas.

119. On or about May 26, 2017, dicamba damage was initially observed on McLemore's Farms soybeans (e.g., leaf curling, stunted growth). Several trees also showed dicamba damage as well (e.g., leaf curling).

120. Beyond the initial 2017 dicamba damage, McLemore Farms was hit with dicamba several times this year. Each time its soybeans showed dicamba damage.

121. McLemore Farms grows 1,026 acres of soybeans, at least 85% of which showed dicamba damage.

122. Dicamba damage was still evident during the inspection of McLemore Farms' fields on September 7, 2017, by the agents of Monsanto, BASF, and DuPont.

123. As of this filing, the total dollar value of damage is not known.

124. In addition to 2017 damage, McLemore Farms experienced dicamba damage in 2016 to its soybeans.

***Michael Baioni***

125. Michael Baioni grows soybeans in Marion and Crawfordsville, Arkansas.

126. On or about June 10, 2017, dicamba damage was initially observed on Mr. Baioni's soybeans (e.g., leaf curling, stunted growth).

127. Mr. Baioni grows approximately 400 acres of soybeans, all of which showed dicamba damage.

128. Dicamba damage was still evident during the inspection of Michael Baioni's fields on September 6, 2017, by the agents of Monsanto, BASF, and DuPont.

129. Due to their stunted growth, Mr. Baioni had to apply additional rounds of herbicide treatments to his soybeans.

130. As of this filing, the total dollar value of damage is not known.

131. In 2017, Mr. Baioni planted Liberty Link soybeans. Due to the damage by Xtend, next year Mr. Baioni likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***P+E Partners***

132. P+E Partners grows soybeans in Marion, Arkansas.

133. On or about June 2017, dicamba damage was initially observed on P+E Partners' soybeans (e.g., leaf curling, stunted growth).

134. Dicamba damage was still evident during the inspection of P+E Partners' fields on September 6, 2017, by the agents of Monsanto, BASF, and DuPont.

135. P+E Partners grows non-dicamba resistant soybeans, approximately 200 acres of which showed dicamba damage.

136. As of this filing, the total dollar value of damage is not known.

137. Due to the damage by Xtend, next year P+E Partners likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***Kemp Farms***

138. Kemp Farms grows soybeans in East Prairie, Missouri.

139. On or about mid-July 2017, dicamba damage was initially observed on Kemp Farms soybeans (e.g., leaf curling, stunted growth).

140. Kemp Farms grows approximately 660 acres of soybeans, at least 70-80% of which showed dicamba damage.

141. Dicamba damage was still evident during the inspection of Kemp Farms' fields on September 22, 2017, by the agents of Monsanto, BASF, and DuPont.

142. As of this filing, the total dollar value of damage is not known.

143. In 2017, Kemp Farms planted Liberty Link soybeans. Due to the damage by Xtend, next year Kemp Farms likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***Buckskin Farms***

144. Buckskin Farms grows soybeans in Crawfordsville, Arkansas.

145. On or about June 2017, dicamba damage was initially observed on Buckskin Farms soybeans (e.g., leaf curling, stunted growth).

146. Buckskin Farms grows approximately 1151 acres of soybeans, approximately all of which showed dicamba damage.

147. Dicamba damage was still evident during the inspection of Buckskin Farms' fields on September 7, 2017, by the agents of Monsanto, BASF, and DuPont.

148. As of this filing, the total dollar value of damage is not known.

149. In 2017, Buckskin Farms planted conventional Armour 49 C3 soybeans, some of which it saves for the next generation of seed to be planted. The damaged seeds are being tested now to determine viability.

***John P. Baioni Farms***

150. John P. Baioni Farms grows soybeans in Marion, Arkansas.

151. On or about July 2, 10 and 12, 2017, dicamba damage was initially observed on John P. Baioni Farms soybeans (e.g., leaf curling, stunted growth).

152. Dicamba damage was still evident during the inspection of John P. Baioni fields on September 6, 2017, by the agents of Monsanto, BASF, and DuPont.

153. John P. Baioni Farms grows non-dicamba resistant soybeans, approximately 725 acres of which showed dicamba damage.

154. As of this filing, the total dollar value of damage is not known.

155. John P. Baioni Farms also planted 500 acres of Xtend soybeans and 230 acres of XtendiMax cotton.

156. Due to the damage by Xtend, next year John P. Baioni Farms likely will need to purchase and plant additional Xtend seeds to defend against non-target dicamba damage.

***Henry + Jeff Finch Farms***

157. Henry + Jeff Finch Farms grows soybeans in Black Oak, Arkansas.

158. During 2017, dicamba damage was observed on Henry + Jeff Finch Farms soybeans (e.g., leaf curling, stunted growth).

159. Henry + Jeff Finch Farms grows approximately 1850 acres of soybeans, about 700 of which showed dicamba damage.

160. As of this filing, the total dollar value of damage is not known.

161. In 2017, Henry + Jeff Finch Farms planted Pioneer and Asgrow soybeans. Due to the damage by Xtend, next year Henry + Jeff Finch Farms likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***H+H Farm Partnership***

162. H+H Farm Partnership grows soybeans in Earle, Arkansas.

163. On or about June 12, 2017, dicamba damage was initially observed on H+H Farm Partnership's soybeans (e.g., leaf curling, stunted growth).

164. H+H Farm Partnership grows non-dicamba resistant soybeans, about 5,000 acres of which showed dicamba damage.

165. Dicamba damage was still evident during the inspection of H+H Farm Partnership's fields on September 6, 2017, by the agents of Monsanto, BASF, and DuPont.

166. Due to the damage sustained, H+H Farm Partnership had to replant approximately 130 acres.

167. As of this filing, the total dollar value of damage is not known.

168. In 2017, H+H Farm Partnership planted Roundup Ready soybeans. Due to the damage by Xtend, next year H+H Farm Partnership likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***Vincent Farms***

169. Vincent Farms grows soybeans in Crawfordsville, Arkansas.

170. On or about June 2017, dicamba damage was initially observed on Vincent Farms soybeans (e.g., leaf curling, stunted growth).

171. Vincent Farms grows approximately 4,761 acres of soybeans, about at least 2,000 of which showed dicamba damage.

172. As of this filing, the total dollar value of damage is not known.

173. Due to the damage by Xtend, next year Vincent Farms likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***Robert Terry Farms***

174. Robert Terry Farms grows soybeans in Earle, Arkansas.

175. On or about June 20, 2017, dicamba damage was initially observed on Robert Terry Farms soybeans (e.g., leaf curling, stunted growth).

176. After dicamba damage was observed, Robert Terry Farms applied Liberty (32 oz. acre twice) and Intensity (16 oz. acre twice) to the damaged soybeans to compensate for the dicamba damage.

177. Robert Terry Farms grows approximately 1200 acres of non-dicamba resistant soybeans, of which approximately 900 acres showed dicamba damage.

178. As of this filing, the total dollar value of damage is not known.

179. In 2017, Robert Terry Farms planted Liberty Link soybeans. Due to the damage by Xtend, next year Robert Terry Farms likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

180. Robert Terry Farms also grows roughly a tennis-sized court patch of pumpkins which also suffered dicamba damage.

***Morrison Partners***

181. Morrison Partners grows soybeans in Earle, Arkansas.

182. On or about mid-June 2017, dicamba damage was initially observed on Morrison Partners soybeans (e.g., leaf curling, stunted growth).

183. Morrison Partners grows approximately 4500 acres of soybeans, about 4000 of which showed dicamba damage.

184. Dicamba damage was still evident during the inspection of Morrison Partners' fields on September 6, 2017, by the agents of Monsanto, BASF, and DuPont.

185. As of this filing, the total dollar value of damage is not known.

186. In 2017, Morrison Partners planted Liberty Link and Roundup Ready soybeans. Due to the damage by Xtend, next year Morrison Partners likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***Cooper Family Farms***

187. Cooper Family Farms grows soybeans in Wynne, Arkansas.

188. On or about June 15, 2017, dicamba damage was initially observed on Cooper Family Farms' soybeans (e.g., leaf curling, stunted growth).

189. Cooper Family Farms grows approximately 1800 acres of soybeans all of which showed dicamba damage.

190. As of this filing, the total dollar value of damage is not known.

191. In 2017, Cooper Family Farms planted Liberty Link soybeans. Due to the damage by Xtend, next year Cooper Family Farms likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***Speiser Farm Inc.***

192. Speiser Farm Inc. grows soybeans in Witt, Illinois.

193. On or about July 15-20, 2017, dicamba damage was initially observed on Speiser Farm Inc. soybeans (e.g., leaf curling, stunted growth).

194. Speiser Farm Inc. grows approximately 650 acres of soybeans, some of which showed dicamba damage.

195. As of this filing, the total dollar value of damage is not known.

196. In 2017, Speiser Farm Inc. planted Golden Harvest soybeans and a few test acres of Xtend. Due to the dicamba damage to his Golden Harvest soybeans, Speiser Farm Inc.

purchased approximately 60% dicamba seeds to defend against 2018 non-target dicamba damage.

***Robert Delaney***

197. Robert Delaney grows soybeans in Kendall County, Illinois (in Seward and Lisbon Township).

198. On or about mid-late June 2017, dicamba damage was initially observed on Robert Delaney's soybeans (e.g., leaf curling, stunted growth).

199. Robert Delaney grows approximately 151 acres of soybeans, about 77 of which showed dicamba damage.

200. As of this filing, the total dollar value of damage is not known.

201. In 2017, Robert Delaney planted a Becks Hybrid soybean (Roundup Ready). Due to the damage by Xtend, Robert Delaney already placed orders for Xtend seed for 2018 to defend against a repeat of non-target dicamba damage.

***Jerry Stogsdill***

202. Jerry Stogsdill grows soybeans in Black Oak and Caraway, Arkansas.

203. On or about May 15 to June 1, 2017, dicamba damage was initially observed on Jerry Stogsdill's soybeans (e.g., leaf curling, stunted growth).

204. Jerry Stogsdill grows approximately 250 acres of soybeans, about all of which showed dicamba damage.

205. As of this filing, the total dollar value of damage is not known.

206. In 2017, Jerry Stogsdill planted Asgrow soybeans. Due to the damage by Xtend, next year Jerry Stogsdill likely will need to purchase Xtend seeds to defend against non-target dicamba damage.

***Heinco Farms***

207. Heinco Farms grows soybeans in Shickley, Nebraska.

208. On or about July 4, 2017, dicamba damage was initially observed on Heinco Farms' soybeans (e.g., leaf curling, stunted growth).

209. Heinco Farms grows approximately 1740 acres of soybeans, most of which are RoundUp Ready 2 soybeans. Heinco purchased these seeds because it enjoyed success with them previously and they were less expensive than Xtend. Heinco also planted a small amount of Xtend soybeans in 2017. Heinco Farms' Roundup Ready 2 soybeans showed dicamba damage.

210. As of this filing, the total dollar value of damage is not known.

***Mattis Farms***

211. Mattis Farms grows soybeans in Martinsville and West York, Illinois.

212. On or about July 15, 2017, dicamba damage was initially observed on Mattis Farms' soybeans (e.g., leaf curling, stunted growth).

213. The dicamba damage caused a loss of canopy, requiring multiple trips by hand to weed the fields.

214. Mattis Farms grows approximately 186 acres of soybeans, 48 acres of which are seed beans for Syngenta and 138 acres of which are seed beans for Pioneer. Currently, they are being tested for viability.

215. As of this filing, the total dollar value of damage is not known.

***Randy Fendrick***

216. Randy Fendrick grows organic soybeans, corn, peas and alfalfa in David City, Nebraska.

217. On or about July 15-20, 2017, dicamba damage was initially observed on Randy Fendrick's soybeans (e.g., leaf curling, stunted growth, pod loss).

218. Randy Fendrick grows approximately 350 acres of organic soybeans, approximately of which 40-80 acres of which were damaged.

219. As of this filing, the total dollar value of damage is not known.

220. Randy Fendrick is a 100% organic farmer, and therefore cannot use GMO seeds or chemicals in 2018. Given there are no dicamba-resistant, organic soybeans, his crops are especially susceptible to dicamba.

***LGO Farms Partnership***

221. LGO Farms Partnership ("LGO Farms") grows soybeans in Truman, Arkansas.

222. LGO Farms grows non-dicamba resistant soybeans, of which approximately 2500 acres were damaged by dicamba.

223. On or about June 2, dicamba damage was initially observed on LGO Farms soybeans (e.g., leaf curling, stunted growth).

224. As of this filing, the total dollar value of damage is not known.

***Hunter Tree Farms***

225. Hunter Tree Farms raises shade trees for sale in O'Fallon, Missouri. Hunter Tree Farms raise trees such as maples, oaks, lindens, conifers, birch, and red bud trees. These trees were chosen because they are in high demand and chosen by municipalities to replace ash trees.

226. Hunter Tree Farms estimates it has approximately 3,000 trees damaged by dicamba in 2016 and 2017.

227. On or about the first week of July 2016 and 2017, dicamba damage was initially observed on Hunter Tree Farm trees. Damage included leaf damage and stunted growth.

228. 2018 was supposed to be Hunter Tree Farms grand opening. Due to the dicamba damage and effect on the trees' growth, a 2018 grand opening is now doubtful.

229. As of this filing, the total dollar value of damage is not known.

***<u>Heitmann Farms</u>***

230. Heitmann Farms grows soybeans in Thayer County, Nebraska and Republic County, Kansas, with fields on either side of the state line.

231. Heitmann Farms grows approximately 1300 acres of soybeans, all of which are RoundUp Ready 2 soybeans.

232. On or about late June 2017, dicamba damage was initially observed on Heitmann Farms' soybeans (e.g., leaf curling, stunted growth). Due to their location on the border, upon information and belief some of the dicamba that damaged Heitmann Farms' fields drifted from across the state line.

233. Dicamba damage was also observed on Heitmann Farms' potato plants, rose bushes, trees, and ornamentals.

234. Due to the damage suffered, Heitmann Farms will likely purchase Xtend seeds for 2018, though it would rather plant Roundup Ready 2 again.

235. As of this filing, the total dollar value of damage is not known.

***The Herbicide Dicamba***

236. Dicamba is not a new herbicide; it was first registered in 1967.

237. As an herbicide, dicamba works by increasing plant growth rate. Once sufficient concentration is reached, the target plant grows in abnormal and uncontrollable ways, eventually outgrowing its nutrient supplies. It essentially grows itself to death.

238. Symptoms of dicamba application can include cupping, twisting, stunting and yield loss. Damage also can carry over into the next generation of seed that can produce symptoms in its progeny.

239. Dicamba is a potent herbicide capable of killing difficult weeds such as pigweed, some of which is glyphosate (Roundup) tolerant.

240. Soybeans are especially vulnerable to dicamba, responding negatively to much lower concentrations of dicamba than most other plants.

241. When it comes to people, dicamba is moderately toxic by ingestion and slightly toxic by inhalation or dermal exposure.

242. Dicamba is mobile, and can spread across a large area, including unintended areas and fields.

243. Due to its high mobility, dicamba can reach non-target plants via field/site runoff, spray drift during application, by vapor drift from volatilization, by blowing dust and through temperature inversion drift. The types of damage to non-target crops and plants most relevant to this action (spray drift, volatilization, and temperature inversion), and damage caused by each type, are often distinguishable from the others.

244. Non-target damage caused by physical/spray drift of dicamba has a specific, identifiable signature.

> Spray particle drift has a telling pattern, which most anyone in the industry has observed at one time or another for various herbicides. The dosage and symptoms in an adjacent sensitive crop are greatest closest to the treated field, due to the highest frequency of larger spray droplets settling out fairly rapidly. For this reason, one indicator of spray particle drift is herbicide symptomology on weeds growing along an adjacent roadside or in a fencerow between the two fields. The injury then tapers off with distance from the treated area as a decreasing number of smaller droplets continues to settle out, until the point where no injury occurs due to insufficient number of droplets and dosage to cause injury.

Ex. 26.[34] Drift leads to concentrated damage to neighboring non-target crops and plants, and less concentrated damage the further from the sprayed field. As can be seen in the photograph below, the damage caused to the field on the left is likely caused by physical drift as the damage is more concentrated by the road, but then lessens as it moves into the field.



Ex. 5. With physical drift, most times it is possible to see where the dicamba was sprayed, or at a minimum, determine the direction where the drift arose.

245. Volatilization occurs when a liquid or solid changes into a vapor after spraying. Non-target damage due to volatilization occurs when an herbicide, after it hits the target, dries, then minutes to hours later, lifts off the target as a gas. Wind then allows for the dispersal of the herbicide gas to non-target fields.

246. Temperature inversion drift differs from volatilization in that both volatilized dicamba (as a gas) and physical droplets of dicamba travel in an "inversion layer." This occurs

[34] "It's Beginning to Look a lot Like – Off-Target Dicamba Movement – Our Favorite Time of the Year!" Ohio State University Extension (2017) (Downloaded July 14, 2017 from https://agcrops.osu.edu/newsletter/corn-newsletter/2017-21/it%E2%80%99s-beginning-look-lot-%E2%80%93-target-dicamba-movement-%E2%80%93-our-favorite)

because vapors and fine droplets of dicamba hang in cold air. Typically during summer days, it is warmer at the soil level, and cooler as altitude increases.[35] When a temperature inversion occurs, temperatures are cooler at the soil line. This allows for vapors and fines to hang in the air for hours. When the temperature inverts (warmer air occurring again at ground level, and colder at higher altitudes), the vapors and fines travel upwards with the inversion layer. When this happens, breezes, even a light breeze (a few miles an hour) will allow the fines to travel *en masse*, sometimes miles. When an inversion occurs again (warmer temperatures at ground level than in the air), the vapors and fines *en masse* drop onto fields below.

247. Damage caused by temperature inversion results in widespread and uniform damage.

248. Also, because temperature inversions can cause damage miles away from the source, it is sometimes impossible to determine the field from which the herbicide was sprayed.

249. The results are like the detonation of a dicamba bomb. All fields at the same growth stage will be affected in the same manner, even where dicamba was not sprayed for several miles.

250. Further, a field from a single dicamba spraying can generate vapor for multiple days, leading to multiple temperature inversions, allowing for damage to non-target crops and plants day-after-day, multiple times. As experts such as the University of Tennessee's Larry Steckel have stated, multiple hits will result in increased yield loss.

> Fields that got hit early with light doses of herbicide may not have yield losses. "However, these fields that got hit multiple times are struggling. Some of them aren't boot-top tall and they were planted May 1. They are likely going to have some significant yield loss."

Ex. 19.

---

[35] An easy to understand explanation is provided in Dr. Larry Steckel's video "Dicamba Volatility or Inversion? Do You Know the Difference?" at http://agfaxweedsolutions.com/2017/07/07/dicamba-volatility-temperature-inversion-know-difference-video/?utm_content=buffer0f424&utm_medium=social&utm_source=twitter.com&utm_campaign=buffer .

251. Due to its volatility, dicamba has primarily been used as a pasture herbicide and for vegetation burn down prior to planting in soybean, cotton, and other crops. Prior to Nov. 2016, dicamba was registered for use on pre-plant and post-harvest soybeans and on pre-plant and post-harvest cotton. It was not approved for post-emergent spraying.

252. On April 28, 2010 and July 30, 2012, Monsanto filed applications to register new uses of dicamba on genetically-modified, dicamba-tolerant soybeans and cotton. Monsanto's proposed new use focused on adding post-emergence/over-the-top applications to dicamba-tolerant soybeans and cotton.

253. In 2012, experts questioned Monsanto's plan to utilize dicamba for over-the-top application on resistant crops. For example, a posting from Diane Brown from the Michigan State University Extension, interviewing David Mortenson, a professor of weed ecology from Penn State, stated that non-target crop and plant damage due to dicamba was 75 times greater than for glyphosate.

> "What is [more] troubling is that 2,4-D and dicamba are older and less environmentally friendly [than glyphosate]." Vapor drift of more toxic herbicides has been implicated in many incidents of crop injury and may have additional impacts on natural vegetation interspersed in agricultural landscapes, Mortensen stated. Scientists have documented that non-target terrestrial plant injury was 75 to 400 times higher for dicamba and 2,4-D, respectively, than for glyphosate.

Ex. 27.[36]

254. When considering whether to approve dicamba for use over-the-top of Xtend soybean crops, Monsanto convinced the EPA that spray drift exposure was the principal risk issue.

> Without consideration of mitigation measures on the approved label, the agency considers spray drift exposure to be the principal risk issue to be considered with these

[36] "2,4-D and dicamba-resistant crops and their implications for susceptible non-target crops," Michigan State University Extension (Nov. 2013) (Downloaded July 14, 2017 from http://agfaxweedsolutions.com/2017/07/07/dicamba-volatility-temperature-inversion-know-difference-video/?utm_content=buffer0f424&utm_medium=social&utm_source=twitter.com&utm_campaign=buf).

> new uses, owing to a variety of lines of evidence, including past experience with other dicamba formulations.

Ex. 28.[37]

255. Due to dicamba's motility, it took until Nov. 2016 for the EPA to approve over-the-top application of certain formulations of dicamba for soybeans and cotton. *Id.*

256. After EPA approval numerous states, including Illinois, Nebraska, Kansas, and Missouri, approved the use of Engenia, FeXapan and XtendiMax for over-the-top applications on Xtend crops. Defendants manufactured, distributed, and sold Xtend seeds and Engenia, FeXapan and XtendiMax in those states, including Illinois, Nebraska, Kansas, and Missouri.

257. Arkansas, however, especially hard hit by dicamba damage in 2016, was skeptical of the safety of Monsanto's over-the-top dicamba formulations. It did not approve the use of Monsanto's XtendiMax dicamba formulations for 2017. It only approved BASF's Engenia, which was sold in Arkansas in 2017. Regardless, as part of its "crop system," Monsanto sold Xtend seeds in Arkansas in 2017, explicitly linking its Xtend seeds to Engenia as the only-available, over-the-top dicamba formulation. Further, Monsanto sold XtendiMax in states that neighbor Arkansas (e.g., Tennessee and Missouri). As discussed in this amended complaint, the volatility of XtendiMax, Engenia and FeXapan would have allowed Defendants' dicamba formulations to drift, sometimes for miles. Thus, while XtendiMax and FeXapan were not sold in Arkansas, because they were sold and used in states that border Arkansas (along with Engenia), volatility and temperature inversions from Defendants' herbicides would have caused damage to Arkansas crops, trees, and plants, especially in those counties (e.g., Crittenden, Marion, and Craighead) that border these states.

---

[37] "Final Registration of Dicamba on Dicamba-Tolerant Cotton and Soybean," EPA, Jack E. Housenger (Nov. 9, 2016).

***Monsanto's Xtend Product Line***

258. Monsanto's Xtend products can be thought of as the latest version of its Roundup Ready seeds, which can trace its history to the 1970s.

259. In 1974, Monsanto brought a glyphosate herbicide to the market, and marketed it as "Roundup."

260. As an herbicide, Roundup was a popular-selling product. It was especially profitable for Monsanto because it was protected under patents until 2000 (when the final glyphosate patent expired). During that time, Roundup earned Monsanto billions of dollars.

261. Even after its patents lapsed, glyphosate enjoyed continued popularity because, starting in 1996, Monsanto released GMO crops that were resistant to glyphosate. Marketed as "Roundup Ready," these crops allowed farmers the ability to spray the glyphosate herbicide over-the-top of growing Roundup Ready crops. In this manner, the glyphosate herbicide would kill other plants and weeds, while not hurting the Roundup Ready glyphosate resistant crops. Its use led to almost weed-free, clean fields containing just the desired Roundup Ready crops.

262. As the years have passed, certain glyphosate tolerant weeds proliferated. Because spraying glyphosate on such weeds was no longer effective, farmers needed to engage in additional practices for weed control.

263. To combat glyphosate tolerant weeds, Monsanto worked on what would become its Xtend platform. Monsanto's goal was to create crops not only resistant to glyphosate, but also resistant to dicamba. This would create a GMO crop resistant to a glyphosate/dicamba herbicide cocktail which, in theory, would allow glyphosate and dicamba to work together to kill additional weeds (even those that had evolved a resistance to glyphosate) while leaving the Xtend crops unharmed.

264. As Monsanto acknowledged in its marketing materials, the Xtend products in combination with dicamba created a "crop system."[38] In other words, Xtend and approved, over-the-top formulations of dicamba should be considered as products necessarily used together to achieve their full benefits.

***Monsanto's Unflinching March to Release***

265. In 2012, Monsanto unveiled its Roundup Ready® Xtend Crop System.

266. Monsanto's initial position on the Xtend technologies was that release would not occur until "regulatory approval" was obtained for the use of dicamba over-the-top. As stated by Chief Technology Officer Robert Fraley:

> The Roundup Ready® Xtend Crop System is intended to offer more consistent, flexible control of weeds, especially tough-to-manage and glyphosate-resistant weeds, Fraley noted, adding that the system is on track for Ground Breakers(SM) on-farm field trials under permit next season and introduction to U.S. soybean farmers in 2014, *pending regulatory approval*.

Ex. 6 (emphasis added).

267. Monsanto's delaying release until regulatory approval would have been responsible and necessary. If Xtend products were released prior to EPA approval of over-the-top dicamba formulations, application of the then available dicamba formulations on Xtend crops would necessarily lead to non-target crop and plant damage. This is why, at least initially, Monsanto indicated it would withhold Xtend products from the market until over-the-top formulations were approved—to eliminate the chance of non-target damage to crops and plants.

[38] Ex. 29, "Next Level Weed Control is Here, Welcome to Your Source for the Latest Information on the Roundup Ready® Xtend Crop System," (Downloaded June 9, 2017 from https://www.roundupreadyxtend.com/Pages/default.aspx).

268. At least as early as 2013, Monsanto marketed the Xtend soybean product lines' resistance to dicamba to farmers with its "Follow-a-Field" initiative. This marketing scheme followed three commercial-scale Xtend soybean fields "from burndown through harvest as part of the Monsanto Ground Breakers® Field Trials Under Permit program." Ex. 30.[39]

> "The Follow-A-Field program will showcase three farmers who will tell the story of how the system works on their farm. These farmers will share their own experience with the system and application requirements, as well as show the advantages of incorporating dicamba into their weed control plans." says Michelle Vigna, Monsanto Roundup Ready Xtend launch manager

*Id.* The Follow-a-Field initiative targeted farmers and focused on the benefits of over-the-top applications of dicamba.

> The Follow-A-Field program will showcase the components of Roundup Ready 2 Xtend soybeans and local Roundup Ready PLUS recommendations that incorporate a new mode of action, dicamba. Visitors viewing the program online will get a full preview of the weed control technology – management practices, seed traits, farmer perspectives and more. The initiative will demonstrate the Roundup Ready Xtend™ Crop System application requirements, local Roundup Ready PLUS® recommendations, and the efficacy and crop safety of dicamba and glyphosate as an integral part of a diversified weed management program.

*Id.*

269. The purpose of Monsanto's Follow-a-Field marketing scheme was to advertise the benefits of dicamba resistance, so that once released, farmers would be enticed to purchase Xtend products.

270. When it came to its XtendFlex cotton, Monsanto's waiting for "regulatory approval" stance quickly changed. On or about January 2015, Monsanto announced a "limited

---

[39] "Monsanto Announces 'Follow-A-Field Initiative to Educate Growers on the Roundup Ready 2 Xtend™ Soybeans," Mon Press Release (Aug. 27, 2013) (Downloaded July 14, 2017 from http://news.monsanto.com/news/follow-field/monsanto-announces-follow-field-initiative-educate-growers-roundup-ready-2-xtend-s)

introduction" of Xtend cotton for the 2015 planting season. Ex. 31.[40] This "limited" release targeted half a million acres despite still lacking dicamba approval for over-the-top applications.

271. Upon information and belief, Monsanto wanted to test the water to see what type of repercussions would occur when there was off-target dicamba damage due to its product. A "limited" release of XtendFlex cotton presented the perfect opportunity for this test.

272. In discussing this early and "limited" release during Monsanto's Second Quarter 2015 Results-Earnings Conference Call, Brett Begemann, Monsanto's Chief Operating Officer, explained Xtend cotton was not yet approved for over-the-top application.

> We announced our pricing of $6 an acre for the added value from flexible, improved weed control along with a full XtendFlex chemistry rebate to reflect that growers are unable to use dicamba over-the-top as we await final regulatory approvals.

Ex. 32 at 8.[41]

273. At the time, it was Monsanto's public position that a "rebate" and warnings to farmers to not use dicamba for over-the-top applications on XtendFlex cotton would be sufficient to deter improper dicamba use. Monsanto CFO Pierre Courduroux, reiterated this sentiment during the same conference call:

> I would point you to we did price the XtendFlex cotton in the south at $6, but we also extended a rebate to farmers because they won't have the opportunity to use dicamba this year, but they will get the opportunity to use two herbicide modes of action with glufosinate.

*Id.* at 17.

---

[40] "Bollgard II® XtendFlex TM Cotton Expected On Over 500,000 Acres," Monsanto Press Release (Jan. 2015). (Downloaded July 14, 2017 from http://news.monsanto.com/press-release/products/bollgard-ii-xtendflex-tm-cotton-expected-over-500000-acres).

[41] MON's Q2 2015 Results – Earnings Call Transcript, (Downloaded July 14, 2017 from http://seekingalpha.com/article/3045726-monsantos-mon-ceo-hugh-grant-on-q2-2015-results-earnings-call-transcript).

274. While publicly stating it was hoping farmers would not use dicamba on XtendFlex, it appears Monsanto nonetheless allowed its seed representatives to encourage off-label, dicamba usage.

275. Before the Arkansas Plant Board, a 2015 purchaser of XtendFlex Cotton testified that Monsanto seed representatives told him how he could spray dicamba over-the-top of his Xtend crops, even when it was illegal to do so, because approval was imminent.

> MS. NICHOLS: The Committee asked that you come in or required that he come in. I think they have some questions as to why they considered this a grievous and they wanted to know -- from what I understand, *why this application was made at this rate.*
> MR. HOWE: Exactly right.
> MR. MASTERS: *Well, you think I just grabbed it out of the air? You think the boy that just left here just grabbed those figures out of the air and did it. Somebody told him to, right?*
> MR. FINCH: *Who told you to?*
> MR. MASTERS: *You know who did. I'm not going to say it.*
> MR. FINCH: *Monsanto?*
> MR. MASTERS: *A few words may incriminate myself. Why sure.*
> MR. FINCH: *So, Monsanto told you to spray this Strut* --
> MR. MASTERS: Well --
> MR. FINCH: -- *directly over the top and it wouldn't hurt a thing?*
> MR. MASTERS: *Right. And the cotton is developed and it didn't hurt the cotton one dab, but they told us it would be legal, but you know it's not legal. Now, this is January of '15 that it's not legal right now, but it will be by May at the latest.* So, we planted it, we sprayed it, then everybody commenced to saying, "Oh, it's not legal no more. It's not legal." Well, it -- I'm just like the rest of you. I didn't read the writing. Dicamba, I've used it on corn. Clarity, which is a more refined Dicamba that's some of the other. There's two formulations of Dicamba. One, the salts in them are a little different. And I can't remember exactly what they were, but Clarity is the one that's a little more better to spray over cotton than the other cheaper variety is.
> MR. FINCH: *But who's your rep?*
> MR. MASTERS: *I'm not going to say, because he was just doing what somebody told him.*

Ex. 10 at 10-12 (emphasis added).

> MR. FINCH: Would you have planted this – would you have bought this cotton had you known that Montsanto [sic] would come in or EPA might come in and destroy that crop because you did an off label application? Would you have planted that crop?

> MR. MASTERS: No. And I wouldn't have planted that crop if they hadn't told me that it would probably be -- in other words, they pretty well assured me that in '15, that before May, that it would be legal. You could spray over the top of it and be just fine.

*Id.* at 17-18. Monsanto's duplicitous stance led to off-label spraying of dicamba, and damage to 2015 crops and plants.[42] *See, e.g.,* Ex. 9, 10.

276. Contrary to its position on XtendFlex cotton, at least to the outside world, Monsanto continued its "waiting for regulatory approval" approach for Xtend soybeans. In the April 1, Q2 2015 earning conference call, Monsanto COO Begemann stated:

> Preparations for a record trade launch of Roundup Ready 2 Xtend soybeans continued *as we await final regulatory approvals* and secure seed production acres for what we expect to be a greater than 3 million acre launch in 2016 and available in more than 60 varieties, as shown on Slide 13.

Ex. 32 at 7-8 (emphasis added).[43]

277. Monsanto CFO Courduroux also reiterated Monsanto's bullish opinion of Xtend soybeans:

> Our core share footprint has grown in the southern hemisphere this season, and Roundup Ready 2 Xtend soybeans *continue to meet the milestones necessary to propel it forward for what is now expected to be a more than 3 million acre launch in 2016*.

*Id.* at 9 (emphasis added). The "milestones" Courduroux referred to were regulatory approvals, including EPA approval of over-the-top application of dicamba.

278. Even in May 2015, it appeared publicly that Monsanto intended to act responsibly with its Xtend soybean products consistent with its 2012 statements. In a presentation at the Wells Fargo Industrial & Construction Conference, Michael Frank, Vice President of Global

---

[42] Any instructions, notices, or even warnings, if such existed, that accompanied Monsanto's products in 2015 to present were negated by its representatives providing information to its customers such as application rate of generic, older dicamba formulations for over-the-top application on Xtend seeds.

[43] MON (Downloaded July 14, 2017 from: http://seekingalpha.com/article/3045726-monsantos-mon-ceo-hugh-grant-on-q2-2015-results-earnings-call-transcript).

Commercial at Monsanto, indicated Xtend soybeans were "ON TRACK FOR 2016 LAUNCH," but were still "Awaiting EPA approval for in-crop use" of dicamba.




Ex. 33, p. 11.[44]

279. Further, on December 2, 2015, at the 2015 Citi Basic Materials Conference, a slide presented by Dr. Robb Fraley, Monsanto Chief Technology Officer, again stated the Xtend soybean system was "[o]n track for 2016 launch" it was just "[a]waiting EPA approval for in-crop use."

[44] Michael J. Frank Presentation, Wells Fargo Industrial & Construction Conference (May 6, 2015).




Ex. 34, p.13.

280. Despite these reassurances, there were hints that Monsanto might be paying lip service to EPA regulatory approval. In the Q3, 2015 conference of June 2015, during a question and answer period, Hugh Grant, Chief Executive Officer of Monsanto, was questioned about the "pretty sizeable investments" of the Xtend system opportunities for the future.

> **Don Carson**
> Yes, thank you. Hugh a question on your Dicamba investments, pretty sizable investments, you talked about getting a reasonable return on investment, is that return on investment based on just the chemistry itself or is that considering the roughly $6 fee you're going to get on Xtend, so just wondering how big an opportunity Dicamba as a chemistry can be for you going forward?
>
> **Hugh Grant**
> Yes, thanks for the question Don. I think it's going to be substantial. It is, we said 200 million plus, I wish we had that, today there is tremendous demand out there. As we run the mass from this we looked at both, we looked at the return based on the plan alone and then also the platform opportunity when you enable 200 million plus acres, but Pierre maybe a few more inputs.

Ex. 35 at 16.[45] This shows concerns over wanting to monetize Monsanto's investments in its Xtend products was mounting.

281. Further, Grant was asked, "On the dicamba side I thought that we were still waiting for regulatory approval on the in crop use, is there any update there," to which he answered Monsanto was "optimistic" on the timing of approvals. *Id.* at 29.

282. Monsanto dropped its outward appearance of waiting for EPA approval on or about late summer or early fall 2015. In Monsanto's October 7, 2015 Q4 conference call, Monsanto COO Begemann explained the plan:

> We recently rolled pricing and are now planning for a launch that includes more than 70 unique soybean varieties across our branded and licensed footprint. Based on the value creation demonstrated, we have priced the new Xtend varieties at roughly $5 to $10 per acre premium over Roundup Ready 2 Yield varieties. This level of incremental value creation continues to reinforce Xtend as one of the leading core business growth drivers. *Given the overwhelming demand from farmers, dealers and licensees, we've implemented a pre-order reservation process in advance of the final regulatory milestones and based on current tracking, we expect the seed to be fully reserved by early December*.

Ex. 36 at 9 (emphasis added).[46]

283. Publicly citing to "overwhelming demand," Monsanto announced that, regardless as to whether the EPA approved its products, it would begin the process of selling Xtend soybeans.

284. The real reason for Monsanto's premature release was not "overwhelming demand," it was because the process of growing sufficient soybean seeds to sell must be committed to at least one year in advance. Soybean seeds to be sold in 2016, must come from a 2015 crop. Soybean seeds to be sold in a major release in 2016, required a larger 2015 crop. So,

---

[45] MON Q3 2015 Results – Earnings Call Transcript (Downloaded July 14, 2017 from http://seekingalpha.com/article/3282135-monsantos-mon-ceo-hugh-grant-on-q3-2015-results-earnings-call-transcript).

[46] MON Q4 2015 Results – Earnings Conference Call Transcript (Downloaded July 14, 2017 from: http://seekingalpha.com/article/3557566-monsantos-mon-ceo-hugh-grant-q4-2015-results-earnings-call-transcript).

statements made in October 2015 were made after the crops for Monsanto's 2016 release were grown. Therefore, despite outward appearances, months before, Monsanto gambled on a what it hoped was an imminent EPA registration, but was committed to the major release nonetheless.

285. This shows Monsanto's arrogance. In its mind, the EPA registration process was a foregone conclusion; it was an annoying delay before Monsanto could start making money. Monsanto's actions show it never considered outright rejection of its over-the-top formulations was possible. And as discussed in this amended complaint, is likely why Monsanto did not allow universities to run independent volatility tests on its products. Such tests would slow the process more, or, because the 2017, independent test-results show volatility of over-the-top dicamba formulations, result in a rejection.

286. CFO Courduroux provided Monsanto's actual reasoning for its premature release: greed.

> In North America, the excitement for the Roundup Ready 2 Xtend launch continues to grow as we target more than 3 million acres with the new Xtend varieties priced at $5 to $10 per acre premium.

*Id.* at 12.

287. The price for Monsanto to overlook its responsibilities was apparently a $5 to $10 premium per acre for 3 million acres; a potential initial earning of $15 to $30 million.

288. But this was just the beginning. Monsanto's focus was not on just the initial release, but the yearly "incremental" increase in demand. As the slide presentation for the Q4 conference call stated, the "Roundup Ready Xtend Crop System penetration [is] expected to create >250M acres of incremental demand." Ex. 37 at 16.[47]

---

[47] MON Fiscal Year 2015 Results and Fiscal Year 2016 Outlook (Oct. 7, 2015).

289. At a $5 to $10 premium, this would potentially earn Monsanto $1.25 to $2.5 billion more a year.

290. Monsanto's premature release would ensure the "incremental" demand increase would begin sooner, so that it could maximize profits earlier.

291. During the same conference call, it appears from the transcript that Hugh Grant side-stepped answering a question about EPA approval:

> And then on the EPA side, we continue to hear it's progressing through that process. But I don't know if -- so I guess that's all we can say on that at the moment.

Ex. 36 at 26.

292. Outside of the conference call, and in the fields, XtendFlex cotton season was proceeding, and reports of dicamba abuse leading to drift and damage to non-target/neighboring crops surfaced. *See, e.g.,* Ex. 9, 10. Some of this damage was caused by Monsanto seed representatives encouraging spraying dicamba over-the-top of the XtendFlex cotton. Ex. 10 at 10-12, 17-18.

293. Undaunted by the damage caused by off-label dicamba usage, and still lacking EPA approval, Monsanto continued with its December reservation process for Xtend soybeans, as well as a second-year release of XtendFlex cotton.

294. On January 6, 2016, in the Q1 conference call, Fraley repeated the motivations for not acting responsibly were financial when he called the Xtend product line a "$1 billion plus blockbuster product." Ex. 38 at 10.[48]

295. With pressures circling over a major release without EPA approval, in the same Q1 2016 phone call, Hugh Grant attempted to justify the release, characterizing EPA approval as

[48] Q1 2016 Results - Earnings Call Transcript (Downloaded July 14, 2017 from http://seekingalpha.com/article/3794576-monsanto-companys-mon-ceo-hugh-grant-q1-2016-results-earnings-call-transcript).

"imminent," and implying farmers would have access to over-the-top application of dicamba this planting season. *Id.* at 24.

296. Grant's "imminent" statement was misleading, or at a minimum, confusing to potential purchasers of Monsanto's Xtend products.

297. Grant, also in Q1 2016, emphasized that this was a product that farmers "really, really need and frankly they are tired of waiting." *Id.* at 24. The release, however, shows it was Monsanto that was "frankly…tired of waiting" for the EPA.

298. In the 2016 Q1 call, Monsanto COO Begemann was asked whether, like with cotton, Monsanto would offer a rebate for basically the unusable dicamba resistance. In response, Begemann stated:

> That's the way we would look at it. And the whole approach behind that is getting the farmers comfortable with the varieties and buying new varieties and I missed that in your earlier question. Yes, if we have the opportunity to get some out there whether they used the whole system or not it will make for a bigger launch next year than this year. So it definitely benefits us and the farmer to get that experience with the new varieties.

*Id.* at 25.

299. On April 6, 2016, Monsanto continued to mislead and confuse Xtend customers with its "imminent" EPA approval theme, though it pared it down to only *one* dicamba formulation:

> Our other blockbuster soybean growth driver is Roundup Ready 2 Xtend soybeans, as shown on slide 11. As you know, we received our China import approval back in early February and now are very pleased to see the recent opening of the EPA comment period for the in-crop use of M1691, a low-volatility dicamba formulation. This marks a critical step forward for the Roundup Ready 2 Xtend crop system. According to the EPA, this first label for in-crop use is expected by late summer to early fall, and we expect approval for the in-crop use of XtendiMax and Roundup Xtend, both with VaporGrip technology, shortly thereafter to be ready for the fiscal year 2017 season.

Ex. 39 at 7.[49]

300. While its Xtend soybean release was looking more premature (and thus more irresponsible), Monsanto publicly held out hope (albeit a decreasing amount) it could get approval for one dicamba formulation this season, while conceding it would not get others.

301. Still, with or without EPA approval, Monsanto was committed to the launch of Xtend soybeans, regardless of the potential consequences.

302. Begemann confirmed Monsanto's no-matter-what attitude:

> I'll tell you, though, the demand for this product is really high. Farmers can't wait to get their hands on it. We know there's challenges out there. It's a great product, so I'm not calling or throwing a flag saying I'm worried about next year yet because I think we're going to get enough of these varieties out there. Farmers are going to see it, and the appetite is going to be really good for next year. So, we're going to stay on our launch plan for next year.

*Id.* at 19.

303. With the decision to launch its Xtend soybeans without EPA approval, Monsanto decided to paper its release to give the appearance of propriety.

304. Until about January 2016, Monsanto marketed Xtend products for sale on its webpages. A limited disclaimer appeared on these pages stating:

> The launch of Roundup Ready Xtend Crop System is pending regulatory approvals for its component products.

Ex. 40.[50] As Monsanto stated, the entire "[s]ystem" would launch once "regulatory approvals for its *component products*" was approved. *Id.*

[49] Mon Q2 2016 Results – Earnings Call Transcript (downloaded July 14, 2017 from http://seekingalpha.com/article/3962120-monsantos-mon-ceo-hugh-grant-q2-2016-results-earnings-call-transcript).
[50] Roundup Ready 2 Xtend Soybeans Product Page (~Jan. 2016).

305. An over-the-top dicamba formulation was a necessary "component" of the Xtend crop system. Therefore, the message to potential customers was clear: "launch" would not occur until all "regulatory approvals" were received.

306. With its launch now "imminent" without EPA approval, on or about May 2016, after orders were placed, with planting season ongoing and seeds likely in at least some farmers' hands, Monsanto changed this disclaimer:

> **The launch of the Roundup Ready® Xtend Crop System is pending regulatory approvals.**
>
> **This information is for technical and educational purposes only and is not an offer to sell Roundup Xtend or Roundup Ready 2 Xtend. Roundup Xtend and Roundup Ready 2 Xtend are not yet registered or available for sale or commercial use anywhere in the United States.**

Ex. 41.[51]

307. Monsanto's visible-to-the-public strategy change then was not to act responsibly, but rather to recast its obvious marketing attempts to induce sales as mere "technical and educational" information, well after the fact. Such changes were admissions that Monsanto knew their premature release would damage non-target crops and plants, but rather than act responsibly and withhold the launch, to rely on wiggle words in the hopes of escaping liability.

308. Monsanto's premature release of Xtend without a corresponding approved herbicide was unprecedented. Prior to the release of Xtend seeds, it was contrary to standard industry practice to release a new seed without the simultaneous availability of a corresponding herbicide. As the University of Arkansas's Dr. Bob Scott stated, "It's an odd situation because

---

[51] Roundup Ready 2 Xtend Soybeans Product Page (~May 2016).

we can't recall a technology like this being released without a corresponding herbicide. We had Roundup Ready, LibertyLink – none released without a herbicide." Ex. 47.[52]

309. Despite this, Defendant Monsanto bucked industry precedent and sold only one part of the crop system—Xtend seeds—at a time when the only available dicamba formulations available were the older, less-expensive formulations that if used would result in off target crop and plant damage.

***2016 Damage Due to Monsanto's Premature Release of Xtend Soybeans***

310. As predicted, numerous purchasers of Xtend soybeans and XtendFlex cotton sprayed their fields with dicamba. Because less-volatile dicamba formulations were not available (*i.e.,* they still lacked EPA approval), the damage and death to non-target crops and plants was exacerbated.

> "In addition, the improved formulations of dicamba that reduce volatility are not available, so any dicamba formulations that have been sprayed to these fields are ones that tend to be more volatile, which increases the potential for off-target movement. The result of these applications is damage on neighboring susceptible soybean and cotton fields that are not Xtend or tolerant to dicamba herbicide. Over the last two weeks, we have received more phone calls than we can count wondering what to do and what to expect once this injury occurs," Barber wrote.
>
> Steckel noted in his recent newsletter that dicamba formulations available today can move off intended target areas under warm air temperatures. The herbicide turns into a gaseous state and moves into the air up to 24 hours after application. "Clarity and Banvel are designed and indeed labeled to be applied in March and April for burndown or to small corn," Steckel said. "The air temperatures during that time of the year are almost never warm enough to be conducive for volatility. They are not designed for use in June and July in Tennessee as 80- to 90-degree temperatures greatly increase the probability that these herbicides will move off the target and with a small breeze move on to a sensitive crop," he said.

[52] "Dicamba drift incidents have ripple effect," Delta Farm Press (July 21, 2016) (Downloaded July 14, 2017 from http://deltafarmpress.com/soybeans/dicamba-drift-incidents-have-ripple-effect).

Ex. 42.[53]

311. The scale of damage due to dicamba misuse was so large, the EPA issued a statement in August 2016.

> EPA and state agencies have received an unusually high number of reports of crop damage that appear related to misuse of herbicides containing the active ingredient dicamba. Investigations into the alleged misuse are ongoing. This Compliance Advisory is intended to provide information on the agricultural and compliance concerns raised by these incidents.

Ex. 14.

312. In detailing the geography affected, the EPA continued:

> To date, the Missouri Department of Agriculture has received approximately 117 complaints alleging misuse of pesticide products containing dicamba. Missouri growers estimate that more than 42,000 acres of crops have been adversely affected. These growers have reported damage on a number of crops including peaches, tomatoes, cantaloupes, watermelons, rice, cotton, peas, peanuts, alfalfa, and soybeans. Similar complaints alleging misuse of dicamba products have been received by Alabama, Arkansas, Illinois, Kentucky, Minnesota, Mississippi, North Carolina, Tennessee and Texas.

*Id.*

313. Industry experts agreed the scale of damage to non-target crops and plants in 2016 was unprecedented.

> "This is a huge issue and is really unprecedented," says Kevin Bradley, University of Missouri weed specialist. "The situation with drift in the Bootheel is unlike anything I've seen before."

Ex. 43.[54]

---

[53] "Dixie Dicamba Dilemma, Off-Target and Off-Label Herbicide Issues Arise," The Progressive Farmer (July 2016) (Downloaded July 14, 2017 from https://www.dtnpf.com/agriculture/web/ag/news/crops/article/2016/07/07/target-label-herbicide-issues-arise-2).

[54] "Improper dicamba use leaves Mid-South a multitude of drift cases," Delta Farm Press (July 2016) (Downloaded July 14, 2017 from http://deltafarmpress.com/soybeans/improper-dicamba-use-leaves-mid-south-multitude-drift-cases).

314. Dicamba effects a broad range of plaints, and is not limited to soybean, or even crops generally. Instead, any plants in the dicamba drift/volatilization path are likely adversely affected.

> "Soybeans are what have been affected most," says Bradley. "There will be yield losses, sometimes large, in some of these fields. However, there are some vegetable crops and homeowners are calling with complaints about harmed ornamental or fruit trees. It isn't just row-crop farmers being affected."

*Id.*

315. While some fault lies with the farmers who applied dicamba over-the-top of Xtend products, it's easy to see why they did what they did. Given the benefits of dicamba, farmers are undeterred by the small fines they may need to pay *if* they are caught.

> *"The farmers are flat out telling us that 'we'll write you a check',"* Susie Nichols from the Arkansas State Plant Board told the Wall Street Journal.

Ex. 44 (emphasis in original).[55]

316. The penalties for using dicamba were almost nonexistent: in some states, a potential maximum $1,000 fine. Considering the benefits dicamba use gives to Xtend crop yield, and the low dollar value of the fine *if a farmer would get caught,* it's clear why many farmers simply wrote off any potential fine as a cost of doing business. Other farmers were blunt about the uselessness of a $1,000 fine, such as Curtis Storey:

> "$1,000 fine? Sure, that'll stop them," he says with heavy dismay. "I've had people tell me to keep quiet or we may lose the technology. That's false reasoning to blame me since I'm not the one breaking the law. Multiple people have continued making dicamba applications over the top. This is going on in other counties and states. Everybody knows it."

Ex. 45.[56]

---

[55] "Farm feud: Monsanto and its clients under fire for damaging crops," RT News (Aug. 2016) (Downloaded July 14, 2017 from https://www.rt.com/usa/354520-monsanto-dicamba-pesticide-illegal/).

[56] "Dicamba Drift Stirs Pot of Farm Trouble," Delta Farm Press (July 2016) (Downloaded July 14, 2017 from http://www.oisc.purdue.edu/pesticide/pdf/iprb_147_dicamba.pdf).

***The Unprecedented Damage of the 2017 Season***

317. Despite the damage from the growing season in 2016, the EPA approved the application of certain formulations of dicamba for over-the-top application of Xtend crops in Nov. 2016. The approved herbicides, however, only received a two-year label.

318. This approval led to a full rollout of Monsanto's Xtend products, along with its XtendiMax dicamba formulation, BASF's Engenia and DuPont's FeXapan

319. As many predicted, the 2017 planting season has been a disaster. A least 22 states have investigated dicamba damage. Ex. 72.[57] In Arkansas, there have been 986 filed complaints, over 132 in Tennessee, 310 in Missouri, 245 in Illinois and 250 in Minnesota. *Id.* [58] These complaints arose even where "strict adherence" to label instructions were followed:

> Ominously, Goodson insists many of the countywide drift incidents involve applications with strict adherence to label specifications: spraying done right. "Some guys are doing it absolutely right by the label and management and still ending up with dicamba on a neighbor's crops through volatility," he says.

Ex. 21.

320. The volatility of Defendants' XtendiMax, Engenia and FeXapan have led to non-target crop, tree, and plant damage. Further, the VaporGrip component of both XtendiMax and FeXapan (upon information and belief developed in this district), does not "grip" sufficiently to prohibit volatilization, as Monsanto admitted, sometimes up to 72 hours.

321. 2017 damage led to temporary bans of over-the-top dicamba usage in Missouri[59] and Arkansas, and label changes in Tennessee.

---

[57] *See also* "17 States Investigate Dicamba Damage Complaints Spanning 2.5 Million Acres," EcoWatch (Aug. 2, 2017) downloaded on Oct. 24, 2017 from https://www.ecowatch.com/monsanto-dicamba-2468298141.html.
[58] *See also,* Ex. 19, "Dicamba Debate Continues, States Contemplate More Herbicide Restrictions," DTN Progress Farmer (July 12, 2017) (Downloaded July 14, 2017 from https://www.dtnpf.com/agriculture/web/ag/news/article/2017/07/12/states-contemplate-herbicide).
[59] On July 13, Missouri removed its ban after requiring label changes.

322. What needs to be kept in mind is that the parties harmed by dicamba drift are innocent. All they did was not purchase Xtend products. If they had, their crops and plants would be fine. Plaintiffs here are innocent bystanders hurt by Defendants' decision to prematurely release their products.

***The Dicamba Damage From 2015-2017 Was Foreseeable, And Defendants Knew Damage Would Occur***

323. Defendants knew dicamba damage would occur and be widespread. Damage occurred with Monsanto's premature release of XtendFlex cotton in 2015, warning Defendants that a larger release would result in more damage. Still, they trudged forward, leading to the predicted greater damage in 2016. And 2017 has been a deluge.

324. Industry experts predicted Xtend's premature release would result in damage to non-target crops and plants. For example, University of Arkansas weed scientist Jason Norsworthy warned of these dangers for years.

> "I had a reporter call two weeks ago after the first hearing at the Plant Board," says Norsworthy. "They asked 'Did you not see this coming? Why were you blindsided?'
>
> "There was no blind-siding. We knew this was likely to be a major issue. We've been telling the Plant Board this for several years now. We've been saying it at all the winter meetings.
>
> "Two years ago, a 400-foot buffer was set in every direction for dicamba applications to dicamba-resistant crops, even though the crop was not yet deregulated. That buffer was set based on the work we'd done in drift and volatility trials as well as injury to the progeny (offspring). At the end of the day, soybeans are highly sensitive to dicamba."

Ex. 46.[60]

---

[60] "Dicamba drift expected, no 'blind-siding'," Delta Farm Press (Aug. 15, 2016) (Downloaded July 14, 2017 from http://deltafarmpress.com/soybeans/dicamba-drift-expected-no-blind-siding).

325. Some of the industry experts' complaints focused on Monsanto's premature 2015 and 2016 releases. As Dr. Bob Scott, Extension Weed Scientist from the University of Arkansas, explained:

> The dicamba drift, says Bob Scott, "is an absolute shame. There's blame to pass around to many facets of agriculture. You have to ask if the technology should have been released without the new herbicide formulations. There's no excuse -- *no excuse* -- for making off-label applications. It looks like there needs to be some sharper teeth in the regulatory side. Guys with fields that have been drifted on won't file complaints with the Plant Board. It's just a mess and it's irritating. This is really having ramifications, and setting up potential future problems, up and down the line.

Ex. 47.[61]

326. Other experts indicated that even with EPA approved formulations, dicamba damage was inevitable.

> From the first time I heard dicamba-tolerant soybeans and cotton were going to be developed, I have seen this coming. However, a part of me wanted to believe that surely with the brilliant minds in industry they must know something that I do not.
>
> The answer to that is now obvious.
>
> Last year's experiences should have told anyone everything they needed to know about this year. Yet there was the hope that lowering the volatility of dicamba formulations would somehow solve the problem.
>
> …
>
> However, what it really boils down to is the sensitivity of soybean to dicamba -- that part can't be fixed. I wish I could feel differently because the last thing I want is for a technology to fail. However I have said from the beginning this one would be the biggest train wreck agriculture has ever seen.

Ex. 48.[62]

---

[61] "Dicamba drift incidents have ripple effect," Delta Farm Press (July 21, 2016) (Downloaded July 14, 2017 from http://deltafarmpress.com/soybeans/dicamba-drift-incidents-have-ripple-effect).
[62] "Dicamba drift issues move back into spotlight," Delta Farm Press (Jun. 15, 2017) (Downloaded July 14, 2017 from http://www.deltafarmpress.com/soybeans/dicamba-drift-issues-move-back-spotlight).

327. Industry experts also informed Defendants their label instructions could not be followed (e.g., they would not allow for timely application), and would lead to dicamba damage.

> I said from the start the label couldn't be followed and allow all the acres to be sprayed in a timely manner.

*Id.* Despite knowing their label instructions were not workable, Defendants withheld such information from the EPA, again choosing profit over responsibility.

328. The damage being caused is not simply failure to follow the instructions or labels. As experts have explained, the majority of 2017 damage to non-target crops and fields is uniform, meaning the damage arose due to temperature inversion and volatility. As Dr. Kevin Bradley of the University of Missouri Extension stated:

> **The majority** of fields I've been in are injured from one end to the other with no discernable difference in soybean symptomology. This suggests problems with off-site movement through volatility.

Ex. 17 at 13 (emphasis in original). Damage due to volatility is not due to applicator error or failure to follow instructions/labels; it arises due to a defect with the product.

329. In conducting independent tests after the 2017 planting season, Dr. Bradley's initial test results indicate that after proper spraying techniques, even the approved dicamba formulations show volatility:

> Formulations = Will be interesting to see how Engenia and XtendiMax compare to Banvel, but **initial results w/ air samples and indicator plants suggest that both can be detected in air after application**.
>
> Volatility = Much more to see with the remaining time points and air samples. **Indicator plants suggest volatilization is still occurring at least 24 hours after treatment.**

*Id.* at 28 (emphasis added).

330. On August 27-29, 2017, Monsanto held a conference on dicamba. There, invitees of Monsanto (distinguished, independent weed scientists) raised their concerns about volatilization and Monsanto's response to off-target dicamba damage.

331. At this conference Dr. Mike Owen, agronomy and weed science specialist professor from Iowa State University, summarized his contacts with colleagues at "each land grant university": 1) complaints were split closely between drift and volatilization, 2) limited tank contaminations were found and 3) the number of *reported* issues considerably under represents actual dicamba damage. Ex. 75 at 1.[63] Dr. Owen also reported that 1) "[f]ield assessments of volatilization are consistent and suggest this is a problem without a clear solution," 2) the current label "is not usable by commercial and private applicators and guarantees that applications will be off-label," 3) that Defendants' suggestions that off-target movement of dicamba is acceptable because yields allegedly will not be negatively impacted is "unconscionable," and 4) to suggest there will be less of a problem in 2018 because more Xtend seeds will be sold "is inappropriate and flies in the face of 'stewardship' claims." *Id.* at 2.

332. As the above shows, the Xtend crop system, including XtendiMax, FeXapan and Engenia, is incapable of being made safe for its intended and ordinary use. As stated by Dr. Norsworthy from the University of Arkansas, "This is a product that is broken," and "This is a product we can't put on plants during the summer months of 2017 and keep it there." Ex. 76.[64] Dr. Norsworthy's concerns with the new dicamba formulations could not be fixed by creating new instructions:

> Norsworthy said tighter restrictions on spraying won't fix the chemical's tendency to move off target, especially in certain climate conditions when the herbicide can volatilize off plants as a vapor and move miles away to susceptible plants. "I can fix physical drift,"

[63] Publicly shared slides from Dr. Owen's presentation at Mon. 9/27-29, 2017 Conference.
[64] "No Dicamba in '18, Arkansas Weed Expert Urges," ArkansasOnline (Downloaded on Aug. 23, 2017 from http://m.arkansasonline.com/news/2017/aug/18/no-dicamba-in-18-weed-expert-urges-2017/).

> he said. "I can't do anything about volatility." He said volatility was the biggest problem with the herbicide this year and that his own tests, and those by colleagues in Tennessee and Missouri, supported that belief.

*Id.*

333. In September 2017, the Arkansas Plant Board voted to ban applications of dicamba after April 15. One of the Plant Board Members, David Hundley, with Ozark Mountain Poultry (OMP), in defending the Board's vote stated:

> "When we sat down it became obvious we were trying to fix an issue that can't be fixed with this herbicide. It volatilizes and moves. You can't fix that with more training, with different nozzles, with different types of application.
>
> "That's where 75 percent of the task force came down and that's largely why there was a cut-off suggested with untraceable off-target drift where there's no opportunity for a damaged grower to be compensated for his damage. The manufacturers have offered zero help to damaged farmers. They have continually blamed the damage on their neighbors for applying either off label products or not following the label. Several of us could get past the fact that all of a sudden the producers in Arkansas did not know how to apply chemicals as claimed by the manufacturers."

Ex. 77.[65]

334. The independent expert consensus on volatility and unworkability of the label/instructions is contrary to how Monsanto markets its approved dicamba herbicides; instead, Monsanto misleads its consumers by touting that XtendiMax has a "significant reduction in volatility potential," has "[l]ow volatility" and "Will provide applicators confidence in on-target application of dicamba in combination with application requirements for successful on-target applications." Ex. 49.

335. Even BASF touts that it has solved the volatility problem:

> Although the potential for dicamba volatility is low, the Engenia herbicide formulation was developed to *further* minimize secondary loss due to volatilization.

---

[65] "Dicamba task force member: 'Figure out' new formulations," Delta Farm Press, Sept. 18, 2017 (downloaded on Sept. 28 from http://www.deltafarmpress.com/print/45665).

Ex. 50 at 3, Engenia Preregistration brochure (emphasis added). BASF also touts that the "Volatility Concerns" have been "Addressed." *Id.*

336. It's not just Dr. Bradley's tests that find Defendants' claims of "low" volatility was false. Dr. Thomas Mueller of the University of Tennessee in July 2017 released test results finding, "This data indicates the dicamba (from Engenia) is moving from the site of application into the air immediately above the treated field" and "Given sensitivity of soybeans to POST dicamba, these data indicate that soybean injury in adjacent areas should be expected from vapor moment of dicamba after application." Ex. 18.

337. Having volatilization after proper treatment is not acceptable, and certainly not "low volatility" or a "significant reduction in volatility potential" and has not "Addressed" the "Volatility Concerns" …especially in areas where temperature inversions are common, and neighboring crops are very susceptible to dicamba damage (such as soybeans).

***Defendants Withheld Crucial Information From the EPA***

338. Defendants withheld information from the EPA, which had they disclosed, would have resulted in the denial of their over-the-top dicamba formulations, if not of Xtend products altogether. Such information includes, but is not limited to, misrepresenting the risks of temperature inversions and volatility, providing misleading test results, and failing to inform the EPA that their label instructions were unrealistic and potentially impossible to follow.

339. Monsanto also limited its EPA disclosures to its own tests; it did not allow independent tests on volatility, despite numerous requests from experts that such independent tests be conducted *prior* to receiving their EPA registrations.

340. In August 2016, Dr. Bradley of the University of Missouri, commented on Monsanto's refusal to allow such independent studies.

> Bradley says that he and other university researchers have studied the efficacy of the new herbicide for its weed control, but he says Monsanto has not allowed independent research on the drift properties of the new compound.
>
> "We can talk about what these formulations do for weed control nine ways from Sunday," said Bradley. "We really can't tell you anything about the volatility or its potential volatility, because we have not been able to do that research, and that's really unfortunate."

Ex. 67. Dr. Bradley explained his concerns that more tests were needed in detail to a reporter after he addressed the Missouri House Agriculture Committee in 2016.

> Secondly there is a lot of stuff coming out from companies in response to all of this about, you know, when you have the new formulations of dicamba in the future, or if we have the new formulations of dicamba in the future, that this is all going to go away, kind of, I'm paraphrasing there. But that's basically the gist of the message, and you know I would say, you know, I just tried to tell the committee I'm not of that opinion, I'm not real comfortable in being able to say that we have all this solved. And yes, what has happened this year is primarily due to some illegal applications of formulations that shouldn't have been sprayed, but I guess I don't have the confidence of being able to say that when we move forward assuming EPA grants approval of these new herbicides and different formulations that we won't experience some of this in the future and I think we just need to have a little bit of a moment of pause and also perhaps some more research to figure all this out.

*Id.*[66]

341. Further, during an Arkansas Plant Board meeting on or about August 8, 2016, there was a discussion with Monsanto about its refusal to allow University of Arkansas weed scientists to conduct drift and volatility research on XtendiMax with VaporGrip. During this discussion, Monsanto's representative (Dr. Boyd Carey) responded that Monsanto was concerned that the results of such studies could jeopardize Monsanto's EPA registration.

342. The point of this should not be lost. Monsanto allowed independent, unbiased testing by universities on efficacy; it did not allow such independent, unbiased testing for volatility. Not allowing such tests for volatility is suspect by itself. The damage in 2017, shows

---

[66] Dr. Bradley's statements are in an audio file provided on http://cdn.brownfieldagnews.com/wp-content/uploads/2016/09/160831_KevinBradley-1.mp3.

such tests were warranted, especially as the results of at least Dr. Bradley (Ex. 17) and Dr. Mueller (Ex. 18) confirm damage is caused by volatilization even after following the labels' instructions. This is due to a product defect, not applicator error.

343. Defendants also were aware of the risk of dicamba damage to non-target crops and plants through temperature inversion, but downplayed its risks.

344. Though mostly a self-serving document, in July of 2017, Monsanto COO Fraley responded to the large-scale dicamba damage. Ex. 51.[67] There, he admitted that Defendants were warned about the risk of dicamba damage due to temperature inversions.

> Some consultants and academicians felt that vaporization of dicamba, especially from older and generic formulations not approved for in-crop use, could be exacerbated by temperature inversions, which were quite frequent this spring.

345. Despite receiving these warnings, Defendants did not provide any testing showing their products could be safely used in environments where temperature inversions were common (*e.g.,* the midsouth where temperature inversions occur nearly every clear night) and where the neighboring crops would be very susceptible to dicamba damage (e.g., soybeans).

346. Further, the labels for XtendiMax and Engenia provide inadequate precautions to limit the risk of damage caused by temperature inversions. For example, the Engenia label states:

---

[67] "Talking Dicamba With Farmers—What I Learned," Medium (July 11, 2017) (Downloaded July 14, 2017 from https://medium.com/@RobbFraley/talking-dicamba-with-farmers-what-i-learned-3830a07c6e75).

> **Temperature Inversions**
>
> **DO NOT** make applications of **Engenia** when temperature inversions exist at the field level. Temperature inversions increase drift potential because fine droplets may remain suspended in the air longer after application. Suspended droplets can move in unpredictable directions because of the light, variable winds common during inversions. Temperature inversions are characterized by increasing temperatures with altitude and are common on nights with limited cloud cover and light-to-no wind.
>
> Inversions begin to form as the sun sets and often continue into the morning before surface warming. Their presence can be indicated by ground fog, smoke not rising, dust hanging over a road, or presence of dew or frost. Smoke that layers and moves laterally (under low wind conditions) indicates an inversion, while smoke that moves upward and rapidly dissipates indicates good vertical air mixing. Inversion conditions typically dissipate with increased winds (above 3 MPH) or when surface air begins to warm (3° F from morning low).

Ex. 58. This is an inadequate instruction, as dicamba, even the approved formulations, could volatilize after application for periods exceeding 24 hours. This means regardless of the conditions at the time of spraying, they could (and often would) drastically change within the next 24 hours.

347. Similarly, the XtendiMax label[68] has similar inadequate and misleading statements about the risk of temperature inversion.

[68] The FeXapan label contains nearly-identical language to the XtendiMax label.

**Temperature Inversions.** Do not apply during a temperature inversion because off-target movement potential is high.

- During a temperature inversion, the atmosphere is very stable and vertical air mixing is restricted, which causes small, suspended droplets to remain in a concentrated cloud. This cloud can move in unpredictable directions due to the light, variable winds common during inversions.
- Temperature inversions are characterized by increasing temperatures with altitude and are common on evenings and nights with limited cloud cover and light to no wind. Cooling of air at the earth's surface takes place and warmer air is trapped above it. They begin to form as the sun sets and often continue into the morning.
- Their presence can be indicated by ground fog; however, if fog is not present, inversions can also be identified by the movement of smoke from a ground source or an aircraft smoke generator. Smoke that layers and moves laterally in a concentrated cloud (under low wind conditions) indicates an inversion, while smoke that moves upward and rapidly dissipates indicates good vertical air mixing.

- The inversion will dissipate with increased winds (above 3 miles per hour) or at sunrise when the surface air begins to warm (generally 3°F from morning low).

Ex. 52.

348. Defendants thus down-played the risk of temperature inversions and their products ability to stay "on target" rather than drift non-target. Had they properly raised other experts' concerns about temperature inversions, Engenia, FeXapan and XtendiMax would not have been approved (if not Xtend products all together).

349. Defendants' failure to properly apprise the EPA and its customers of the risk of temperature inversions directly led to off-target crop and plant damage. In 2017, the damage seen is widespread and uniform. Multi-county/multi-state damage of a uniform nature could only occur due to temperature inversions.

350. Along these same lines, Defendants did not explain to the EPA that dicamba volatility takes place over time, sometimes over several days. With inversions in summertime in the mid-south occurring on most clear nights, the result would be volatilized dicamba and fine droplets catching in the inversion layer, then moving *en masse* and affecting others' fields. Such

damage is a chemical problem (*i.e.,* a problem with Engenia, FeXapan and XtendiMax not performing as explained to the EPA and to Defendants' customers), not an applicator problem.

351. Experts such as the University of Tennessee's Larry Steckel confirm the observed 2017 damage is due to the Defendants' products *not* misapplication.

> Steckel, like weed specialists in other states, say much of the injury they are seeing this year seems related to the herbicide moving as a gas at some point after application. "This is landscape level redistribution of that herbicide," Steckel said, compared to physical drift that often injures in a pattern in the field.
>
> "It's 200-acre or larger fields covered pretty uniformly. I've never seen anything like it," he said.

Ex. 19. Other experts, such as Dr. Mark Loux from the Department of Horticulture and Crop Science at University of Illinois and Dr. Bill Johnson of Purdue University similarly agree that most of the damage is not due to spray drift, but rather the volatility of dicamba.

> But particle drift does not result in the relative uniformity of dicamba injury over a large adjacent field that has occurred in some cases. This would be more indicative of movement via dicamba volatilization from leaf or soil surfaces, occurring sometime within several days after application. Vapors then move with prevailing air currents, with potential to move far greater distances than spray particles, upwards of a half mile. Movement of vapors does not require much wind. For example, volatilization of dicamba that occurs under relatively still inversion conditions can result in prolonged suspension and movement of vapors with gentle air currents. In one field we looked at, there appeared to be an initial volatilization event from the adjacent dicamba-treated soybeans, with some subsequent soybean recovery. This appeared to followed by a second round of dicamba exposure and injury to the recovering soybeans several weeks later.

Ex. 26.

352. Temperature inversions in combination with volatility is what has led to the wide-spread, uniform damage of fields, such as what is being seen in 2017.

353. Given Defendants' products' propensity to volatilize and cause damage at least through temperature inversions even where their labels are followed, Defendants' products do

not perform their intended function without unreasonable adverse effects on the environment (especially given the scale of damage).

354. Further, Defendants' volatility tests submitted to the EPA were inadequate. Defendants did not submit tests to the EPA 1) showing the safe level of dicamba volatility to eliminate non-target damage, especially to sensitive soybean plants and 2) that their products meet that safe level. Rather, Defendants merely showed their products were *less* volatile (*i.e.*, have a "reduced" volatility) than currently approved dicamba formulations. Given how sensitive soybeans are to dicamba, a "reduced" volatility[69] test is insufficient as any amount of volatility would lead to non-target crop and plant damage. As Aaron Hager of the University of Illinois stated:

> Please keep in mind that low volatility is not the same as no volatility. The new formulations are still volatile, albeit less volatile than older formulations.[70]

355. Additionally, Defendants did not inform the EPA that despite farmers best efforts, following the label might be impossible.

356. Experts have called the instructions into question as unworkable given the window of application is very small.

> "We've probably had everything occur," [University of Illinois weed scientist Aaron Hager] notes. "There were not many days where it was possible to spray within label requirements."
>
> Josh Gunther, Burrus Hybrids, used weather data from 2013, 2014 and 2015 to compare label requirements and possible XtendiMax, Liberty and RoundUp PowerMax application hours. "On average, there are half as many hours available to spray on label with XtendiMax compared to Liberty and RoundUp," [Stephanie Porter, sales agronomist with Burrus Hybrids] explains.

[69] Even after the disaster of 2017, Monsanto sticks to its "reduced" volatility language (six times in a July 2017 blog). Ex. 70 ("Dicamba-based Herbicide XtendiMax® with VaporGrip® Technology: Years in the Making," Monsanto.com (Downloaded on July 15, 2017 from https://monsanto.com/products/product-stewardship/articles/dicamba-xtendimax-vaporgrip-technology/). This emphasizes it chose the wrong types of tests to mislead others into thinking "reduced" and "safe" are the same.

[70] Ex. 100, "The Dicamba Dilemma in Illinois: Facts and Speculations," The Bulletin (July 18, 2017)(Downloaded on July 19, 2017 from http://bulletin.ipm.illinois.edu/?p=3942).

> Every growing season has different weather conditions, she notes, but the calculations indicate just how small the application window can be, especially considering temperature inversion frequencies.

Ex. 53.[71]

357. Experts such as the University of Tennessee's Steckel also have criticized Defendants' instructions, and questioned whether the technology itself is safe enough to be used under any conditions.

> The label associated with the approved low-volatility dicamba formulations called XtendiMax, FeXapan and Engenia are already complicated without further restrictions. "Following them as they are now is a Herculean task. Talk about threading the needle -- you can't spray when it's too windy. You can't spray under 3 miles per hour. You got to keep the boom down -- there are so many things," Steckel said. "It looks good on paper, but when a farmer or applicator is trying to actually execute that over thousands of acres covering several counties, it's almost impossible."

…

> He added that many farmers abandoned dicamba sprays and turned to other herbicide options to avoid hurting neighboring crops further. Depending on the weed control pressure and problems, that's a sacrifice and potential loss of income for those that bought into the technology, he agreed. "Mostly farmers want to do the right thing." "I'm just not sure we can steward this technology as it currently exists," he added.

Ex. 19. Dr. Steckel also expressed these concerns directly to Monsanto in August 2017 when he explained following the label was "Nearly impossible" as 1) there was only a "very small window of time" in which to spray, 2) the low, 24" boom height was "a joke," 3) tank mix restrictions were not practical and 4) in view of the prohibition on spraying if rain is expected within 24 hours commented, "who is that accurate of a forecaster". Ex. 78 at 1, 3. Iowa State's Dr. Owen similarly stated at the same conference that the current label "is not usable by commercial and private applicators and guarantees that applications will be off-label." Ex. 75 at 2.

---

[71] "Dicamba: What's happening in Illinois," Prairie Farmer (July 11, 2017) (Downloaded July 14, 2017 from http://www.prairiefarmer.com/crop-protection/dicamba-what-s-happening-illinois).

358. With labels that are difficult if not impossible to follow, improper spraying necessarily occurs with application of Defendants' products.

359. Defendants' products then, when used in accordance with widespread and commonly recognized practices (*e.g.,* attempting to follow a label that cannot reasonably be followed, and with a product that is prone to volatilize and temperature inversions), have led to unreasonable adverse effects on the environment as described in detail in this amended complaint.

360. The injury caused by exposure to dicamba-containing products resulted in damage to non-target crops and plants. Particularly here, exposure to dicamba led to financial loss to all Plaintiff farmers.

361. The proximate cause of the injury was the defective design, marketing, selling, and misbranding of the Xtend products[72] and the dicamba formulations that made up the Xtend crop system. Defendants were willful and negligent in their release, marketing, and selling of a defective crop system (*e.g.,* in 2017) and for releasing, marketing, and selling a defective crop system without an accompanying EPA-approved dicamba herbicide (in 2015 and 2016).

362. For example, Monsanto falsely markets XtendiMax as allowing for "successful on-target applications."

**Significantly Reduce Relative Volatility With VaporGrip® Technology**

- Proprietary technology developed by Monsanto that helps prevent the formation of dicamba acid
- XtendiMax® herbicide with VaporGrip® Technology provides a significant reduction in volatility potential compared to commercially available dicamba formulations
- *Will provide applicators confidence in on-target application of dicamba in combination with application requirements for successful on-target applications*

[72] The Xtend seeds themselves also add to the damage. For example, the increased drift injury seen is attributable to application of dicamba formulations "later in the season, when surrounding crops are vulnerable to damage; increased vapor drift due to higher temperatures; and the increased scale of use with widespread planting. Ex. 102 at 41.

Ex. 54 (emphasis added).[73] Upon information belief this identical (and similar statements) appeared on Monsanto marketing materials from earlier in 2017 as well and therefore was marketed towards potential customers.

363. Similar misleading statements were made about Engenia, and remain on BASF's webpage today.

> Field research demonstrates on-target herbicide application success with low volatility and drift, *so the herbicide remains in place*.

Ex. 55 (emphasis added).[74] This same statement appeared on BASF's website at least as of April 2017 (if not earlier), and thus was marketed towards potential customers. Ex. 56.[75] Further, when speaking with customers, Engenia sales representatives compared Engenia molecules to "bowling balls" that would not go anywhere as compared to other chemicals molecules that were like "softballs" or "baseballs."

364. On Feb. 16, 2017, in its press release announcing EPA registration of FeXapan, DuPont made similar statements about its "low-volatility dicamba formulation."

> FeXapan™ employs a new formulation of dicamba that offers *a significant reduction in volatility potential* than conventional dicamba herbicides, which helps *minimize off-target movement* when used according to label guidelines.

Ex. 57 (emphasis added).[76]

365. These statements, and statements like these, are false and misleading. Even properly applied XtendiMax, Engenia and FeXapan volatilize and damage other fields through volatility and temperature inversion. Therefore, Defendants stating or implying that there will be

---

[73] XtendiMax-Tech-Sheet (Downloaded July 14, 2017 from http://www.roundupreadyplus.com/products/cotton/xtendimax).
[74] BASF Engenia marketing (Downloaded on July 11, 2017, from http://agproducts.basf.us/campaigns/engenia/).
[75] Archive.org capture of http://agproducts.basf.us/campaigns/engenia/ from Apr. 8, 2017.
[76] "EPA Approval: FeXapan™ Herbicide Plus VaporGrip® Technology" (Feb. 16, 2017 DuPont Press Release) (Downloaded July 16, 2017 from http://www.dupont.com/products-and-services/crop-protection/soybean-protection/press-releases/dicamba-herbicide.html).

no damage due to volatilization if labels/instructions are followed is likely to confuse and mislead consumers.

366. Despite independent test results from multiple universities in 2017 showing that XtendiMax, Engenia and FeXapan volatilize, Defendants extoll false narratives to mislead and confuse consumers into believing that if the herbicides are applied pursuant to the labels, damage will not result to non-target crops and plants. As Dr. Norsworthy from the University of Arkansas explained, this is not the case:

> Norsworthy said tighter restrictions on spraying won't fix the chemical's tendency to move off target, especially in certain climate conditions when the herbicide can volatilize off plants as a vapor and move miles away to susceptible plants. "I can fix physical drift," he said. "I can't do anything about volatility." He said volatility was the biggest problem with the herbicide this year and that his own tests, and those by colleagues in Tennessee and Missouri, supported that belief.

Ex. 76.[77]

367. Test results confirm volatility occurs even when labels were followed. Despite this, Defendants continue with their misleading and confusing statements to their customers. For example, on July 21, 2017, Monsanto represented "When farmers and applicators follow these instructions, they work," and told consumers in a "Story" on its webpage that:

> We're in the early stages, for sure. But to this point, the indications are that volatility of the approved over-the-top products is *not* the major source of the off-target movement.

Ex. 79 (emphasis in original).[78] Monsanto also touts that due to "rigorous training" and "following the label recommendations" in Georgia "there have been virtually no reported claims to date." *Id.* at 15. However, Monsanto fails to note that when it comes to dicamba-sensitive soybeans, of the 31

---

[77] "No Dicamba in '18, Arkansas Weed Expert Urges," ArkansasOnline (Downloaded on Aug. 23, 2017 from http://m.arkansasonline.com/news/2017/aug/18/no-dicamba-in-18-weed-expert-urges-2017/).

[78] "Dicamba Field Investigations: What Monsanto Has Learned So Far," Brian Naber, Monsanto "Stories," (downloaded on Aug. 23, 2017 from https://monsanto.com/products/articles/dicamba-field-investigations-monsanto-learned-far/ ). Though published in July, this webpage was still available on Monsanto's website at least as of Aug. 23, 2017 *after* three universities test results directly refuted Monsanto's claims.

states reporting soybean acreage, only five (including Delaware and New Jersey) have less soybean acreage than Georgia.[79] Ex. 93 at 15.[80]

368. Monsanto CTO Robb Fraley also recently claimed there was a 100-fold reduction in volatility for XtendiMax and Engenia compared to older dicamba formulations. Ex. 80.[81] Similarly, Scott Partridge, Defendant Monsanto's Vice President of Global Strategy, claimed XtendiMax "will not move far, including through volatilization." Ex. 81.[82] These statements conflict with the independent experts' test results described herein.

369. Similarly, BASF's Engenia U.S. Information Brochure states:

> Although the potential for dicamba volatility is low, the Engenia herbicide formulation was developed to further minimize secondary loss due to volatilization.

Ex. 50 at 3. To the contrary, dicamba does not have "low" volatility, and the implication that Engenia was somehow further "developed" to have even less than "low" volatility is false, as independent tests show Engenia is volatile for over 24 hours after application.

370. FeXapan's label also falsely makes similar "low" volatility claims:

> **Better Weed Management With Less Worry About Dicamba Volatility**
>
> DuPont™ FeXapan™ herbicide Plus VaporGrip® Technology gives soybean and cotton growers more ways to handle resistant weeds in a low-volatility dicamba formulation.
>
> …
>
> As part of the Roundup Ready 2 Xtend® Acre Solution, FeXapan™ herbicide Plus VaporGrip® Technology uses a low-volatility dicamba formulation to add a needed mode

---

[79] Comparatively, and given its size, Georgia has fewer soybean acres than most states. See, e.g., Ex. 98, USDA Soybean Production by County for 2017 (Downloaded Nov. 2, 2017 from https://www.nass.usda.gov/Charts_and_Maps/Crops_County/sb-pr.php).
[80] USDA Acreage Report (June 30, 2017) (downloaded on November 2, 2017 from https://usda.mannlib.cornell.edu/usda/current/Acre/Acre-06-30-2017.pdf).
[81] "Monsanto officials add their perspective on dicamba issues this season," Indiana Prairie Farmer (July 13, 2017) downloaded Oct. 20, 2017 from http://www.indianaprairiefarmer.com/crop-protection/monsanto-officials-addtheir-perspective-dicamba-issues-season.
[82] "Widespread crop damage from dicamba herbicide fuels controversy," Chemical & Engineering News (Aug. 21, 2017) Downloaded on Oct. 20, 2017 from http://cen.acs.org/articles/95/i33/Widespread-crop-damage-dicamba-herbicide.html.

> of action to weed-control program while reducing potential for off-target herbicide movement from volatility. Always follow FeXapan™ herbicide Plus VaporGrip® Technology application best practices for best weed-control results and to support long-term value of dicamba herbicides.

Ex. 82.[83] Again, the use of the phrase "low-volatility" is misleading because FeXapan is also volatile for over 24 hours after application.

371. Statements such as these from Defendants mislead and confuse or are likely to mislead and confuse consumers as to whether use of XtendiMax, Engenia and FeXapan will cause damage to non-target crops and plants. Such false statements lead to continued use of XtendiMax, Engenia and FeXapan, and damage to non-target crops and plants.

372. Recently, the EPA conceded Defendants' products were more dangerous than how they were marketed. On October 13, 2017, the EPA reached an agreement with Monsanto, DuPont, and BASF to impose additional requirements for over-the-top use of XtendiMax, Engenia and FeXapan. Some of the changes to the label included:

1) Classifying products as Restricted Use Pesticides which would permit only certified applicators with special training, and those under their supervision, to apply them;
2) Limiting applications to when maximum wind speeds are below 10 mph (from 15 mph); and
3) Reducing the times during the day when applications can occur.

These label changes confirmed the prior labels and instructions were insufficient. For example, Andrew Thostenson, the Pesticide Program Specialist for North Dakota State University Extension Service, stated:

> With new use rules for 2018, it is a fact that reading and following the label was NOT enough in 2017!

Ex. 83.[84]

---

[83] FeXapan Herbicide Plus Vaporgrip Technology webpage (Downloaded on Aug. 23, 2017 from http://www.dupont.com/products-and-services/crop-protection/soybean-protection/products/fexapan.html).
[84] Oct. 13, 2017 Tweets from Andrew Thostenson.

> New mandatory trainings for 2018 demonstrate that voluntary stewardship activities were insufficient in 2017.

*Id.*

> New RUP designation demonstrates that the new dicamba formulations pose a significant risk.

*Id.*

373. Also concerning is that when it comes to its tests, Monsanto appears to only have reported "lower" volatility observations from tests for a 24-hour time-period after application. For example, in a "Story" on its website entitled "Dicamba-based Herbicide XtendiMax® with VaporGrip® Technology: Years in the Making," Monsanto outlined three volatility tests, two of which (Humidome method and Hoop House method) were expressly limited to 24 hrs. Ex. 70.[85] These tests have been criticized by others as well not only on their procedures, but due to bias. See, e.g., Ex. 102 at 13-15.[86] Further, tests in the patent which appears to cover the VaporGrip technology further discussed test results limited to 24 hours. Ex. 84, U.S. Patent No. 9,402,396, at Example 31 (col. 69, lns. 1-44)("The closed containers were held for 24 hours in a growth chamber…"), Example 32 (col. 69, lns. 45-67)("The method of Example 31 was used to assess…") and Example 34 (col. 70, ln. 39 to col. 71, ln. 12)("Airborne dicamba was collected on a polyurethane foam (PUF) trap over the ensuing 24 hours and quantified").

374. Monsanto's apparent reporting of only 24-hour time period tests is suspicious because independent test results by universities show that XtendiMax, Engenia and FeXapan

---

[85] Downloaded on Aug. 23, 2017 from https://monsanto.com/products/product-stewardship/articles/dicamba-xtendimax-vaporgrip-technology/.
[86] Center for Food Safety Comments on Arkansas State Plant Board's Proposal to Restrict Dicamba Use, Oct. 30, 2017.

volatilized after 24 hours. And recently, at an Arkansas Plant Board meeting, even a Monsanto representative conceded volatility occurs from 24-72 hours.[87]

> "Know that volatility does occur absolutely occurs, but the amount that will occur is gonna happen very quickly in 24 hours…could be taken out to 72…but again dissipation or the movement from that field as it moves across…dicamba is heavier than air, its going fall out of the top, and where it does, it's gonna be fairly quickly after that sprayed field whatever was volatilized in that 24-hour period."

375. Considering weather forecasting as a science has difficulties accurately predicting weather even 24 hours out, conceding volatility occurs for up to three days proves that even if applicators follow the products-at-issue's labels, damage to non-target crops and plants will occur.[88]

376. Defendants have common-law and statutory duties to not mislead consumers about their products ability to damage non-target crops and plants.

377. Defendants also have common-law and statutory duties to give reasonable and adequate warning of dangers reasonably foreseeable in the use of their products to others.

378. Defendants also have common-law and statutory duties to provide instructions on how to utilize their products to make it reasonably likely that any harm to non-target crops will be avoided if followed.

379. None of the labels for Defendants' products provide full, complete, and accurate information about the extreme toxicity of dicamba-containing products. None of Defendants' labels contain directions for use that, if complied with, are adequate to protect the environment, including Plaintiffs' crops and plants. Defendants' labels do not and never have contained

---

[87] Available from https://www.facebook.com/ArkansasFarmBureau/videos/10159178698590321/ (last visited Oct. 18, 2017). Quoted portion occurs from approx. 37-59 seconds. If the Court wishes for a copy of this video, Plaintiffs' counsel has a digital video file which it can produce upon request.

[88] See also Ex. 102 at 28-31.

warning or caution statements that, if complied with, are adequate to protect the environment, including Plaintiffs' crops and plants.

380. The inherent, phytotoxic profile of dicamba-containing products cannot be applied with reasonable safety in agricultural areas using any typical or reasonably practical application techniques and conditions of use limitations. Given the well-recognized nature and patterns of cultivation in these (and other) regions, the proximity of other non-Xtend crops, trees and plants, and the foreseeable weather patterns and timing of likely application, damage to non-target crops, trees and plants was inevitable and known to Defendants. Accordingly, Defendants products are defective as inherently posing an irreducible, unreasonable risk of harm to crops that are not resistant to dicamba.

***Non-Target Dicamba Damage Actually Helps Defendants' Sales***

381. Counterintuitively, damage due to dicamba drift hastens additional Xtend sales, and thus helps the Defendants. As numerous farmers have reported, since the only crops that would not be damaged would be dicamba resistant crops, to protect their own fields, they need to use Xtend (whether they want to or not).

> "When my suppliers say 'I'm going to have to quit growing non-GMO soybeans and start planting dicamba beans just to protect myself' it becomes an issue," he said. "They don't want to go that route, but they may not have a choice."

Ex. 5.[89] Dr. Bradley of the University of Missouri in an audio interview after addressing the Missouri House Agriculture Committee in 2016 stated "every farmer" he had spoken with who suffered dicamba damage indicated they would have to plant dicamba resistant crops the next year to protect themselves.

[89] Illegal Herbicide Use on GMO Crops Causing Massive Damage to Fruit, Vegetable and Soybean Farms, EcoWatch (Aug. 23, 2016) (Downloaded July 14, 2017 from http://www.ecowatch.com/monsanto-roundup-ready-soybean-1983477089.html?platform=hootsuite).

> Every farmer I've visited with that's been injured, and these are famers that have done nothing wrong, they've just got drifted onto. Every single one of them has said the same thing, and that is that next year they will plant the new trait—the dicamba resistant trait—to protect themselves. I hear that terminology over and over and over and it just makes me cringe a little bit to think that farmers won't have choices. That they aren't able to plant whatever they want to plant. And that they've got to plant a dicamba resistant soybean in the future so they don't get injured.[90]

382. There are large segments of farmers who prefer older, less expensive seed, and do not wish to pay an increased trait fee. There are also farmers that wish to use other breeds of soybeans as a diversity tool. There are also farmers that want to grow organic and non-GMO for specialty markets for a premium, or grow food beans for a specialty market. As more farmers utilize dicamba for over-the-top applications, the possibility of damage to these non-dicamba tolerant crops will increase, to the point most (if not all) soybeans and/or cotton eventually will need to be Xtend products to survive growing season.

383. Upon information and belief, the timing of the release of Xtend soybeans was also motivated by competition from Bayer's Liberty Link soybeans. Upon information and belief, Liberty Link, especially in the mid-South was beginning to erode Monsanto's market share for soybeans due to its superior weed control[91] and price point for its seed and accompanying herbicide. Now, without resistance to dicamba, it is unlikely that the superior Liberty Link will viably compete against Xtend soybeans even though 1) Xtend soybeans are more expensive, 2) the Xtend Crop System's over-the-top dicamba formulations are more expensive, 3) the new label requirements for Xtend's over-the-top herbicides are more time consuming and unworkable

---

[90] Full audio available from: http://cdn.brownfieldagnews.com/wp-content/uploads/2016/09/160831_KevinBradley-1.mp3.

[91] Liberty Link soybeans are resistant to the herbicide glufosinate which provides an herbicide resistance system that is still effective in the presence of glyphosate resistant weeds. Glufosinate is superior to dicamba for at least the reason it does not suffer the volatility issues of dicamba.

for timely application and 4) the inherent product defect of volatility poses a high risk of non-target damage due to application of XtendiMax, Engenia and FeXapan.

384. At least one industry expert noted that prior to the release of Xtend seeds, there was an increase in registrations by Defendants of older and more volatile dicamba formulations. Mr. Steve Smith of Save Our Crops Coalition sent a letter to Thomas Vilsack, Secretary of Agriculture for the USDA, expressing his concerns about the increased availability of older dicamba formulations just as Xtend seeds were released:

> For instance, just from a review of publically [sic] available sources, we know our differences with Monsanto and BASF are especially stark with respect to the use of so-called 'generic' forms of dicamba. Monsanto has sought the registration for its older, more volatile Clarity formulation, and failed to mention the availability of the lower volatility Engenia formulation within its publically [sic] available petition documents. Our differences are also stark with respect to product stewardship. Monsanto has not publicly presented any strategy to mitigate adverse environmental effects of either herbicide, through label language, through limitations on application timing, or through the competitive pricing of lower volatility formulations.

Ex. 85.[92] Such an increase in the availability of generic dicamba formulations is suspect given that prior to the Xtend release, dicamba usage "declined precipitously from its peak 1994 levels."

> Monsanto's own petition to USDA for non-regulated status of MON-87708-9 Soybeans projects, upon peak adoption, dicamba use will approximately double it's 1994 peak historical use level, or reach about 25 million pounds annually. However, it should be noted, the use of dicamba has declined precipitously from its peak 1994 level.
>
> What Monsanto's petition does not indicate is the rate of change in dicamba use from current use levels. This omission is particularly glaring given the intensity of the rate of sudden change. The latest figures place the amount of dicamba applied at about 2.7 million pounds annually.

Ex. 86 at 4-5 (footnotes omitted).[93]

---

[92] SOCC 2014 letter, downloaded Oct. 20, 2017 from http://saveourcrops.org/wp-content/uploads/2014/02/FINAL-SOCC-Letter-to-the-Secretary-EIS-022012.pdf.
[93] Sept. 2012 Comment of SOCC, downloaded on Oct. 20, 2017 from http://saveourcrops.org/wp-content/uploads/2012/09/FINAL-Comment-New-Uses-Dicamba-092112.pdf.

385. In 2016, Mr. Smith again raised his concern about the availability of generic formulations of dicamba.

> However, SOCC would note that BASF and Monsanto still sell older, cheaper, and more volatile formulations of dicamba, and that BASF and Monsanto have yet to present stewardship plans or suggest additional registration restrictions that might mitigate the potential for these non-registered generic formulations to cause non-target plant damage. SOCC views the mere existence of such formulations as necessary, but, unfortunately, insufficient to adequately protect against the potential for non-target plant damage. In the absence of leadership from BASF and Monsanto, SOCC would request that EPA exercise its clear authority to further regulate a "widespread and common practice" which may cause unreasonable adverse effects.

Ex. 87 at 10.[94]

386. An increase in older, less expensive, and more volatile versions of dicamba[95] at the same time as the release of Xtend seeds (especially when use of dicamba had flatlined around the same time) increases the likelihood of illegal spraying of those same formulations, which in turn would cause more damage to non-target crops, trees, and plants.

387. As described in this amended complaint, Defendants' scheme improves their sales by physically destroying products (*i.e.*, non-dicamba resistant soybean and cotton seeds) competitive to Xtend seeds, and creating fear, uncertainty, and doubt in farming communities as to the viability of planting seeds other than Xtend. Defendants' then are not gaining increased market share through superiority of their products (they are not superior), but rather through purchaser fear that competitive products will be damaged, causing yield loss.

388. Given this, the more damage caused by dicamba to non-target plants and crops, the better Defendants' sales the next season.

---

[94] SOCC May 24, 2016 Petition, downloaded Oct. 20, 2017 from http://saveourcrops.org/wp-content/uploads/2016/05/FINAL-SOCC-Petition-RUP-Generic-Dicamba-160524.pdf.

[95] Of note, Defendant BASF is the largest seller of dicamba herbicides in the U.S. See http://www.intlcorn.com/seedsiteblog/?p=847 (last visited Aug. 22, 2017).

***Defendants' Knowledge and Warnings of the Dicamba Drift Crisis***

389. As shown above, for years, Defendants were warned that release of Xtend products and/or their accompanying herbicides would have the disastrous consequences that have taken place each year in 2015, 2016 and 2017.

390. For example, in 2013-14, a coalition of farmers called Save Our Crops complained to both Monsanto and Dow AgroSciences about their dicamba herbicide formulations.

391. Save Our Crops was not an anti-GMO organization, in fact, it was pro-GMOs. Its concern was damage to off-target crops and plants.

392. After meeting with Save Our Crops, Dow AgroSciences took the warnings to heart, and changed one of its herbicides on the market. In the words of a Save Our Crops representative, Dow acted as a "good corporate citizen[]." Ex. 8.

393. Save Our Crops met with Monsanto in 2013; nothing came of their meeting.

> Monsanto officials "have just dug their feet in," said Steve Smith, chairman of the Save Our Crops group. "I'm not here to be a salesman for Dow, but I'm here to stand up when people do the right thing," he said. "Dow did."

*Id.* The fears raised by Save Our Crops to Monsanto in 2013 are exactly what has taken place with its Xtend releases:

> Farmers feared with millions more acres being sprayed with these drift-prone chemicals, their vegetable fields will be in danger. While the new genetically modified varieties of corn and soybean will resist the herbicides, their vegetables won't.

*Id.* Experts in the field such as Neil Rhodes, director of the herbicide stewardship program at the University of Tennessee, Knoxville, were not surprised about the concerns raised by Save Our Crops. *Id.* Similarly, Franklin Egan a research ecologist with the U.S. Department of Agriculture's Agricultural Research Service joined in with Save Our Crops' sentiment:

> Vegetable farmers in the Midwest, where large amounts of corn and soybeans are grown, will be at "high risk" because they'll be in close proximity to fields being sprayed with 2,4-D and dicamba, he said.

*Id.*

394. Worse than the financial damages inflicted by dicamba drift and volatilization are damages to the farming community:

> "You're accusing your neighbor of harming your stuff. You've got to live with these people your whole life, and your children will live with their children," he said.

*Id.*

395. After damage caused by XtendFlex cotton in 2015 and Xtend soybeans and XtendFlex cotton in 2016, Save Our Crops warned Monsanto again. On August 9, 2016, Steve Smith, Chairman of the Save Our Crops Coalition sent Hugh Grant, Chairman and CEO of the Monsanto Company, a letter predicting the very disaster now ongoing in 2017.

> The Save Our Crops Coalition (SOCC) has, since its inception, repeatedly warned of the potential for dicamba to drift and volatilize when applied later in the growing season. Such drift incidents have confirmed what SOCC had already suspected –
>
> - That unscrupulous applicators will apply non-labeled generic forms of dicamba that are prone to off-target movement if such generic forms cost less, and,
> - That dicamba application later and later in the growing season is especially hazardous given dicamba's propensity to volatilize and drift as temperatures rise.
>
> Unfortunately, there can be no doubt that Monsanto created this problem by selling Xtend soybeans and cotton, before lower volatility dicamba products were made available to applicators. Our fear is that this single, devastating mistake will be only be compounded by further mistakes that Monsanto seems eager to make.
>
> …
>
> At every opportunity, SOCC has presented its case to Monsanto's usually very capable personnel. Unfortunately, either because of inertia or intransigence, such personnel have found reasons not to deal with the problems that are clearly visible on our horizon. For this reason, I must elevate my concerns to you – the CEO.

Ex. 59.[96]

396. As is made clear by the above, Defendants ignored these warnings.

***<u>The Xtend Crop System, including Xtend Seeds, XtendiMax, Engenia and FeXapan are Ultrahazardous Products</u>***

397. While dicamba has been used for decades as pasture herbicides and for vegetation burn down prior to planting, dicamba was not commonly used for over-the-top applications (indeed, at all). Until 2017, it was illegal to apply dicamba formulations over-the-top of crops. Xtend seeds, Engenia, XtendiMax and FeXapan then were not commonly used products in the farming community.

398. Further, when Engenia, XtendiMax and FeXapan were approved, they contained some of the most restrictive and difficult to follow labels in the industry. The EPA also only awarded them a two-year label.

399. Confirming how dangerous Engenia, XtendiMax and FeXapan were, on October 13, 2017, the EPA reached an agreement with Defendants to add restrictions on their labels, including classifying their new dicamba formulations as Restricted Use Pesticides (a classification other dicamba formulations do not have). Ex. 88.[97] This means for the 2018 season, only licensed and trained individuals (and those supervised by licensed/trained individuals) could use these formulations. As Dr. Andrew Thostenson, the Pesticide Program Specialist for North Dakota State University Extension Service stated, "New [restricted use pesticide] designation demonstrates that the new dicamba formulations pose a significant risk." Ex. 83. Thus, even

[96] SOCC Pens Open Letter to Chairman of Monsanto (Aug. 9, 2016) (Downloaded on July 14, 2017 from http://saveourcrops.org/).

[97] "EPA and States' Collective Efforts Lead to Regulatory Action on Dicamba," EPA Press Release (Oct. 13, 2017) downloaded Oct. 13, 2017 from https://www.epa.gov/pesticides/epa-and-states-collective-efforts-lead-regulatory-action-dicamba.

experts classify the herbicides at issue in this case, and thus the entire system itself, as a "significant risk." Id.

400. The EPA defines a Restricted Use Pesticide ("RUP") as having "the potential to cause unreasonable adverse effects to the environment and injury to applicators or bystanders without added restrictions." Ex. 89.[98] The reclassification of the products-at-issue in this action as RUPs is a concession that not only did Defendants' products cause "unreasonable adverse effects to the environment and injury" to others, but the prior labels and instructions were insufficient to protect against such adverse effects and injury. In other words, if purchasers of the "crop system" attempted to and did follow the 2017 labels/instructions (e.g., assert the utmost care required by the Defendants), non-target damage still would have resulted.

401. As shown in this amended complaint, the Xtend Crop System, including XtendiMax, Engenia and FeXapan, is unsafe for reasonably foreseeable use. The approved over-the-top herbicides are dangerous to an extent beyond that which would be contemplated by the ordinary and reasonable buyer, consumer, or user who acquires or uses the product. The label change on these products (e.g., reclassifying the herbicides as RUPs) confirm the products are more dangerous than contemplated by ordinary and reasonable consumers, and in fact, that the label/instructions provided for 2017 were insufficient to prevent off-target damage.

402. With Defendants' refusal to acknowledge their herbicides' volatility gives rise to non-target damage, and their inability to create a "no volatility" formulation, Defendants have been unable or intentionally failed to eliminate the risks posed by the products at issue. Defendants also, by releasing difficult-if-not-impossible instructions (now admitted being

[98] "Restricted Use Products (RUP) Report," EPA.gov, downloaded Oct. 17, 2017 from https://www.epa.gov/pesticide-worker-safety/restricted-use-products-rup-report.

insufficient due to label change), confirms the exercise of reasonable care (e.g., following their instructions) still would have resulted in non-target dicamba damage.

403. Further, the harms caused significantly outweigh the costs of the crop system itself.

***The Sole Benefit of Xtend is Dicamba Resistance.***

404. The only meaningful difference between the Xtend products and other comparable Roundup Ready products is the trait for dicamba resistance. See, e.g., Ex. 60 ("The same yield and quality potential farmers already know and trust from their Genuity® Roundup Ready 2 Yield® Soybeans.")[99]

405. In the Q1 2016 phone call in January 2016, Fraley confirmed that the sole benefit of the Xtend soybean product was its "superior weed control" because it had the "same high yield" as other Roundup Ready 2 varieties. Ex. 38 at 11.

406. This is an important and oft-represented point, appearing also in Monsanto's 2015 Q4 conference call (Xtend products, such as the Xtend soybeans, "enhance the strength of [its] current Roundup Ready system with dicamba tolerance"[100]), in a 2016 Monsanto press release (Xtend products "are built on the same high-yielding germplasm as Genuity® Roundup Ready 2 Yield® soybeans, which continue to deliver a greater than four bushel per acre advantage as compared to the original Roundup Ready® soybeans")[101] and in a 2015 Monsanto press release:

> Initial results from the 2015 U.S. harvest reinforce Monsanto's performance advantage DEKALB® corn is outperforming competitive products for the tenth consecutive year, with early 2015 harvest results once again highlighting a strong performance advantage of more than 7 bushels per acre on average. In soybeans, early Roundup Ready 2 Yield®

[99] Traits/Roundup Ready® Xtend Crop System, capture of https://www.roundupreadyxtend.com/About/Traits/Pages/default.aspx from Mar. 14, 2017 webpage from archive.org.

[100] Ex. 36 at 9.

[101] Ex. 61, "Farmers to Gain Access to Monsanto's Roundup Ready 2 Xtend™ Soybeans in 2016," MON Press Release (Feb. 3, 2016) (Downloaded July 14, 2016 from http://news.monsanto.com/press-release/products/farmers-gain-access-monsantos-roundup-ready-2-xtend-soybeans-2016).

> harvest results reinforce the platform's industry-leading yield advantage of more than 4 bushels per acre on average versus first-generation Roundup Ready soybeans.
>
> *Importantly, this becomes the foundation for Roundup Ready 2 Xtend™ soybeans whose performance is expected to be at parity with Roundup Ready 2 Yield® soybeans from a yield performance perspective***,** with the benefits of improved weed control for those hard to control weeds.

Ex. 62 (emphasis added).[102]

407. Independent, university testing also found the yields were actually *lower* than Monsanto's prior Roundup Ready products. Ex. 63.[103]

> So far, these university trials have not found any significant yield bumps from the Xtend trait alone. In field trials from the Universities of Wisconsin and Minnesota, Xtend varieties tended to yield a bushel or two lower on average.
>
> When University of Wisconsin agronomist Shawn Conley crunched the numbers for Wisconsin Soybean program's field trials, he found that Roundup Ready 2 varieties out-yielded Xtend varieties by 1.8 bushels per acre on average.

*Id.*[104]

408. Considering the above, the price premium paid for Xtend is solely for the dicamba resistance trait.

409. Despite the above, it appears when marketing to farmers, Monsanto marketed the Xtend traits as having *better* yields. For example, when asked why the Monsanto released Xtend soybeans in 2016, Duane Simpson, the lead of Monsanto's U.S. State and Local Government Affairs Team stated:

> What we've seen here with the soybeans is that about 70% of our best germplasm—our best varieties—were in our Xtend traits. So here in the bootheel are best varieties are

---

[102] "Clear Focus, Strength of Core Business…", MON Press Release (Nov. 17, 2015) (Downloaded July 14, 2017 from http://news.monsanto.com/press-release/clear-focus-strength-core-business-emergence-new-platforms-and-financial-discipline-ba")

[103] "New Trait Data Available, University Yield Data Emerging for Xtend Soybeans," The Progressive Farmer (11/16/2016) (Downloaded July 16, 2017 from https://www.dtnpf.com/agriculture/web/ag/news/crops/article/2016/11/16/university-yield-data-emerging-xtend-2).

[104]

> providing 7 to 12 bushels or better per acre than the ones that don't have the Xtend trait in them.[105]

From Mr. Simpson's statements, it appears Xtend yields were falsely marketed to farmers.

410. Further, his statements emphasize the benefit (and need) in the industry for unbiased, independent testing on Monsanto products (indeed on all GMO products). Here, the independent yield tests served as a check to separate marketing claims (of a 7-to-12-bushels-per-acre increase) versus reality (a 1.8-bushel-per-acre *decrease*). Ex. 63. Similarly, it makes Monsanto's decision to not allow universities to conduct volatilization testing prior to the 2017 release (tests which now refute Monsanto's claims[106]) more suspect.

***Defendants' Nonexistent and Ineffective Stewardship Program***

411. Prior to approval of a dicamba product for over-the-top application, Monsanto left farmers without a stewardship program. Instead, Monsanto basically put a warning label on its Xtend or XtendFlex products stating that dicamba should not be used with these products. This, however, was only for appearance as its seed representatives told its customers it would be OK to spray over-the-top.

412. Further, without the availability of non-drifting dicamba formulations in 2015 and 2016, no matter what available formulations were utilized by farmers/applicators, drift onto non-target plants and crops was guaranteed.

413. Without an adequate stewardship plan prior to at least Nov. 2016, Monsanto did not inform its customers that *all* available dicamba formulations would drift or volatilize and lead to non-target plant damage. To the contrary, Monsanto's years of marketing misled and/or confused Monsanto's customers to believe that if they applied available formulations of dicamba

---

[105] Statements available on .mp3 file at http://cdn.brownfieldagnews.com/wp-content/uploads/2016/09/160831_DuaneSimpson.mp3 (starting at ~1:05).
[106] See, e.g., Exhs. 17, 18.

to Xtend or XtendFlex, it would only be the purchasers at risk of a fine for applying a non-approved herbicide.

414. Purchasers, however, were unaware that improperly applying dicamba would lead to drift and volatilization, which would lead to damage to non-target crops and harm to others.

415. Even after EPA approval of over-the-top application of dicamba on Xtend products, Defendants' stewardship plan failed. Rather than providing labels and instructions that would allow for safe application of approved dicamba products (if possible), what has resulted is more damage and complaints than in 2015 and 2016 combined.

416. Also, the October 2017 change in the over-the-top herbicides' labels confirm the prior label and stewardship efforts were ineffective.

417. Experts agree that Defendants' behavior during 2017 violated its duties and its stewardship claims. For example, during his presentation at Monsanto's Sept. 27-29, 2017 dicamba conference, Iowa State University's Dr. Owen stated 1) Defendants' suggestions that off-target movement of dicamba is acceptable because yields allegedly will not be negatively impacted is "unconscionable," and 2) to suggest there will be less of a problem in 2018 because more Xtend seeds will be sold "is inappropriate and flies in the face of 'stewardship' claims."




Ex. 75 at 2.

418. Further showing Defendants' failure to abide by its stewardship responsibilities is its ignoring of the approved over-the-top dicamba formulations' volatility. At the same conference, Dr. Larry Steckel from the University of Tennessee stated that "Volatility of Xtenidmax/Engenia" is "[h]ard to address when registrants, despite evidence, will not consider it an issue." Ex. 78 at 3. In support, Dr. Steckel relied on research from Purdue, the University of Arkansas, University of Missouri, University of Georgia, University of Tennessee, and even Monsanto's Texas data submitted to the Arkansas Plant Board that "clearly showed volatility 54 to 65 hours after application." *Id*. Also, after the 2017 label change to Defendants' over-the-top dicamba formulation, Andrew Thostenson, the Pesticide Program Specialist for North Dakota State University Extension Service, stated, "New mandatory trainings for 2018 demonstrate that voluntary stewardship activities were insufficient in 2017." Ex. 83.

419. Despite the overwhelming evidence of a volatility defect with their over-the-top dicamba formulations, Defendants' public denials and refusals to admit that their products volatilize and cause non-target crop damage violates their stewardship responsibilities. For example, in its July 21, 2017, Monsanto purposefully made statements to mislead and confuse its farmer consumers that the damage caused by the Xtend crop system is due to reasons other than volatilization. Ex. 79.[107] Similarly, Dan Westburg, a BASF representative, stated "he didn't believe volatility was a major factor." Ex. 76.[108]

420. Despite its stewardship responsibilities, Monsanto plans to double the amount of Xtend sales for 2018, and is offering incentive pricing on its Xtend products to undercut the competition.[109] Upon information and belief, Defendants are also increasing the amounts of XtendiMax, Engenia and FeXapan available for 2018. This ignoring of their stewardship responsibilities is wooing a 2018 environmental catastrophe.

***Defendants Failed in their Responsibilities and Legal Duties***

421. Manufacturers should exercise reasonable care not to commercialize and sell products that they know will create a risk of widespread harm.

422. Beyond that, Monsanto agreed to a legal, ethical, and moral obligation to release only safe and environmentally responsible products. Through at least its website, Monsanto represented that it takes product stewardship "seriously":

> We take the stewardship of our products seriously. Product stewardship is the legal, ethical and moral obligation to ensure our products and technologies are safe and

---

[107] "Dicamba Field Investigations: What Monsanto Has Learned So Far," July 21, 2017 (Downloaded Aug. 23, 2017 from https://monsanto.com/products/articles/dicamba-field-investigations-monsanto-learned-far/).
[108] "No dicamba in '18, Arkansas weed expert urges," Arkansas Online, Aug. 18, 2017 (downloaded on Aug. 23, 2017 from http://m.arkansasonline.com/news/2017/aug/18/no-dicamba-in-18-weed-expert-urges-2017/)
[109] See, e.g., https://www.roundupreadyxtend.com/About/Incentives/Pages/default.aspx (earning up to $11.50 back per acre).

> environmentally responsible. It is a component of Product Life Cycle Stewardship, which includes product introduction, stewardship of products in the marketplace and effective discontinuation of outdated technology.

Ex. 64.[110]

423. Monsanto agreed that "Stewardship is the *shared* responsibility of Monsanto, our licensees and our grower customers." *Id.* (emphasis added).

424. Here, Monsanto and its licensees BASF and DuPont failed in their duties and in their shared responsibility by releasing products they knew created a risk of widespread harm.

425. Recently and publicly, Monsanto confirmed its responsibility and duties to those affected by dicamba in 2017. On Aug. 2, 2017, the Executive Vice President and Chief Technology Officer of Monsanto, Robert Fraley, penned an "open letter" to Monsanto's "farmer customers." Ex. 90.[111] In it, Dr. Fraley encouraged those whose fields suffered dicamba damage to "contact us as soon as possible." *Id.* Once its "farmer customers" contacted Monsanto, a "report" would be prepared, after which Monsanto would send an "agronomic specialist" to "review" the fields' symptomology. *Id.*

426. Although this letter is likely a veiled attempt at discovery of materials to be used against its "farmer customers" in litigation (and thus a further violation of its responsibilities and duties), Monsanto admitted in it that it had a responsibility and fiduciary duty to farmers. *Id.* Along with imploring "farmer customers" to immediately contact Monsanto, Dr. Fraley also wrote, "we want you to know that *we will be with you every step of the way this season*" and "*we will stand by you* throughout the growing season." *Id.* (emphasis added).

---

[110] "Stewardship and The Pledge" (Downloaded on Sept. 6, 2016 from http://www.monsanto.com/products/pages/stewardship-and-pledge.aspx).

[111] "An Open Letter to Our Farmer-Customers," Monsanto.com (Downloaded on Oct. 20, 2017 from https://monsanto.com/products/product-stewardship/articles/to-our-farmer-customers/).

427. These statements not only confirm Monsanto's responsibility and fiduciary duty to its farmers, it also coincides with its Stewardship pledge.

428. Monsanto also failed in this "shared responsibility," by allowing applicators and farmers who illegally sprayed dicamba over-the-top of Xtend in prior years, to continue purchasing Xtend products in 2017.

429. Upon information and belief and as developed facts will show, Monsanto representatives were pressed by the Arkansas Plant Board in 2015 and/or 2016 for a promise to bar Xtend purchasers would illegally applied dicamba from future purchases of Xtend products. Monsanto refused to take such actions. Not only is this a failure by Monsanto to meet the duty it owed to the industry, it also shows its true motive: profit over responsibility.

430. BASF also failed to meet its duties. Even now, BASF contends Engenia is safe for use and offers a stewardship program

> A responsibility for stewardship.
>
> Every aspect of farming takes commitment, and teaching correct, effective herbicide application is our commitment to you.
>
> In modern agriculture, the advent of new and advanced herbicide technologies must accompany an equal dedication to stewardship. With the push toward leading technologies, like Engenia herbicide, BASF developed the On Target Application Academy (OTAA) to provide best-practice training that promotes correct and effective herbicide application.
>
> OTAA guides BASF's long-standing stewardship responsibility to growers through a one-of-a-kind educational program. Featuring some of the top minds in herbicide application technology in the country, OTAA sessions teach growers how to minimize drift and make applications of low-volatility Engenia herbicide safe, accurate and effective. Since its inception in 2012, OTAA has reached thousands of growers in highest crop producing regions in the country.

Ex. 65.[112]

---

[112] "A responsibility for stewardship" (Downloaded July 14, 2017 from http://agproducts.basf.us/campaigns/engenia/#stewardship).

431. BASF has failed in this regard. As the above-tests show, Engenia was volatile, subject to drift through at least temperature inversions and damaged non-target crops and plants. Particularly for Plaintiffs and the Arkansas State Class, Engenia was the only dicamba formulation approved for over-the-top application in Arkansas. Thus, Engenia contributed to the record reports of damage in Arkansas.

432. DuPont has a similar stewardship pledge.

> Balancing our search for solutions that are both science-enabled and sustainable helps us make the most responsible and appropriate use of science to help ensure food security, deliver global energy solutions, and protect the earth and its citizens.

Ex. 66.[113]

433. DuPont has failed in this regard. As the above-tests show, FeXapan was volatile, subject to drift through at least temperature inversions and damaged non-target crops and plants. Allowing such destruction to occur to non-target crops does not align with DuPont's purported duty to ensure "the most responsible and appropriate use of science to help ensure food security." *Id.*

434. The interconnected nature of the parties' relationship here also gave rise to a duty from the exact harm Defendants caused.

435. Defendants commercialized their products without taking sufficient steps to avoid the foreseeable consequences of dicamba application, temperature inversion, volatilization, and destructive drift.

436. Further, Defendants acted affirmatively to mislead and confuse consumers and the industry in general, and to cover up their wrongdoing by blaming misuse on its customers—

[113] "Stewardship" (Downloaded on July 16, 2017 from http://www.dupont.com/corporate-functions/sustainability/sustainability-commitments/product-stewardship-regulator/articles/product-stewardship.html).

customers that it admitted had a shared duty along with Defendants to avoid the harm they caused.

437. The parties here are part of an inter-connected industry and market, with expectations on all sides that manufacturers, growers, and sellers would act at least in part for the mutual benefit of all in that inter-connected web.

438. The harm to Plaintiffs and others were not only foreseeable, it was foreseen as Plaintiffs suffered the very harm expected to occur.

439. Defendants were not only warned about the risk of such harms, Monsanto's premature release of XtendFlex cotton in 2015 and of both Xtend soybeans and XtendFlex cotton in 2016 confirmed that a larger 2017 release would lead to more dicamba misuse and damage to non-target crops and plants.

440. Further, and as discussed above, Defendants withheld information from the EPA in violation of duties owed not only to the EPA but to the industry.

441. The connection between Plaintiffs' harm centers on Defendants' release of Xtend products and their dicamba formulations. If such products were not available, Xtend customers would not have sprayed dicamba over the top of their crops, and therefore the damage complained of in this action would not have occurred.

442. Sales representatives informing prospective customers to engage in off-label uses further confirms the harm centers on Defendants.

443. The injury suffered by Plaintiffs and others are not out of proportion to Defendants' culpability. Defendants knew from Monsanto's premature 2015 and 2016 releases that damage to non-target plants and crops would occur. Defendants' refusal to allow independent testing on volatility also confirm they were aware their products would damage non-

target crops and plants. Defendants also knew (or should have known) a much larger rollout of Xtend products would cause additional, greater damage than prior years. Further, Defendants were aware that no matter what safeguards were taken, damage due to temperature drift, volatility and drift would result, and hid such information from the EPA.

444. Monsanto also knew its "warning" process to prevent off-label use was insufficient as well, especially after its 2015 and 2016 releases.

445. Additionally, Monsanto's release of Xtend and XtendFlex has not only led to damaged crops, it has sowed anger and resentment in farming communities where farmers may have had their crops damaged by other members of their community.

446. Finally, Defendants are seeking to shirk their responsibility onto their customers that allegedly misused dicamba, despite their pledge that stewardship is a "shared responsibility." That should not be lost here. Defendants' public defense to the damage in 2017 is either 1) Xtend product customers or applicators did not follow the approved, over-the-top labels/instructions when applying dicamba, or 2) Xtend product customers utilized unauthorized dicamba formulations for over-the-top applications. While these defenses overlook the independent tests that now show volatility even when the approved formulations were properly applied, Defendants' defense is their customers.

447. Through their stewardship pledge, Defendants affirmatively adopted a duty or responsibility to prevent the harm they caused.

448. Defendants also have a duty to prevent future harm from arising, especially where such harm is foreseeable.

449. One such future harm which Defendants have a duty to prevent would be from their customers, known to Defendants, who previously caused non-target damage by failing to follow Defendants' instructions and labels.

450. Defendants have agreements with the purchasers of the products-at-issue, and can either cancel such agreements due to violations by their customers or prohibit future sales of the products at issue in this action to violators.

451. For example, Monsanto[114] has Technology/Stewardship Agreements with purchasers of Xtend and XtendFlex seeds through which it asserts control on which herbicides its customers can use, as well as how to apply those herbicides.

452. Should Monsanto's customers violate the terms of the Technology/Stewardship Agreements, Monsanto has the right to revoke their agreements and/or prohibit future sales of Xtend and XtendFlex seeds to violators.

453. Monsanto has publicly condoned over-the-top spraying of non-approved dicamba formulations on Xtend and XtendFlex crops.

454. Monsanto has also publicly stated that over-the-top spraying of non-approved dicamba formulations is inconsistent with its instructions and labels.

455. Over-the-top spraying of non-approved dicamba formulations on Xtend and XtendFlex crops constitutes a violation of the Technology/Stewardship Agreement. If its Xtend and XtendFlex customers engage in such behavior, Monsanto can cancel their Technology/Stewardship Agreements and prohibit future sales of Xtend and XtendFlex seeds to them.

[114] DuPont would also have agreements with its purchasers of dicamba resistant seeds as well.

456. Despite this, in 2016, no grower licenses were pulled/cancelled due to illegal applications of dicamba. Ex. 92.[115]

457. In a 2017 deposition, Masters (the individual described above who admitted he illegally sprayed dicamba over-the-top of his XtendFlex cotton) explained that his Monsanto sales representative was aware in 2015 (when Masters first purchased XtendFlex seeds), that his XtendFlex purchase was for illegal usage of dicamba as an over-the-top herbicide. Ex. 91 at 146:6-15.[116] Despite knowing this, Monsanto's sales representative explained to Masters the proper amounts of non-approved dicamba formulation to utilize as an over-the-top application. *Id.* at 130:13-132:24. Also in his 2017 deposition, Masters testified that in 2016, his Monsanto sales representative was aware that Masters illegally sprayed dicamba on his XtendFlex seeds, yet in 2016, he sold him Xtend products again—with knowledge Masters intended to illegally spray dicamba again. *Id.* at 149:12-150:18. As of his Sept. 20, 2017 deposition, Monsanto conducted no investigation into Masters' illegal spraying, and has not revoked Masters' technology license. *Id.* at 151:18-152:25.

458. Monsanto publicly contends that most (if not all) of the 2017 damage to non-target crops and plants due to dicamba allegedly was caused by failure to follow approved dicamba herbicides' labels and instructions. If its Xtend customers engaged in such behavior and, Monsanto could and should cancel their Technology/Stewardship Agreements and prohibit future sales of Xtend and XtendFlex seeds to them.

[115] "Dicamba Questions Cloud 2017 Horizon," AgWeb, January 31, 2017 (Downloaded from https://www.agweb.com/article/dicamba-questions-cloud-2017-horizon-naa-chris-bennett/ on October 17, 2017).
[116] Masters 2017 Dep. Tr. from Bader Farms, et al. v. Monsanto Company, et al. Case: 1:17-cv-00020-SNLJ (EDMO)

459. Upon information and belief, and despite being aware of numerous violations in 2015, 2016 and 2017, Monsanto has not cancelled any of its customers Technology/Stewardship Agreements and/or prevented the sales of Xtend or XtendFlex seeds to its customers.

460. To restate, despite its awareness of known violations, Monsanto continues selling Xtend and XtendFlex seeds to those who failed to comply with their Technology/Stewardship Agreements. By doing so, Monsanto is not protecting innocent third parties, such as Plaintiffs, despite possessing the power to do so.

461. Defendants also have similar agreements with their customers due to XtendiMax, Engenia and FeXapan sales. Upon information and belief, Defendants have not cancelled any agreements with their customers due to non-target dicamba damage or prohibited sales of Defendants' over-the-top formulations to their offending customers.

462. Here, greed won out over their duty and responsibilities. Finding Defendants guilty simply adopts the policies that Defendants purported they followed, yet did not.

463. Implementing such a rule is feasible. Manufacturers should not release GMOs, or products in general, which will inevitably lead to non-target crop and plant damage, especially when those damaged are innocent parties guilty only of not buying Xtend products.

464. Similarly, when the purchasers of Defendants' products are allegedly the ones that caused the more-than 3.6 million acres of reported damage, manufacturers have a duty to prevent those customers from continuing to buy and use Defendants' products and cause additional non-target damage.

465. Given Defendants' adoption of stewardship standards, the expectation on behalf of Plaintiffs and other similarly situated stakeholders, would be that Defendants would not release a product that would cause harm to others.

466. There is no burden in guarding against injuries of this type. Monsanto created a product (Xtend) that to work as created and planned required another product (specific formulations of dicamba). Linking the sales of these two products (as Defendants refer to them, a "crop system") is not a burden. The entire "crop system" itself is defective; the over-the-top herbicides volatilize and are susceptible to temperature inversions, and the Xtend seeds for weed control require application of the very same defective dicamba formulations. Further, in 2015 and 2016, manufacturing, distributing, and selling of the "crop system" without the accompanying herbicide (missing a necessary component) was on-its-face providing an incomplete and thus defective product.

467. Further, allowing a damages recovery in a case like this has a sensible stopping point: once Xtend products are removed from the market and/or volatile over-the-top dicamba use is prevented, future damages will stop (though, as some damage will occur to seeds which will be planted the following year, the stopping point would require an additional growing season).

468. Defendants failed to provide assistance in the form of stewardship programs that would eliminate dicamba volatilization or drift, and thereby avoid non-target crop damage.

469. Defendants failed to offer a dicamba formulation that would not volatilize or drift, thereby making non-target crop damage inevitable.

470. Defendants engaged in affirmative conduct that contributed to the harm caused.

471. With the benefits to Monsanto of premature releases of Xtend (*i.e.*, additional and increased sales of Xtend products in the future due to farmers' purchasing products to defend against others' misuse), Monsanto's decision to prematurely release its Xtend products and to continue selling such products were intended to affect non-Xtend planting farmers.

472. At a minimum, Monsanto, and DuPont distributed Xtend seeds, and Defendants Monsanto, BASF, and DuPont distributed dicamba formulations for over-the-top application on Xtend seeds, knowing they would lead to damage to non-target crops and plants.

473. The obligations imposed by the damage caused by dicamba in 2015 and 2016 put Defendants in a position to control, and, in fact, prevent damage to non-target plants crops (by withholding Xtend from the market) or control the damage.

474. Allegedly, Monsanto had agreements with each purchaser of Xtend products that warned them against utilizing dicamba in the 2015 and 2016 seasons. These alleged agreements gave Monsanto some measure of control over the use of its Xtend products, as well as a means to abate any damages caused by misuse.

475. Similarly, Monsanto and DuPont have agreements with each purchaser of Xtend products that warned them against utilizing dicamba in the 2017 season. These alleged agreements give Monsanto and DuPont some measure of control over the use of their Xtend products, as well as a means to abate any damages caused by misuse.

476. Still, it appears Defendants took no actions in this regard.

***Damages Suffered by Plaintiffs Due to Defendants' Products and Misrepresentations***

477. The Plaintiffs in this action suffered physical damage to their plants, crops, and trees due to dicamba exposure. This damage caused, at a minimum, leaf cupping and stunted/delayed growth, plant/tree death, and/or loss of yield. Further, at the time of harvest, maturity/dry down issues were also noted.

478. In attempts to ameliorate the dicamba damage, Plaintiffs (e.g., Michael Baioni, Amore Farms and Robert Terry) applied additional chemicals (e.g., herbicide treatment) to the

stunted soybean plants. Due to excessive damage to their crops, Plaintiffs (e.g., H+H Farm Partnership) had to replant some of their soybeans, resulting in additional time and expense.

479. Further, Plaintiffs (e.g., Buckskin Farms) save a portion of their harvest for planting the following year. Due to their exposure to dicamba, those seeds may not be viable (they are currently being tested).

480. Dicamba presence can also jeopardize the status of crops as organic, putting price premiums at risk.

481. Plaintiffs also live under the threat that Monsanto may prohibit them from purchasing Monsanto licensed technologies as well.[117] Even if Monsanto allows Plaintiffs to purchase and plant Xtend seeds in 2018, this will require additional costs for Plaintiffs, as Xtend seeds are more expensive as are the approved, over-the-top dicamba formulations. Plaintiffs do not wish to plant Xtend seeds, but the only way to prevent additional damage to their crops would be through the purchase of Xtend seeds.

482. Had Xtend and XtendFlex seeds not been available for sale, Plaintiffs would not have suffered dicamba damage.

483. Had others not applied dicamba formulations over-the-top of their Xtend and XtendFlex crops, Plaintiffs would not have suffered dicamba damage.

484. Further, due to the large-scale applications of dicamba this year, all of Defendants' new dicamba formulations were part of a cloud of herbicides that caused wide-scale damage.

[117] Although no Plaintiff has yet been prevented from purchasing Xtend seeds, the rumor is that Monsanto will retaliate against any plaintiff who files suit by blocking future Xtend purchases.

485. Plaintiffs in this action operate their farms as businesses, and ultimately produce their crops (e.g., soybeans) for sale. The damage caused by Defendants' products will lead to reduced sales due to reduced quantity and/or quality.

486. Defendants' deception to purchasers of Xtend seeds and/or the approved over-the-top dicamba formulations (as described above) damaged Plaintiffs. These deceptive statements led to sales of Xtend seeds and Defendants' herbicides, which in turn led to damage to Plaintiffs' crops, lost crop yields and loss of sales.

***Defendants' Illegal Monopolistic Behavior***

487. In the U.S. soybean market, Monsanto holds great market power. Ninety percent (90%) of soybeans grown in the U.S. are genetically engineered with Monsanto's Roundup resistance. Ex. 68.[118]

488. In the U.S. cotton seed market, Monsanto holds great market power, as well. Ninety percent (90%) of the cotton market in the U.S. is GMO, and upon information and belief, Monsanto seeds make up a significant portion of the GMO cotton seed sold in the U.S. Ex. 69. [119]

489. 'Monsanto and Defendants' goal by adding dicamba herbicide resistance to soybeans and cotton was to maintain and expand their already vast market power in these markets, including Defendants as a whole, and Monsanto by itself.

490. The agricultural seed market is an oligopoly. According to the USDA, the "Big Six" (BASF, Bayer, Dow, DuPont, Monsanto, and Syngenta) dominate the seed market. Ex.

[118] "As Patents Expire, Farmers Plant Generic GMOs," MIT Technology Review (July 30, 2015 (Downloaded on July 15, 2017 from https://www.technologyreview.com/s/539746/as-patents-expire-farmers-plant-generic-gmos/).
[119] "Recent Trends in GE Adoption," U.S. Dept. of Agriculture (July 12, 2017) (Downloaded July 15, 2017 from http://www.ers.usda.gov/data-products/adoption-of-genetically-engineered-crops-in-the-us/recent-trends-in-ge-adoption.aspx). While discussing the GMO market generally, discovery will determine the actual share of the market which is Monsanto products. Upon information and belief, it is expected to be 90% of the market.

99.[120] After a Dow-DuPont merger, and Bayer divesting its soybean business to BASF, the cotton and soybean seed markets are dominated by the Defendants. *Id.* According to 2017 estimates, Monsanto controls 28.2% of the soybean seed market, DuPont controls 37.7% (from premerger DuPont Pioneer with 31.9% and Dow's 5.8%), giving just these Defendants 65.9% of the soybean market. Ex. 97.[121]




This 65.9% of the market is a low estimate, as it does not include BASF (which after its acquisition of seeds (including LibertyLink) from Bayer also holds a noticeable portion of the soybean market). *Id*. Further, upon information and belief, these numbers are low as they do not include licensed products of the Defendants sold by other companies.

[120] "Mergers and Competition in Seed and Agricultural Chemical Markets," USDA, downloaded Oct. 23, 2017 from https://www.ers.usda.gov/amber-waves/2017/april/mergers-and-competition-in-seed-and-agricultural-chemical-markets/
[121] "What to Watch as Mergers Near the Finish Line," AgWeb (Aug. 2, 2017) Downloaded Oct. 23, 2017 from https://www.agweb.com/article/what-to-watch-as-mergers-near-the-finish-line-naa-sonja-begemann/

491. The Defendants' share of the soybean market will only increase. Monsanto announced it will double the amount of Xtend seeds sold in 2018 from 2017. In 2017, the USDA estimated that 89.5 million acres of soybeans and 12.1 million acres of cotton were planted. Ex. 93.[122] In 2017, 25 million acres were Xtend technology, which led to over 3.6 million acres of *reported* damage, with estimates of actual 2017 damage far exceeding this amount. Ex. 94[123]; Ex. 95.[124] It is expected that next year, soybean plantings will drop to 86.1 million acres. Ex. 94. Despite this, in 2018, Monsanto believes 50 million acres of Xtend soybeans and cotton will be planted. *Id.* Thus, in just a few years from release, the Xtend technology alone is expected to account for more than 50% of the market for soybeans and cotton. This rapid increase in market share does not account for the non-dicamba resistant soybean and cotton lines sold and licensed by Defendants which further increase their market share.

492. For cotton, the market is dominated by Monsanto (*i.e.,* Deltapine) and Bayer, as Americot sells Monsanto licensed technologies such as XtendFlex cotton and Phytogen sells Monsanto licensed technologies such as Roundup Ready.

---

[122] USDA Acreage Report (June 30, 2017) (downloaded on October 19, 2017 from https://usda.mannlib.cornell.edu/usda/current/Acre/Acre-06-30-2017.pdf).

[123] "Acreage shift looming? Xtend plantings expected to double.," Farm Week Now (Aug. 31, 2017), http://farmweeknow.com/story-acreage-shift-looming-xtend-plantings-expected-double-4-164268

[124] "Monsanto Supports Dicamba Label as it Stands," AG Web (Aug. 30, 2017) downloaded Oct. 20, 2017 from https://www.agweb.com/article/monsanto-supports-dicamba-label-as-it-stands-naa-sonja-begemann/.




493. Monsanto and Defendant's' strategy in 2015 and 2016: since all available dicamba formulations would drift or volatilize, the only way farmers could protect their crops from improper dicamba use would be to also buy Xtend products. Despite their being no approved over-the-top dicamba formulations, Defendants increased the amount of other dicamba formulations on the market which would ensure illegal application. Further, Monsanto sales representatives instructed customers how to apply non-approved dicamba over-the-top of Xtend seeds. As the evidence above shows, this strategy worked by causing damage to non-dicamba crops and an increase in future sales of Xtend crops. Further, after EPA approval, given drift and volatilization would always occur, the only way farmers could protect their crops would be to purchase Xtend products.

494. With the millions of acres of damage caused to crops by over-the-top dicamba use, farmers now believe they need to purchase their seeds defensively (*i.e.*, purchase dicamba resistant crops) to protect themselves.

495. The relevant markets are currently soybeans and cotton, as well as dicamba resistant soybeans and cotton. In the future, the relevant markets expand to all crop types which Monsanto genetically modifies to incorporate dicamba herbicide resistance. In this manner, Monsanto and Defendants hope to hijack additional crop markets, turning them (via fear of non-target crop damage) into exclusive dicamba resistant markets for which Monsanto owns the patents to exclude others from competing.

496. The geographic market is all areas of the United States where soybean and cotton planting occur, or where to-be-created created Xtend crops will be planted.

497. Monsanto's products in these markets currently include—at least—its RoundUp Ready and RoundUp Ready 2 products, Xtend soybeans, XtendFlex cotton, and other products Monsanto is developing with dicamba resistance. Further, Defendants also sell soybeans and cotton (e.g., BASF just purchased LibertyLink from Bayer; DuPont sells Xtend seeds, etc.). All the Defendants also sell over-the-top dicamba formulations.

498. Facts supporting Monsanto and Defendants' market/monopoly power include:

Monsanto's technology in the soybean market is about 90%, and it has had such a presence since at least 2008.

The Defendants operate an oligopoly in the soybean and cotton markets.

Monsanto and Defendants have a dominant share of the cotton market (which could be 90% as well), and they have had this large of a presence since at least 2012.

Monsanto and Defendants' dominant market share in both the soybean and cotton markets are now protected by the fear of dicamba drift. After the damage caused by the 2015, 2016 and 2017 growing seasons, farmers feel they need to defensively purchase dicamba tolerant products to ensure their crops are not affected by others. This creates a barrier to entry because Monsanto owns the patents on dicamba tolerance.

The fear of non-target damage drives an increase in Defendants' market share and sales of Xtend products. In 2015, there were 500,000 acres of XtendFlex cotton planted, and no Xtend soybeans. In 2016, 3-million acres of Xtend soybeans were planted and an increased amount of XtendFlex cotton. In 2017, 25 million acres of Xtend soybeans were

> planted as was an increased amount of XtendFlex cotton. And in 2018, Monsanto estimates there will be 50 million acres of Xtend products planted, 40 million of which will be Xtend soybeans in the U.S. market.
>
> Monsanto's "2025 Target" for the Xtend technology is 200-250 million acres across soy, cotton, and corn. Ex. 34 at 13. Considering current levels of soy, cotton and corn acreage planted is about 200 million acres (see, e.g., Ex. 93), clearly Monsanto is targeting near 100% of the market with Xtend technology. Ex. 33 at 11, Ex. 34 at 13.
>
> Largely due to Defendants market share and Monsanto's patent ownership over dicamba tolerance, consumers lack commercially viable alternatives to Xtend soybeans, XtendFlex cotton and other Xtend products. In other words, if dicamba is going to be used, only Xtend crops are guaranteed to survive undamaged. All other crops are at risk.

499. By promoting dicamba drift, Defendants can potentially eliminate non-dicamba resistant crops. As some have put it…

> "[Monsanto] knew that people would buy it just to protect themselves," Hayes says. "You're pretty well going to have to. It's a good marketing strategy, I guess. It kind of sucks for us."

Ex. 20. Also, as Cynthia Palmer, a member of an E.P.A. pesticide advisory committee stated, "It seems like farmers have no choice but to buy dicamba-resistant seeds from Monsanto." Ex. 101.[125]

500. Given that the soybean and cotton markets could be turning into "dicamba resistant only" markets, Monsanto can set the price of its products without fear of competition, ensuring maintenance of its minimum $6-$10 price premium. Similarly, Defendants can set the price of their over-the-top herbicides without fear of competition as well.

501. Further, Xtend products could eliminate non-GMO, organic and/or other types of soybeans and cotton from the market (e.g., stop Liberty Link from eroding its soybean market share). This would not be through free-market competition, but rather by threat of or actual

[125] See also Ex. 102 at 34-36.

physical damage to competing products (through non-target damage), or through fear rightfully felt by consumers that to have a viable crop, the only choice would be Xtend products.

502. Finally, upon information and belief, Monsanto might retaliate against the named Plaintiffs in this action and other actions brought against its Xtend technology by preventing future purchases of Monsanto products (and/or Monsanto will pull their current technology agreements). This potential refusal to deal by Monsanto is likely not just on Xtend technologies, but on *all* Monsanto licensed technologies (including products sold by other companies that encompass Monsanto technologies).

***A Warning for 2018 Damage***

503. Monsanto will sell twice the amount of Xtend soybeans next year. Despite this, Defendants have underplayed the volatility issues with their over-the-top dicamba herbicides. They also have not changed the formulations of their over-the-top herbicides to decrease volatility.

504. As Dr. Aaron Hager, from the University of Illinois states, this increase of dicamba in the air will cause problems for the agricultural industry in 2018.

> A lot of people I have talked with said well we're going to plant them just out of defense. We know our neighbors are going to plant them so we are going to have these for defensive purposes. My guess is of all of those acres that are going to be planted for defensive purposes 80% of them are going to get sprayed with dicamba. Now you've essentially almost doubled the load of dicamba that's going to be used in 2018. One of the big differences in 2018, and I hate to say this, this is going to become very public. In 2017 we relearned what we've known for 50 years, and that is that soybean are about the most sensitive dicot species to dicamba that we have in this state. In 2018 we are going to realize that's not the only species. If we increase this load of dicamba that is moving around, by whatever the mechanism is, subdivisions, gardens, orchards, vineyards, native trees around the state. Do we really understand how sensitive some of these are going to be to this increased load now of dicamba? And my greatest fear in 2018 is that this is

going to be very public and we are one major news story away from having an absolute public relations disaster in American agriculture over this topic.[126]

505. Despite 1) the numerous independent tests showing the volatility of Defendants' over-the-top dicamba, 2) warnings from industry experts, 3) increasing amounts of record damage caused by dicamba in 2015, 2016 and then 2017 (damage that but for the availability of the Xtend "crop system" would not have occurred), and 4) in essence coining the new agricultural term of "defensive farming" (where farmers must choose their next years' crops based not on their choice, but on their neighbors' choice), Defendants' greed nonetheless compels them forward to risk 2018 as another record year of dicamba damage.

## CLASS ACTION ALLEGATIONS

506. Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(1), and 23(b)(3) of the Federal Rules of Civil Procedure ("Rules" or, individually, "Rule"), on behalf of themselves and a number of classes (each a "Class," and collectively, "the Classes"), consisting of all persons and entities, either in Plaintiffs' respective states or, collectively, in the Nationwide Class (defined below), who, during the relevant time period, suffered damaged crops or plants due to dicamba drift or volatilization when dicamba was sprayed upon Xtend products. Excluded from the classes described below are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Also excluded are farmers who purchased or planted Xtend products.

507. In addition, Plaintiffs assert claims against Defendants, individually and on behalf of state specific claims. The Arkansas, Illinois, Missouri, Kansas, and Nebraska statewide

---

[126] Oct. 27, 2017 interview from AgricultureReporting.com, available as of 11/1/2017 from https://www.youtube.com/watch?v=2NAasvJ8pK4&feature=youtu.be

Classes, defined below, corresponds to the state of which Plaintiffs are citizens and in which they suffered damage due to Defendants' acts.

508. The Nationwide Class consists of all farmers and growers who suffered damage to their crops, trees, or plants in 2015-2017 due to over-the-top application of dicamba on others' Xtend crops. Excluded from the Nationwide Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Also excluded are farmers who solely purchased or planted Xtend products.

509. The Arkansas State Class consists of all Arkansas farmers and growers who suffered damage to their crops, trees, or plants in 2015-2017 due to over-the-top application of dicamba on others' Xtend crops. Excluded from this State Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Also excluded from the state classes are farmers who solely purchased or planted Xtend products.

510. The Illinois State Class consists of all Illinois farmers and growers who suffered damage to their crops, trees, or plants in 2015-2017 due to over-the-top application of dicamba on others' Xtend crops. Excluded from this State Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Also excluded from the state classes are farmers who solely purchased or planted Xtend products.

511. The Missouri State Class consists of all Missouri farmers and growers who suffered damage to their crops, trees, or plants in 2015-2017 due to over-the-top application of dicamba on others' Xtend crops. Excluded from this State Class are the Court and its officers,

employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Also excluded from the state classes are farmers who solely purchased or planted Xtend products.

512. The Nebraska State Class consists of all Nebraska farmers and growers who suffered damage to their crops, trees, or plants in 2015-2017 due to over-the-top application of dicamba on others' Xtend crops. Excluded from this State Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Also excluded from the state classes are farmers who solely purchased or planted Xtend products.

513. The Kansas State Class consists of all Kansas farmers and growers who suffered damage to their crops, trees, or plants in 2015-2017 due to over-the-top application of dicamba on others' Xtend crops. Excluded from this State Class are the Court and its officers, employees, and relatives; Defendants and their subsidiaries, officers, directors, employees, contractors, and agents; and governmental entities. Also excluded from the state classes are farmers who solely purchased or planted Xtend products.

514. The requirements of Rule 23(a) are satisfied for each of the foregoing Classes because the members of each Class are so numerous and geographically dispersed that joinder of all its members is inapplicable. With regard to the Nationwide and State Classes, it is likely well-over 3.6 million acres of damaged crops have been reported from just 2017. Millions of acres of Xtend crops were also planted. Although the exact number and identity of each Class member is not known, there are hundreds, if not thousands, of members in each Class. The "numerosity" requirement of Rule 23(a)(1) is, therefore, satisfied.

515. The "commonality" requirement of Rule 23(a)(2) is satisfied because there are questions of law and fact common to each of the respective Plaintiffs and the other members of each of the Classes they respectively seek to represent. Among those common questions of law and fact are:

a. whether the members of the Nationwide Class have sustained or continue to sustain damages in their business or property by reason of Defendants' acts or omissions, and, if so, the proper measure and appropriate formula to be applied in determining such damages;

b. whether Defendants knew or should have known that their acts or omissions would cause or contribute to dicamba drift/volatilization and damage to non-target plants and crops;

c. whether Defendants are legally responsible for the damages caused to non-target plants and crops under one or more of the legal theories asserted in this complaint;

d. whether the members of the Nationwide Class and/or State Class have sustained and continue to sustain damage as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages for the Nationwide Class and/or each of the respective State Class; and

e. whether the members of the Classes are entitled to compensatory, statutory, exemplary, and/or punitive damages.

516. Plaintiffs' claims are typical of the claims of all other members of each of the respective Classes that they seek to represent, as described above, because they arise from the same course of conduct by Defendants and are based on the same legal theories as do the claims of all other members of each of the respective Classes. Moreover, Plaintiffs seek the same forms of relief for themselves as they do on behalf of absent Class members. Accordingly, Plaintiffs

have satisfied the "typicality" requirements of Rule 23(a)(3) with respect to each of the Classes they respectively seek to represent.

517. Because their claims are typical of the respective Classes that they seek to represent, Plaintiffs have every incentive to pursue those claims vigorously. Plaintiffs have no conflicts with, or interests antagonistic to, the plaintiff farmers comprising the other members of the Classes they respectively seek to represent relating to the claims set forth herein. Also, Plaintiffs' commitment to the vigorous prosecution of this action is reflected in their retention of competent counsel experienced in litigation of this nature to represent them and the other members of each of the Classes. Plaintiffs' counsel will fairly and adequately represent the interests of each of the proposed Classes, and: (a) have identified and thoroughly investigated the claims set forth herein; (b) are highly experienced in the management and litigation of class actions and complex litigation; (c) have extensive knowledge of the applicable law; and (d) possess the resources to commit to the vigorous prosecution of this action on behalf of the proposed Classes. Accordingly, Plaintiffs satisfy the adequacy of representation requirements of Rule 23(a)(4) with respect to each of the proposed Classes.

518. In addition, this action meets the requirements of Rule 23(b)(1). This case raises questions about, among other things, Defendants' duty of care with respect to its commercialization of herbicides and genetically modified traits, which necessarily require class wide adjudication to prevent the risk of inconsistent rulings and incompatible standards of conduct for Defendants. Moreover, absent a representative class action, many members of the proposed Classes would continue to suffer the harms described herein, for which they would have no remedy. Even if separate actions could be brought by individual Plaintiffs, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the

litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated corn producers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. Further, as this action seeks an injunction, if litigated separately, could result in inconsistent decisions pertaining to duties owed by Defendants.

519. This action additionally meets the requirements of Rule 23(b)(3). Common questions of law and fact, including those enumerated above, exist as to the claims of all members of each of the respective Classes and predominate over questions affecting only individual Class members of each such Class, and a class action is the superior method for the fair and efficient adjudication of this controversy. Class treatment will permit large numbers of similarly-situated persons to prosecute their respective class claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce. Furthermore, while damages to members of each of the proposed Classes are substantial in the aggregate, the damages to any individual member of the proposed Classes may be insufficient to justify individually controlling the prosecution of separate actions against Defendants.

520. This case is manageable as a class action, and a class trial will be manageable. Notice may be provided to members of the respective Classes by first-class mail and through alternative means of publication and the Internet. Moreover, the Nationwide Class members' claims will be decided under federal substantive law and the substantive law of only one state (Missouri), and the State Classes' claims will likewise each be decided under the substantive law of only one state, that of the respective state of each of those Classes. Thus, the Court will not

have to grapple with the application of multiple jurisdictions' law to the members of any single Class.

521. To the extent not all issues or claims, including damages, can be resolved on a class-wide basis, Plaintiffs invoke Rule 23(c)(4) and reserve the right to seek certification of narrower and/or re-defined Classes and/or to seek certification of a liability class or certification of certain issues common to the class. Plaintiffs further reserve the right to seek to combine one or more of the Statewide Classes as appropriate, including to the extent the laws of any two or more states do not have materially conflicting laws relevant to the claims that they may be combined into a single Class.

## PLAINTIFFS' CLAIMS FOR RELIEF

### COUNT I
### Violation of Lanham Act
### (15 U.S.C. § 1125(a)(1)(B))
### On Behalf of Plaintiffs and Nationwide Class

522. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

523. The Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

524. Monsanto's statements and commentary made to the press, statements on the internet, during quarterly conference calls, incorporated into Defendants' websites and on its

Xtend product labels and marketing materials, which, inter alia, represent that dicamba for over-the-top use on Xtend would imminently be approved by the EPA prior to and including the 2016 planting season, as alleged above, were materially false statements that were likely to cause confusion and mistake as to the nature, characteristics, and qualities of Xtend soybeans and dicamba's use thereon.

525. Monsanto's statements include, but are not limited to:

i. Monsanto's statements to farmers and prospective customers in its marketing materials (e.g., on its websites and in its advertising literature) that its Xtend products would not be released until EPA approval;
ii. The numerous statements Monsanto made to the press and to investment analysts on quarterly conference calls that its Xtend products would not be released until EPA approval;
iii. The numerous statements to the press and to investment analysts on quarterly conference calls made concerning "imminent" EPA approval; and
iv. Through other statements indicating that approval from of over-the-top application of dicamba on its Xtend products was expected at times when Monsanto knew it was not.
v. Sales representatives informing applicators and farmers it was OK to spray dicamba over-the-top of their Xtend crops in 2015 and 2016.

526. Further, Monsanto, BASF and DuPont's statements and commentary made to the press, statements on the internet, during quarterly conference calls and incorporated into Defendants' websites, product labels and marketing materials, which, inter alia, represent that dicamba could be safely used for over-the-top application on Xtend products and would not lead to drift and volatilization were materially false statements that were likely to cause confusion and mistake as to the nature, characteristics, and qualities of Xtend soybeans and Defendants' over-the-top dicamba formulations use thereon.

527. As more fully alleged above, these statements are materially false as they misrepresented, and are, and continue to be, likely to cause confusion and mistake as to the nature, characteristics, and qualities of Xtend products and the dicamba formulations to be used with

Xtend products, the impact of drift, volatilization, and temperature inversion of dicamba on non-target crops, trees, and plants, and the ability to prevent/minimize damage due to over-the-top dicamba application.

528. Defendants' statements were made as advertisements for the Xtend product line, XtendiMax, Engenia and FeXapan.

529. Defendants' statements refer specifically to the Xtend product line, XtendiMax, Engenia and FeXapan.

530. Defendants had an economic motivation for making their statements – sales of the Xtend product line, XtendiMax, Engenia and FeXapan.

531. Defendants' statements were likely to and did influence purchasing decisions by farmers planting and growing Xtend crops, at a minimum, by convincing them over-the-top dicamba formulations would not cause non-target crop, tree, and plant damage.

532. Defendants' misleading representations deceived and/or continue to deceive, farmers, applicators, and other consumers.

533. Defendants' statements where widely distributed, which is, at least, sufficient to constitute promotion within the soybean and cotton industries.

534. Upon information and belief, Plaintiffs and class members relied on Defendants' material misrepresentations, for example, by purchasing products other than Xtend products believing their products would be safe from non-target damage due to others' use of dicamba.

535. Plaintiffs and class members have and continue to be damaged by Defendants' material misrepresentations.

536. Defendants' acts proximately caused damage to Plaintiffs and the class.

537. This harm has manifested itself as at least reduced yield, and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

538. Defendants' acts constitute the use of false descriptions and false representations in interstate commerce in violation of the § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**COUNT II**
**Attempted Monopolization of the Soybean Market**
**(Section 2 of Sherman Act)**
**On Behalf of Plaintiffs and Nationwide Class**

539. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

540. Monsanto has willfully engaged, and is engaging, in a course of anticompetitive conduct, including destroying non-dicamba resistant soybean seed, tying and refusals to deal, among other acts, to obtain a monopoly in the soybean market or the dicamba resistant soybean market.

541. There is a dangerous probability that, unless restrained, Monsanto will succeed in obtaining a monopoly in such markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In fact, Monsanto estimated it would control 200-250 million acres of soybean, cotton, and corn plantings by 2025, which would result in Monsanto by itself controlling 90-100% of the U.S. market for each of these crop types.

542. Monsanto has acted with the specific intent to monopolize and destroy effective competition in the markets for soybean seeds and the dicamba resistant soybean market.

543. Monsanto's conduct occurred in and affected interstate commerce.

544. Monsanto's conduct has injured consumers and competition.

545. As a direct, foreseeable, and proximate result of Monsanto's conduct in violation of Section 2 of the Sherman Act, Plaintiffs and the class have been and will be damaged, in amounts to be proven at trial.

546. Plaintiffs and the class's injuries are of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

547. Unless the activities complained of are enjoined, Plaintiffs and the class will suffer immediate and irreparable injury for which Plaintiffs and the class are without an adequate remedy at law, including, but not limited to, the inability to purchase, plant, grow and harvest products that compete with Xtend soybeans or to plant non-GMO or organic soybeans.

548. By reason of the foregoing, Monsanto is liable to Plaintiffs and the class for compensatory damages (trebled), in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT III**
**Violation of Section 1 of Sherman Act by Defendants**
**On Behalf of Plaintiffs and Nationwide Class**

549. Beginning on or about 2009 (between BASF and Monsanto) and 2016 (for DuPont and Monsanto), the exact date being unknown and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the soybean market in the United States as described within this amended complaint.

550. In particular, Defendants and their co-conspirators have combined and conspired to unlawfully limit or eliminate non-dicamba resistant soybeans from the U.S. market by

unlawfully causing physical damage to competing soybeans, and through such damage, unlawfully discouraging farmers from purchasing competing products.

551. As a result of Defendants' and their co-conspirators' unlawful conduct, the market for non-dicamba resistant soybeans is shrinking dramatically and may soon no longer be viable, especially for organic and non-GMO soybeans.

552. The combination or conspiracy among Defendants consisted of continuing agreements, understanding and concerted action among Defendants and their co-conspirators as provided in this amended complaint.

553. For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including but not limited to:

a. Signing agreements regarding research, development, and distribution of dicamba resistant crops and dicamba formulations (both approved for over-the-top application and not approved) that would unlawfully lead to non-target crop, tree, and plant damage.

b. Increasing the amount of generic dicamba formulations available in the market when the demand for such products arises solely due to availability of dicamba-resistant crops, such increase resulting in damage to non-target crops, trees, and plants.

c. Unlawfully instructing customers how to apply non-approved dicamba formulations over-the-top of dicamba-resistant crops.

d. Unlawfully providing false and/or misleading statements to their customers concerning the characteristics of their over-the-top dicamba formulations (such as falsely touting the alleged lack of volatility of their over-the-top formulations).

e. In 2017, providing labels and instructions on their approved dicamba formulations that even if followed would lead to non-target damage of non-dicamba resistant crops, trees, and plants.

f. Falsely representing in the media and their marketing that the vast-majority (if not all) of 2017 damage is not caused by volatility of their approved over-the-top dicamba herbicides.

554. As a result of Defendants and their co-conspirators' unlawful conduct, Plaintiffs and the class have been injured in their businesses and property in that their crops, trees, and plants have been physically damaged, resulting in lower production and thus lower sales, which without Defendants' unlawful behavior would not have occurred.

555. Unless the activities complained of are enjoined, Plaintiffs and the class will suffer immediate and irreparable injury for which Plaintiffs and the class are without an adequate remedy at law, including, but not limited to, the inability to purchase, plant, grow and harvest products that compete with Xtend soybeans or to plant non-GMO or organic soybeans.

556. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory damages (trebled), in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT IV**
**Attempted Monopolization of the Soybean Market by Defendants**
**(Section 1 of Sherman Act)**
**On Behalf of Plaintiffs and Nationwide Class**

557. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

558. Defendants have willfully engaged, and are engaging, in an agreed course of anticompetitive conduct, including destroying non-dicamba resistant soybean seed, tying and refusals to deal, among other acts, to obtain a monopoly in the soybean market or the dicamba resistant soybean market.

559. There is a dangerous probability that, unless restrained, Defendants will succeed in obtaining a monopoly in such markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In fact, Monsanto estimated it would control 200-250 million acres of soybean, cotton, and corn plantings by 2025, which would result in Monsanto by itself controlling 90-100% of the U.S. market for each of these crop types.

560. Defendants have acted with the specific intent to monopolize and destroy effective competition in the markets for soybean seeds.

561. Defendants' conduct occurred in and affected interstate commerce.

562. Defendants' conduct has injured consumers and competition.

563. As a direct, foreseeable, and proximate result of Defendants' conduct in violation of Section 2 of the Sherman Act, Plaintiffs and the class have been and will continue to be damaged, in amounts to be proven at trial.

564. Plaintiffs and the class's injuries are of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

565. Unless the activities complained of are enjoined, Plaintiffs and the class will suffer immediate and irreparable injury for which Plaintiffs and the class are without an adequate remedy at law, including, but not limited to, the inability to purchase, plant, grow and harvest products that compete with Xtend soybeans or to plant non-GMO or organic soybeans.

566. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory damages (trebled), in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT V**
**Trespass to Chattels**
**(Arkansas Common Law)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

567. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

568. Plaintiffs and class members are farmers engaged in the planting, cultivation, harvesting and selling of crops such as soybeans and peanuts.

569. Defendants by selling the Xtend Crop System, XtendiMax, Engenia and FeXapan have damaged or killed Plaintiffs and class members crops, trees, and plants as described above.

570. Defendants manufactured, distributed, and intentionally sold their Xtend seeds and Engenia in the State of Arkansas.

571. Defendants' customers that purchased Xtend seeds in Arkansas applied dicamba over-the-top of their seeds, which caused damage to the Plaintiffs and the class.

572. Engenia was the sole dicamba herbicide approved for over-the-top usage in Arkansas, and therefore caused damage to Plaintiffs and the class.

573. Neighboring states to Arkansas approved XtendiMax, Engenia and FeXapan, and therefore when these over-the-top herbicides were utilized in neighboring states, they volatilized and drifted into at least the neighboring counties of Arkansas, causing damage to Arkansas crops, trees, and plants, including Plaintiffs and the class's crops, trees, and plants.

574. Dicamba drift, volatilization and/or damage due to temperature inversions have negatively impacted Plaintiffs and the class's crops, including harvest and yield.

575. Defendants' actions led not only to damage Plaintiffs and the class's crops, trees, and plants, but also market-wide damage as the harm is widespread.

576. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time, and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

577. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others,

were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

578. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT VI**
**Negligence**
**(Arkansas Common Law)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

579. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

580. Defendants negligently designed and marketed the products at issue, failed to warn those to whom they had a duty to warn about the dangers of the products at issue and negligently trained those that purchased the products at issue.

581. Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

582. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

583. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

584. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;

b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;
c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;
d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;
e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,
f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;
g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and
h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

585. Further, each Defendant has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

586. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

587. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products.

588. Defendants' negligence is a direct and proximate cause of the injuries and damages sustained by the Plaintiffs and the class.

589. Defendants' customers that purchased Xtend seeds in Arkansas applied dicamba over-the-top of their seeds, which caused damage to the Plaintiffs and the class.

590. Engenia was the sole dicamba herbicide approved for over-the-top usage in Arkansas, and therefore caused damage to Plaintiffs and the class.

591. Neighboring states to Arkansas approved XtendiMax, Engenia and FeXapan, and therefore when these over-the-top herbicides were utilized in neighboring states, they volatilized and drifted into at least the neighboring counties of Arkansas, causing damage to Arkansas crops, trees, and plants, including Plaintiffs and the class's crops, trees, and plants.

592. With respect to the release their products, Defendants had a duty to utilize their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Defendants' business.

593. Defendants breached their duties by failing to exercise the requisite degree of care in selling and disseminating their products to prevent them from damaging non-target crops, trees, and plants.

594. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products

595. As alleged above, Defendants breached their duties and the requisite standard of care owed to all foreseeable Plaintiffs, and were therefore negligent.

596. In 2015 and 2016, Monsanto sold its Xtend products knowing that without a safe, approved herbicide there was a significant risk that farmers would use unapproved herbicides to protect their crops.

597. Further, Defendants sold their products knowing there was a significant risk that use of even approved dicamba formulations would lead to damage to non-target crops, trees, and plants, especially in view of the inadequate instructions provided.

598. Defendants violated their duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, temperature inversion, migration, and drift of dicamba-containing products in amounts that would cause severe damage to crops, trees, and plants other than those grown from Xtend seeds.

599. Likewise, Defendants' violated their duty to provide adequate instructions for use of their products that would not lead to damage to non-target crops, trees, and plants.

600. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

601. Defendants' inadequate warnings were a proximate cause of the harm to Plaintiffs and the class.

602. The harm as described above has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

603. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

604. Defendants were negligent in selling of products in areas that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given their physical proximity to non-dicamba resistant crops, trees, and plants, the timing of use of Defendants' products, the inadequate instructions provided, and the history of crop and plant damage occurring in these areas from the use of dicamba-containing products.

605. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

606. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT VII**
**Strict Liability – Products Liability/Defective Design**
**(Ark. Code § 4-86-102)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

607. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

608. Pursuant to Section 4-86-102 of the Arkansas Code, a supplier of a product is liable for harm to another person or his property if: (1) the supplier is engaged in the business of manufacturing, selling, or distributing the product; (2) the product was supplied by him in a defective condition that rendered it unreasonably dangerous; and (3) the defective condition was a proximate cause of the harm to person or to property.

609. Defendants are engaged in the business of manufacturing, selling, and distributing Xtend seeds and/or dicamba formulations to be utilized over-the-top of Xtend seeds, and therefore are each a "supplier" for the purpose of Section 4-86-102 of the Arkansas Code.

610. Defendants' customers that purchased Xtend seeds in Arkansas applied dicamba over-the-top of their seeds, which caused damage to the Plaintiffs and the class.

611. Engenia was the sole dicamba herbicide approved for over-the-top usage in Arkansas, and therefore caused damage to Plaintiffs and the class.

612. Neighboring states to Arkansas approved XtendiMax, Engenia and FeXapan, and therefore when these over-the-top herbicides were utilized in neighboring states, they volatilized and drifted into at least the neighboring counties of Arkansas, causing damage to Arkansas crops, trees, and plants, including Plaintiffs and the class's crops, trees, and plants.

613. Defendants' Xtend products and over-the-top dicamba formulations are defective products that cannot be used in a safe manner to prevent injury to non-target crops. Each of the Defendants supplied their respective products in a defective condition that rendered them unreasonably dangerous.

614. The defective condition of Defendants' products was a proximate cause of the harm to Plaintiffs and the class.

615. Defendants are strictly liable for all damages to Plaintiffs and the class caused by their products.

616. Monsanto was and continues to be a supplier of Xtend products.

617. BASF was and continues to be a supplier of Engenia.

618. DuPont was and continues to be a supplier of Xtend seeds and FeXapan.

619. Monsanto has in the past and continues to manufacture, sell, or otherwise distribute Xtend products.

620. BASF has in the past and continues to manufacture, sell, or otherwise distribute Engenia.

621. DuPont has in the past and continues to manufacture, sell, or otherwise distribute Xtend seeds and FeXapan.

622. Xtend products and Engenia, XtendiMax and FeXapan were used in a manner reasonably foreseeable and anticipated.

623. As a direct and proximate result of the defective and unreasonably dangerous condition of Xtend products and Engenia, XtendiMax and FeXapan as they existed when Defendants supplied them, Plaintiffs and the class have sustained injuries and damages as alleged above.

624. In light of the surrounding circumstances, Defendants knew or should have known that their conduct would naturally or probably result in injuries and damages to the Plaintiffs and the class.

625. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

626. Nevertheless, Defendants continued such conduct in reckless disregard of or conscious indifference to those consequences.

627. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others,

were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

628. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT VIII**
**Strict Liability – Ultrahazardous or**
**Abnormally Dangerous Activity**
**(Arkansas Common Law)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

629. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

630. Monsanto and DuPont's testing, growing, selling, disposing, or otherwise disseminating Xtend products and BASF, Monsanto and DuPont's selling, disposing, or otherwise disseminating Engenia, XtendiMax and FeXapan (respectively) continues to constitute an abnormally dangerous or ultrahazardous activity because such activities created a high degree of risk of harm, the harm has been and will continue to be significant, the risk cannot be eliminated by the exercise of reasonable care, the value to the community is outweighed by its dangerous attributes, and the activity resulted in injuries and damages to Plaintiffs and the class.

631. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides confirms the herbicides were ultrahazardous, as was the entire crop system.

632. Further, dicamba itself is moderately toxic by ingestion and slightly toxic by inhalation or dermal exposure.

633. Given its proclivity to drift and volatilize, it poses a risk to people and animals; not just non-target crops, trees, and plants.

634. In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

635. The type of harm suffered by Plaintiffs and the class is the kind of harm, or the possibility of such harm, which makes the activity abnormally dangerous.

636. Customers that purchased Xtend seeds in Arkansas applied dicamba over-the-top of their seeds, which caused harm to the Plaintiffs and the class.

637. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

638. Engenia was the sole dicamba herbicide approved for over-the-top usage in Arkansas, and therefore caused damage to Plaintiffs and the class.

639. Neighboring states to Arkansas approved XtendiMax, Engenia and FeXapan, and therefore when these over-the-top herbicides were utilized in neighboring states, they volatilized and drifted into at least the neighboring counties of Arkansas, causing damage to Arkansas crops, trees, and plants, including Plaintiffs and the class's crops, trees, and plants.

640. As a direct and proximate result of Defendants' ultrahazardous or abnormally dangerous activities, Plaintiffs and the class have sustained, and will continue to sustain substantial injuries and damages, including those alleged above.

641. Defendants are therefore strictly liable to Plaintiffs and the class for all damages which have resulted or will result from their abnormally dangerous activities with respect to

Monsanto and DuPont's testing, growing, storing, selling, disposing, or otherwise disseminating Xtend products and BASF, Monsanto, and DuPont's selling, disposing, or otherwise disseminating Engenia, XtendiMax and FeXapan.

642. In light of the surrounding circumstances, Defendants knew or should have known that their conduct would naturally or probably result in injuries to Plaintiffs and the class.

643. Nevertheless, Defendants continued such conduct in reckless disregard of or conscious indifference to those consequences.

644. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

645. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT IX**
**Strict Liability – Failure to Warn**
**(Arkansas Common Law)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

646. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

647. Defendants are strictly liable to Plaintiffs and the class as a result of their failure to warn about the dangers of dicamba use associated with Xtend products.

648. Customers that purchased Xtend seeds in Arkansas applied dicamba over-the-top of their seeds, which caused damage to the Plaintiffs and the class.

649. Engenia was the sole dicamba herbicide approved for over-the-top usage in Arkansas, and therefore caused damage to Plaintiffs and the class.

650. Neighboring states to Arkansas approved XtendiMax, Engenia and FeXapan, and therefore when these over-the-top herbicides were utilized in neighboring states, they volatilized and drifted into at least the neighboring counties of Arkansas, causing damage to Arkansas crops, trees, and plants, including Plaintiffs and the class's crops, trees, and plants.

651. Defendants sold Xtend products and Engenia, XtendiMax and FeXapan in the course of their business, as alleged above.

652. When Xtend products are planted, grown, harvested, or otherwise utilized as reasonably anticipated in conjunction with over-the-top dicamba formulations such as Engenia, XtendiMax and FeXapan and without knowledge of the products true characteristics, Xtend products and Engenia, XtendiMax and FeXapan were unreasonably dangerous at the time of its sale.

653. Defendants did not give adequate warnings of the danger of planting, growing, harvesting, or otherwise utilizing Xtend products and use of, disposing, or otherwise disseminating Engenia, XtendiMax and FeXapan for over-the-top applications.

654. Upon information and belief, Xtend products and Engenia, XtendiMax and FeXapan were utilized together in a reasonably anticipated manner.

655. Plaintiffs and the class suffered injury and damages as a direct and proximate result of Defendants' failure to provide adequate warnings regarding the dangers of planting, growing, harvesting, or otherwise utilizing Xtend products in conjunction with over-the-top dicamba formulations such as Engenia, XtendiMax and FeXapan at the time both products were sold.

656. Plaintiffs' damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

657. In light of the surrounding circumstances, Defendants knew or should have known that their conduct would naturally or probably result in injuries to Plaintiffs and the class.

658. Nevertheless, Defendants continued such conduct in reckless disregard of or conscious indifference to those consequences.

659. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

660. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT X**
**Arkansas Deceptive Trade Practices Act**
**(Ark. Code§ 4-88-101, et seq.)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

661. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

662. Each of the Defendants is a "person" for the purposes of the Arkansas Deceptive Trade Practices Act pursuant to Ark. Code Ann.§ 4-88-102(3).

663. The Xtend products and Engenia constitute "goods" within the meaning of Ark. Code Ann. § 4-88-102(6).

664. Pursuant to Arkansas Code Annotated section 4-88-108, it is unlawful for any person to use deception, fraud, or false pretense in, or to conceal, suppress, or omit material facts in connection with the sale or advertisement of goods, such as Xtend products and Engenia.

665. Pursuant to Arkansas Code Annotated section 4-88-107(a)(1), it is unlawful for any person to knowingly make false representations as to the characteristics of goods, such as Xtend products and Engenia.

666. Pursuant to Arkansas Code Annotated section 4-88-107(a)(10), it is unlawful in Arkansas to engage in an "unconscionable, false, or deceptive act or practice in business, commerce, or trade." Further, pursuant to Arkansas Code Annotated section 4-88-107(b), "[t]he deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state."

667. Defendants engaged in unconscionable, false, and deceptive acts and practices in marketing, selling, and labeling their products to imply that the product could safely be used and not lead to damage to non-target crops, trees, and plants. Defendants knew or should have known, if exercising ordinary care, that this was not the case. Defendants also knew or should have known that the use of the products as labeled posed a risk to non-target crops, trees, and plants that was beyond the control of the user, when following the label or other instructions.

668. Defendants' customers and Plaintiffs and members of the Class (e.g., consumers who purchased products other than Defendants' products, because of representations made by Defendants that Xtend products and Engenia would not damage non-target crops, trees, and plants), were subjected to suppression, concealment and omission of material facts as a product of collusive, unlawful efforts by Defendants to control the market and suppress, conceal and omit

from Plaintiffs, and others similarly situation, that their products posed a risk to non-target crops, trees, and plants that was beyond the control of the user, when following the label or other instructions.

669. As a result of Defendants' concealment of their conspiracy and unlawful, unconscionable, false, fraudulent, unfair and deceptive conduct directed toward Plaintiffs and the class, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the class has as a result of the wrongful and unlawful conduct alleged in this complaint.

670. Plaintiffs have a cause of action against each Defendant pursuant to Arkansas Code Annotated section 4-88-113 to recover their damages related to crop and plant injury, as well as reasonable attorneys' fees.

**COUNT XI**
**Civil Conspiracy**
**(Arkansas Common Law)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

671. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

672. Defendants, in a scheme to improperly market, sell, and expand the sales and profits for their dicamba-based products, as described above, conspired with each other to their mutual economic benefit to create a market for their dicamba-based products and profit from the ecological disaster caused by them.

673. The object of the conspiracy is to create an ecological disaster through the use of Defendants dicamba-based products that will force farmers to purchase their dicamba-based products out of self-defense and cause Defendants to reap great profits at the expense of innocent third-parties, like Plaintiffs, who have suffered damage.

674. Early on, Defendants formed partnerships and entered into written joint licensing agreements to share technologies in an effort to speed their dicamba-based products to market.

675. Indeed, Defendants are so intertwined that it is difficult to tell where one of their products ends and the next product begins. For example, Defendant Monsanto's XtendiMax is the same herbicide as Defendant BASF's Clarity herbicide only with Defendant Monsanto adding an additive to Clarity called VaporGrip.

676. Defendants share defective technology.

677. Defendants invested in their dicamba production facilities in preparation for the demand that would be created by the damage that their dicamba-based products would cause.

678. Defendants mutually developed and researched their dicamba-based products together, testing their dicamba-based products at Defendant Monsanto's research facilities.

679. From their testing, Defendants knew the risks and dangers posed to innocent third parties and non-dicamba resistant crops from their dicamba-based products and conspired to conceal this information, especially on volatility, from the public, federal and state regulatory authorities, state legislatures, farmers, their licensees, consumers, and Plaintiffs and the class.

680. Defendants also conspired to inadequately train their employees, agents, distributors, farmers, growers, licensees, and applicators on how to use their dicamba-based herbicides and products to increase the damage and drive up demand for their dicamba-based products.

681. Defendants' agreed not to provide warnings, effective notices, and proper labels and use instructions for their dicamba-based products to increase the damage and drive up demand for their dicamba-based products.

682. Defendants conspired to advertise and market their dicamba herbicides as low volatility formulations of an inherently volatile herbicide, dicamba. Through these coordinated marketing efforts, Defendants created demand for their dicamba-based products before and after the damage caused by them required action by federal and state governments.

683. In 2015 and 2016, through their concerted activities, Defendants colluded in the release of Defendant Monsanto's Xtend seeds prior to the Defendants receiving approval for their dicamba-based herbicides, with knowledge and certainty that farmers would use older dicamba herbicides, such as Defendant BASF's Banvel or Clarity, on Xtend seeds and all Defendants would profit in the short-term and long-term.

684. Defendants, through their agents and representatives, conspired to encourage legal and illegal spraying of their dicamba herbicides, regardless of how much damage it would cause.

685. Defendants' conspiracy required the illegal spraying of Defendants' older dicamba formulations on Xtend seeds to create fear in farmers – either use this technology or face the loss of their non-dicamba resistant crops – until farmers no longer had a choice.

686. Once the EPA approved XtendiMax, Engenia and FeXapan, Defendants jointly proceeded with a full-scale launch of their dicamba-based products, causing a wave of destruction to non-dicamba resistant crops, including Plaintiffs and the class's crops.

687. In response to the damage, Defendants issued coordinated public statements and offered identical stated causes for the damage, none of which had anything to do with Defendants' dicamba-based products, in order to ensure increased demand and profits for their dicamba-based products.

688. Since 2015, the damage caused by Defendants' dicamba-based products has forced non-dicamba resistant crop farmers to purchase and use Defendants' dicamba-based products out of self-defense – precisely as the conspiracy intended.

689. Defendants conspired to threaten, harass, and intimidate innocent landowners from complaining or seeking regulatory or legal assistance.

690. Defendants also conspired to suppress the level of control they had over their licensees who used their dicamba-based products.

691. Further, Defendants did not revoke any licenses with their licensees, including those farmers who used Defendants' dicamba-based products and caused damage to Plaintiffs and the class's crops. Defendants could have acted to prevent or stop the damage that their dicamba-based products cause, but chose not to. In fact, Defendants gave the green-light to illegal spraying by announcing they would take no action against licensees that sprayed illegally.

692. In 2017, customers that purchased Xtend seeds in Arkansas applied dicamba over-the-top of their seeds, which caused damage to the Plaintiffs and the class. Engenia was the sole dicamba herbicide approved for over-the-top usage in Arkansas, and therefore caused damage to Plaintiffs and the class. And neighboring states to Arkansas approved XtendiMax, Engenia and FeXapan, and therefore when these over-the-top herbicides were utilized in neighboring states, they volatilized and drifted into at least the neighboring counties of Arkansas, causing damage to Arkansas crops, trees, and plants, including Plaintiffs and the class's crops, trees, and plants.

693. The unlawful actions of Defendants resulted in damages to Plaintiffs and the class, and thereby Plaintiffs and the class were harmed in the ways and manners described above, including at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those

growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

694. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

695. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XII**
**Breach of Fiduciary Duty**
**(Arkansas Common Law)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

696. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

697. Defendants owed a fiduciary duty to farmers in general, and thus the Plaintiffs and Class.

698. Defendants acknowledged such a duty existed in at least their stewardship pledges.

699. Monsanto further reiterated its fiduciary duty to at least its "farmer-customers" in its Aug. 2, 2017 "Open Letter to Our Farmer-Customers," where its CTO wrote, "we want you to know that we will be with you every step of the way this season" and "we will stand by you throughout the growing season." (emphasis added).

700. As fiduciaries to Plaintiffs and the class, Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

701. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

702. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

703. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;

b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;

c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;

d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;

e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,

f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;

g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and

h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

704. Further, each Defendant had a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to

design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

705. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

706. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products. The EPA revisions to Defendants' labels in October 2017 confirm the prior labels and instructions were inadequate.

707. Despite their fiduciary relationship, Defendants released their Xtend products and Engenia, XtendiMax and FeXapan herbicides, knowing harm would result to Plaintiffs and the class.

708. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products.

709. Damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

710. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others,

were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

711. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XIII**
**Breach Of Express Warranty**
**(Ark. Code Ann. § 4-2-313)**
**On Behalf of Arkansas Plaintiffs and Arkansas Class**

712. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

713. Monsanto expressly warranted that the Xtend crop system was safe and effective, and use of over-the-top application of approved herbicides would not lead to off-target crop damage.

714. BASF expressly warranted that Engenia was safe and effective, and its use on Xtend crops would not lead to off-target crop damage.

715. The Xtend crop system and Engenia, manufactured and sold by Monsanto and BASF, did not conform to these express representations, because they caused injury to Plaintiffs and the class's crops, trees, and plants when used as recommended and directed.

716. As a direct and proximate result of Monsanto and BASF's breach of warranty, Plaintiffs and the class's crops, trees, and plants have suffered injury.

717. While notice of the above count is not required as Monsanto and BASF were already apprised of these issues due to at least the filing of *Bruce Farms Partnership, et al. v.*

*Monsanto Company, et al.*, notice was nonetheless expressly provided to Monsanto and BASF of this claim via a letter included with service of the initial complaint in the instant action.

**COUNT XIV**
**Breach of Implied Warranties of Merchantability and Fitness for a Particular Purpose**
**(Ark. Code Ann. § 4-2-313 and Ark. Code Ann. § 4-2-314)**
**On Behalf of Arkansas Plaintiffs and Arkansas Class**

718. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

719. At the time Monsanto and BASF designed, manufactured, marketed, sold, and distributed the Xtend crop system and Engenia, both knew of the use for which their products were intended and impliedly warranted they were of merchantable quality and safe for their particular use and that their design, manufacture, labeling, and marketing complied with all applicable state and federal requirements.

720. Purchasers of the Xtend crops system and Engenia reasonably relied upon the skill and judgment of Monsanto and BASF as to whether the Xtend crop system and Engenia were of merchantable quality and safe for their intended particular use and upon Monsanto and BASF's implied warranty as to such matters, including that they were in compliance with all state and federal requirements.

721. Contrary to such implied warranties, the Xtend crop system and Engenia were not of merchantable quality or safe for their particular intended use, because the products were defective as described above, and/or failed to comply with state and federal requirements.

722. As a direct and proximate result of Monsanto and BASF's breach of warranties, Plaintiffs and the class's crops, trees, and plants have suffered injury.

723. While notice of the above count is not required as Monsanto and BASF were already apprised of these issues due to at least the filing of *Bruce Farms Partnership, et al. v. Monsanto Company, et al.,* notice was nonetheless expressly provided to Monsanto and BASF of this claim via a letter included with service of the initial complaint in the instant action.

**COUNT XV**
**Punitive Damages**
**(Under Arkansas Law)**
**On Behalf of the Arkansas Plaintiffs and the Arkansas State Class**

724. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

725. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the livelihood of American farmers, including Plaintiffs, for the primary purpose of increasing Defendants' profits from the sale and distribution of Xtend crops, XtendiMax, Engenia, and FeXapan, and the secondary purpose of dominating American farmers and dictating their purchasing decisions. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

726. Prior to the manufacturing, sale, and distribution of XtendiMax, Engenia, and FeXapan, Defendants knew that these products were in a defective condition as previously described herein and knew that those who did not plant Xtend crops would experience and did experience severe crop injuries, and significant anxiety resulting from the potential loss of their livelihood. Further, Defendants, through their officers, directors, managers, and agents, knew that these herbicides presented a substantial and unreasonable risk of harm to the public, including

Plaintiffs, and as such, Defendants unreasonably subjected innocent bystanders to harm by introducing these herbicides into the stream of commerce.

727. The October 2017 reclassification of Defendants' over-the-top herbicides as Restricted Use Pesticides further confirms the herbicides were defective and ultrahazardous, as was the entire crop system.

728. Defendants' ignoring of university research and their ongoing coverup of the damage caused by the volatility of their over-the-top dicamba formulations similarly shows knowing and deliberate actions on their part to place profits above the well-being of others.

729. Despite their knowledge, Defendants, acting through their officers, directors, and managing agents, for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in XtendiMax, Engenia, and FeXapan, and failed to warn the public, including Plaintiffs, of the extreme risk of injury occasioned by said defects inherent in these herbicides. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of these herbicides knowing these actions would expose farmers to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

730. Defendants' conduct was despicable and so contemptible that they would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiffs, entitling Plaintiffs to exemplary damages.

**COUNT XVI**
**Negligence**
**(Under Illinois Law)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

731. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

732. Defendants negligently designed and marketed the products at issue, failed to warn those to whom they had a duty to warn about the dangers of the products at issue and negligently trained those that purchased the products at issue.

733. Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

734. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

735. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

736. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;
b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;
c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;
d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;
e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,
f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;
g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and
h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

737. Further, each Defendant has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from

unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

738. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

739. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products.

740. Defendants' negligence is a direct and proximate cause of the injuries and damages sustained by the Plaintiffs and the class.

741. With respect to the release their products, Defendants had a duty to utilize their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Defendants' business.

742. Defendants breached their duties by failing to exercise the requisite degree of care in selling and disseminating their products to prevent them from damaging non-target crops, trees, and plants.

743. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products.

744. As alleged above, Defendants breached their duties and the requisite standard of care owed to all foreseeable Plaintiffs, and were therefore negligent.

745. Plaintiffs and the class are thus entitled to an award of compensatory damages, prejudgment and post judgment interest.

746. Defendants' conduct was grossly negligent and showed a complete indifference to or conscious disregard of the rights of others, including the Plaintiffs and the class. Punitive damages are thus warranted.

747. In 2015 and 2016, Monsanto sold its Xtend products knowing that without a safe, approved herbicide there was a significant risk that farmers would use unapproved herbicides to protect their crops.

748. Further, Defendants sold their products knowing there was a significant risk that use of even approved dicamba formulations would lead to damage to non-target crops, trees, and plants, especially in view of the inadequate instructions provided.

749. Defendants violated their duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, temperature inversion, migration, and drift of dicamba-containing products in amounts that would cause severe damage to crops, trees, and plants other than those grown from Xtend seeds.

750. Likewise, Defendants' violated their duty to provide adequate instructions for use of their products that would not lead to damage to non-target crops, trees, and plants.

751. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

752. Defendants' inadequate warnings were a proximate cause of the harm to Plaintiffs and the class.

753. The harm as described above has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

754. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

755. Defendants were negligent in selling of products in areas that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given their physical proximity to non-dicamba resistant crops, trees, and plants, the timing of use of Defendants' products, the inadequate instructions provided, and the history of crop and plant damage occurring in these areas from the use of dicamba-containing products.

756. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

757. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XVII**
**Strict Liability – Product Liability/Design Defect**
**(Under Illinois Law)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

758. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

759. Xtend seeds, XtendiMax, Engenia, and FeXapan are defective in design or formulation in that they are not reasonably fit, suitable, or safe for their intended purpose, they cannot be used safely without causing severe risk of harm to others' crops, and their foreseeable risks exceed the benefits associated with their design and formulation.

760. The design of each Xtend seeds, XtendiMax, Engenia, and FeXapan was defective and unsafe in that each causes severe crop injuries as a result of volatility and off target movement, including but not limited to movement through volatility, temperature inversion, and spray drift.

761. This design defect made Defendants' products unreasonably dangerous, yet Defendants knowingly introduced their herbicides into the market.

762. Defendants' herbicides as manufactured by Defendants remained unchanged and were in the same condition at the time of the injuries herein alleged.

763. As a direct and proximate cause of Defendants' manufacture, sale and promotion of the defectively designed products, Plaintiffs and the class sustained harm to their crops.

764. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

765. Defendants' conduct, as described above, was reckless. Defendants risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made

conscious decisions not to redesign, re-label, warn or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages.

766. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

767. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XVIII**
**Strict Liability – Ultrahazardous or Abnormally Dangerous Activity**
**(Illinois Common Law)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

768. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

769. Monsanto and DuPont's testing, growing, selling, disposing, or otherwise disseminating Xtend products and BASF, Monsanto and DuPont's selling, disposing, or otherwise disseminating Engenia, XtendiMax and FeXapan (respectively) continues to constitute an abnormally dangerous or ultrahazardous activity because such activities created a high degree of risk of harm, the harm has been and will continue to be significant, the risk cannot be eliminated by the exercise of reasonable care, the value to the community is outweighed by its dangerous attributes, and the activity resulted in injuries and damages to Plaintiffs and the class.

770. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides confirms the herbicides were ultrahazardous, as was the entire crop system.

771. Further, dicamba itself is moderately toxic by ingestion and slightly toxic by inhalation or dermal exposure.

772. Given its proclivity to drift and volatilize, it poses a risk to people and animals; not just non-target crops, trees, and plants.

773. In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

774. The type of harm to Plaintiffs is the kind of harm, or the possibility of such harm, which makes the activity abnormally dangerous.

775. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

776. As a direct and proximate result of Defendants' ultrahazardous or abnormally dangerous activities, Plaintiffs and the class have sustained, and will continue to sustain substantial injuries and damages, including those alleged above.

777. Defendants are therefore strictly liable to Plaintiffs and the class for all damages which have resulted or will result from their abnormally dangerous activities with respect to Monsanto and DuPont's testing, growing, storing, selling, disposing, or otherwise disseminating Xtend products and BASF, Monsanto, and DuPont's selling, disposing, or otherwise disseminating Engenia, XtendiMax, and FeXapan (respectively).

778. In light of the surrounding circumstances, Defendants knew or should have known that their conduct would naturally or probably result in injuries to Plaintiffs and the class.

779. Nevertheless, Defendants continued such conduct in reckless disregard of or conscious indifference to those consequences.

780. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

781. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XIX**
**Strict Liability—Failure to Warn**
**(Under Illinois Law)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

782. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

783. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Xtend seeds and dicamba herbicides XtendiMax, Engenia, and FeXapan, in the course of the same, directly advertised or marketed the products to the EPA, agricultural professionals, and consumers and therefore had a duty to warn of the risks associated with the use of dicamba products.

784. The Xtend system including dicamba products manufactured and/or supplied by Defendants were defective due to inadequate warnings or instructions because Defendants knew or should have known that the products created significant risks of harm to non-dicamba resistant

crops, trees, and plants, and they failed to adequately warn consumers, regulators, and innocent bystanders of such risks.

785. Monsanto, BASF, and Dupont all failed to adequately warn consumers, regulators, and innocent bystanders that Xtend seeds, XtendiMax, Engenia, and FeXapan could cause severe crop injuries through volatility, temperature inversions, and spray drift.

786. Monsanto, BASF, and Dupont all failed to adequately warn consumers, regulators, and innocent bystanders of the volatilization risks for XtendiMax, Engenia, and FeXapan.

787. Monsanto, BASF, and Dupont all failed to adequately warn consumers, regulators, and innocent bystanders that XtendiMax, Engenia, and FeXapan would move off target through temperature inversions hours and days after application.

788. Xtend seeds, XtendiMax, Engenia, and FeXapan were defective due to inadequate warnings or instructions because, even though Defendants knew or should have known of the risk of severe crop injuries from the use of their products, Defendants failed to provide an adequate warning to consumers or innocent bystanders, knowing the products could cause serious injury. This is confirmed by the October 2017 changes to their herbicides' labels.

789. Defendants failed to perform or otherwise facilitate adequate testing; failed to reveal and/or concealed testing and research data; and selectively and misleadingly revealed and/or analyzed testing and research data.

790. As a direct and proximate result of the reasonably anticipated use of Xtend seeds, XtendiMax, Engenia, and FeXapan, as manufactured, designed, sold, supplied, marketed, and/or introduced into the stream of commerce by Defendants, Plaintiffs and the class suffered serious crop injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages, and losses in the future.

791. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

792. Defendants' conduct, as described above, was reckless. Defendants risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages.

793. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

794. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XX**
**Illinois Consumer Fraud and Deceptive Business Practices Act**
**(815 Ill. Comp. Stat. 505/1 et seq.)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

795. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

796. Defendants engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act when they failed to adequately warn consumers and the agricultural community of

the safety risks associated with Xtend seeds, XtendiMax, Engenia, and FeXapan. As a direct result of Defendants' deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and the class suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

797. The actions and failure to act of Defendants, including the false and misleading representations and omissions of material facts regarding the safety and potential risks of dicamba products and the above described course of fraudulent conduct and fraudulent concealment constitute acts, uses or employment by Defendants of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts in connection with the sale of merchandise of Defendants in violation of the consumer protection statutes listed above.

798. The agricultural community and farmers within the vicinity of Plaintiffs and the class relied upon Defendants' misrepresentations and omissions in determining whether to purchase and use Xtend seeds, XtendiMax, Engenia, and FeXapan.

799. By reason of the unlawful acts engaged in by Defendants, Plaintiffs and the class have suffered ascertainable harm and damages.

800. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

801. As a direct and proximate result of Defendants' conduct, Plaintiffs and the class suffered and will continue to suffer economic loss, pecuniary loss, and other compensable injuries.

802. By reason of the foregoing, Defendants are liable to Plaintiffs and the class under the Illinois Consumer Fraud and Deceptive Business Practices Act for compensatory, statutory and

punitive damages to the extent available, in amounts to be proven at trial, together with interest, costs of suit, attorneys' fees and all such other relief as the Court deems proper.

**COUNT XXI**
**Civil Conspiracy**
**(Under Illinois Law)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

803. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

804. Defendants, in a scheme to improperly market, sell, and expand the sales and profits for their dicamba-based products, as described above, conspired with each other to their mutual economic benefit to create a market for their dicamba-based products and profit from the ecological disaster caused by them.

805. The object of the conspiracy is to create an ecological disaster through the use of Defendants dicamba-based products that will force farmers to purchase their dicamba-based products out of self-defense and cause Defendants to reap great profits at the expense of innocent third-parties, like Plaintiffs, who have suffered damage.

806. Early on, Defendants formed partnerships and entered into written joint licensing agreements to share technologies in an effort to speed their dicamba-based products to market.

807. Indeed, Defendants are so intertwined that it is difficult to tell where one of their products ends and the next product begins. For example, Defendant Monsanto's XtendiMax is the same herbicide as Defendant BASF's Clarity herbicide only with Defendant Monsanto adding an additive to Clarity called VaporGrip.

808. Defendants share defective technology.

809. Defendants invested in their dicamba production facilities in preparation for the demand that would be created by the damage that their dicamba-based products would cause.

810. Defendants mutually developed and researched their dicamba-based products together, testing their dicamba-based products at Defendant Monsanto's research facilities.

811. From their testing, Defendants knew the risks and dangers posed to innocent third parties and non-dicamba resistant crops from their dicamba-based products and conspired to conceal this information, especially on volatility, from the public, federal and state regulatory authorities, state legislatures, farmers, their licensees, consumers, and Plaintiffs.

812. Defendants also conspired to inadequately train their employees, agents, distributors, farmers, growers, licensees, and applicators on how to use their dicamba-based herbicides and products to increase the damage and drive up demand for their dicamba-based products.

813. Defendants' agreed not to provide warnings, effective notices, and proper labels and use instructions for their dicamba-based products to increase the damage and drive up demand for their dicamba-based products.

814. Defendants conspired to advertise and market their dicamba herbicides as low volatility formulations of an inherently volatile herbicide, dicamba. Through these coordinated marketing efforts, Defendants created demand for their dicamba-based products before and after the damage caused by them required action by federal and state governments.

815. In 2015 and 2016, through their concerted activities, Defendants colluded in the release of Defendant Monsanto's Xtend seeds prior to Defendants receiving approval for their dicamba-based herbicides, with knowledge and certainty that farmers would use older dicamba herbicides, such as Defendant BASF's Banvel or Clarity, on Xtend seeds and all Defendants would profit in the short-term and long-term.

816. Defendants, through their agents and representatives, conspired to encourage legal and illegal spraying of their dicamba herbicides, regardless of how much damage it would cause.

817. Defendants' conspiracy required the illegal spraying of Defendants' older dicamba formulations on Defendant Monsanto's Xtend seeds to create fear in farmers – either use this technology or face the loss of their non-dicamba resistant crops – until farmers no longer had a choice.

818. Once the EPA approved XtendiMax and Engenia, Defendants jointly proceeded with a full-scale launch of their dicamba-based products, causing a wave of destruction to non-dicamba resistant crops, including Plaintiffs and the class's crops.

819. In response to the damage, Defendants issued coordinated public statements and offered identical stated causes for the damage, none of which had anything to do with Defendants' dicamba-based products, in order to ensure increased demand and profits for their dicamba-based products.

820. Since 2015, the damage caused by Defendants' dicamba-based products has forced non-dicamba resistant crop farmers to purchase and use Defendants' dicamba-based products out of self-defense – precisely as the conspiracy intended.

821. Defendants conspired to threaten, harass, and intimidate innocent landowners from complaining or seeking regulatory or legal assistance.

822. Defendants also conspired to suppress the level of control they had over their licensees who used their dicamba-based products.

823. Further, Defendants did not revoke any licenses with their licensees, including those farmers who used Defendants' dicamba-based products and caused damage to Plaintiffs and the class's crops. Defendants could have acted to prevent or stop the damage that their dicamba-

based products cause, but chose not to. In fact, Defendants gave the green-light to illegal spraying by announcing they would take no action against licensees that sprayed illegally.

824. In 2017, customers that purchased Xtend seeds in Arkansas applied dicamba over-the-top of their seeds, which caused damage to Plaintiffs and the class. Engenia was the sole dicamba herbicide approved for over-the-top usage in Arkansas, and therefore caused damage to Plaintiffs and the class. And neighboring states to Arkansas approved XtendiMax, Engenia and FeXapan, and therefore when these over-the-top herbicides were utilized in neighboring states, they volatilized and drifted into at least the neighboring counties of Arkansas, causing damage to Arkansas crops, trees, and plants, including Plaintiffs and the class's crops, trees, and plants.

825. The unlawful actions of Defendants resulted in damages to Plaintiffs and the class, and thereby Plaintiffs and the class were harmed in the ways and manners described above, including at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

826. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

827. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXII**
**Breach of Fiduciary Duty**

**(Illinois Common Law)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

828. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

829. Defendants owed a fiduciary duty to farmers in general, and thus the Plaintiffs and Class.

830. Defendants acknowledged such a duty existed in at least their stewardship pledges.

831. Monsanto further reiterated its fiduciary duty to at least its "farmer-customers" in its Aug. 2, 2017 "Open Letter to Our Farmer-Customers," where its CTO wrote, "we want you to know that we will be with you every step of the way this season" and "we will stand by you throughout the growing season." (emphasis added).

832. As fiduciaries to Plaintiffs and the class, Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

833. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

834. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

835. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;

b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;

c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;

d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;

e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,

f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;

g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and

h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

836. Further, each Defendant had a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

837. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

838. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products. The revisions to Defendants' labels in October 2017 confirm the prior labels and instructions were inadequate.

839. Despite their fiduciary relationship, Defendants released their Xtend products and Engenia, XtendiMax and FeXapan herbicides, knowing harm would result to Plaintiffs and the class.

840. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products.

841. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

842. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

843. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXIII**
**Continuing Nuisance**
**(Under Illinois Law)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

844. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

845. Defendants' conduct has created a nuisance by causing widespread damage due to post-emergence applications of XtendiMax, Engenia, and FeXapan on Xtend crops.

846. The widespread and significant off target movement of XtendiMax, Engenia, and FeXapan constitutes an unreasonable and substantial interference with rights common to the general public.

847. This unreasonable interference was and is imposed on Plaintiffs and the class. It arises from Defendants' manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling XtendiMax, Engenia, and FeXapan, and failing to adequately test and warn of the risks and dangers of dicamba as described herein.

848. Specifically, Defendants market XtendiMax, Engenia, and FeXapan with the knowledge that these herbicides are prone to volatize, move off target through temperature inversions, and move off target through spray drift, and will do so despite all mitigation efforts available to applicators.

849. Defendants introduced these products into the stream of commerce with the knowledge that their herbicides were highly toxic to non-dicamba resistant crops, trees, and plants and would cause severe damage to farmers who purchased and planted crops sold by Defendants' competitors.

850. Defendants have unreasonably interfered with Plaintiffs and the class's right to grow and raise crops of their choosing, free of damage and toxic interference from Defendants' dicamba products.

851. The harm suffered by Plaintiffs and the class have manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

852. Defendants' conduct, as described above, was reckless. Defendants risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages and injunctive relief.

853. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

854. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXIV**
**Punitive Damages**
**(Under Illinois Law)**
**On Behalf of the Illinois Plaintiffs and the Illinois State Class**

855. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

856. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious

disregard for the livelihood of American farmers, including Plaintiffs, for the primary purpose of increasing Defendants' profits from the sale and distribution of Xtend crops, XtendiMax, Engenia, and FeXapan, and the secondary purpose of dominating American farmers and dictating their purchasing decisions. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

857. Prior to the manufacturing, sale, and distribution of XtendiMax, Engenia, and FeXapan, Defendants knew that these products were in a defective condition as previously described herein and knew that those who did not plant Xtend crops would experience and did experience severe crop injuries, and significant anxiety resulting from the potential loss of their livelihood. Further, Defendants, through their officers, directors, managers, and agents, knew that these herbicides presented a substantial and unreasonable risk of harm to the public, including Plaintiffs and the class, and as such, Defendants unreasonably subjected innocent bystanders to harm by introducing these herbicides into the stream of commerce.

858. The October 2017 reclassification of Defendants' over-the-top herbicides as Restricted Use Pesticides further confirms the herbicides were defective and ultrahazardous, as was the entire crop system.

859. Defendants' ignoring of university research and their ongoing coverup of the damage caused by the volatility of their over-the-top dicamba formulations similarly shows knowing and deliberate actions on their part to place profits above the well-being of others.

860. Despite their knowledge, Defendants, acting through their officers, directors, and managing agents, for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in XtendiMax, Engenia, and FeXapan, and failed to warn the

public, including Plaintiffs and the class, of the extreme risk of injury occasioned by said defects inherent in these herbicides. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of these herbicides knowing these actions would expose farmers to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

861. Defendants' conduct was despicable and so contemptible that they would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiffs and the class, entitling Plaintiffs and the class to exemplary damages.

**COUNT XXV**
**Violation of Illinois Antitrust Act**
**(740 ILCS 10)**
**On Behalf of Plaintiffs and Illinois Class**

862. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

863. Defendants have willfully engaged, and are engaging, in an agreed course of anticompetitive conduct, including destroying non-dicamba resistant soybean seed, tying and refusals to deal, among other acts, to obtain a monopoly in the soybean market or the dicamba resistant soybean market.

864. Defendants, by contract, combination, or conspiracy as described above have unreasonably restrained trade or commerce in the soybean seeds market.

865. Defendants have also established, maintained, used, or attempted to acquire monopoly power over soybean seeds in this state for the purpose of excluding competition.

866. There is a dangerous probability that, unless restrained, Defendants will succeed in obtaining a monopoly in the soybean seed markets.

867. Defendants have acted with the specific intent to monopolize and destroy effective competition in the markets for soybean seeds.

868. Defendants' conduct has injured the Illinois Plaintiffs, the Illinois Class, consumers and competition.

869. As a direct, foreseeable, and proximate result of Defendants' conduct, the Illinois Plaintiffs and Illinois Class have been and will continue to be damaged, in amounts to be proven at trial.

870. The Illinois Plaintiffs' and Illinois Class's injuries are of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

871. Unless the activities complained of are enjoined, the Illinois Plaintiffs and Illinois Class will suffer immediate and irreparable injury for which they are without an adequate remedy at law, including, but not limited to, the inability to purchase, plant, grow and harvest products that compete with Xtend soybeans or to plant non-GMO or organic soybeans.

872. By reason of the foregoing, Defendants are liable to the Illinois Plaintiffs and Illinois Class for compensatory damages (trebled), in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXVI**
**Trespass**
**(Under Missouri Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

873. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

874. During the time of Defendants' trespass on Plaintiffs and the class's land and crops, Plaintiffs and the class were farmers engaged in the planting, cultivation, harvesting, and selling of crops, such as soybeans.

875. Defendants manufactured, distributed, and intentionally sold their dicamba-based products in the State of Missouri.

876. Defendants directly, intentionally, and physically invaded Plaintiffs and the class's land and crops and caused substantial damage to Plaintiffs and the class's land and crops.

877. The entry by Defendants upon Plaintiffs and the class's land and crops through the sale and use of their dicamba-based products and their users and licensees' use of dicamba-based products was unauthorized.

878. Defendants' dicamba-based products consist of volatile herbicides that volatilized and moved off-target in the form of physical droplets, physical spray particles, and gas particles. These droplets and particles, all airborne, as a result of being sprayed by Defendants' users and licensees, volatilized or moved off-target and settled on Plaintiffs and the class's land and crops, causing substantial damage to Plaintiffs and the class's land and crops, as described above, rendering Plaintiffs and the class's land and crops unfit for Plaintiffs and the class's possession and interest in such land and crops.

879. Defendants' dicamba-based products, including Defendant Monsanto's XtendiMax herbicide, Defendant BASF's Engenia herbicide and DuPont's FeXapan herbicide, have volatilized, drifted, and moved off target during or after the time of their use and intruded on Plaintiffs and the class's land and crops, interfering with Plaintiffs and the class's right to exclusive and actual possession of their property with substantial damage to crops growing on Plaintiffs and the class's property and the land where such crops are grown.

880. Further, Defendants intentionally instructed and encouraged users and licensees of their herbicides to spray dicamba, including Defendants' XtendiMax and Engenia herbicides, on crops near Plaintiffs and the class's properties where Defendants' dicamba-based products can volatilize and move off-target and cause substantial damage to Plaintiffs and the class's land and crops.

881. Through a contractual relationship with their licensees, Defendants exercised control over their licensees and the use of Defendants' dicamba-based products that invaded Plaintiffs and the class's land and crops and caused substantial damage to Plaintiffs and the class's land and crops.

882. In sum, Defendants have engaged in a chemical trespass to Plaintiffs and the class's land.

883. The actions of Defendants and the harm inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

884. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

885. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

886. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXVII**
**Negligence**
**(Missouri Common Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

887. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

888. Defendants negligently designed and marketed the products at issue, failed to warn those to whom they had a duty to warn about the dangers of the products at issue and negligently trained those that purchased the products at issue.

889. Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

890. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

891. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

892. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;
b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;
c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;

d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;
e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,
f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;
g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and
h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

893. Further, each Defendant has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

894. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

895. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products.

896. Defendants' negligence is a direct and proximate cause of the injuries and damages sustained by the Plaintiffs and the class.

897. With respect to the release their products, Defendants had a duty to utilize their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Defendants' business.

898. Defendants breached their duties by failing to exercise the requisite degree of care in selling and disseminating their products to prevent them from damaging non-target crops, trees, and plants.

899. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products

900. The damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

901. As alleged above, Defendants breached their duties and the requisite standard of care owed to all foreseeable Plaintiffs, and were therefore negligent.

902. Plaintiffs and the class are thus entitled to an award of compensatory damages, prejudgment and post judgment interest.

903. Defendants' conduct was grossly negligent and showed a complete indifference to or conscious disregard of the rights of others, including the Plaintiffs and the class. Punitive damages are thus warranted.

904. In 2015 and 2016, Monsanto sold its Xtend products knowing that without a safe, approved herbicide there was a significant risk that farmers would use unapproved herbicides to protect their crops.

905. Further, Defendants sold their products knowing there was a significant risk that use of even approved dicamba formulations would lead to damage to non-target crops, trees, and plants, especially in view of the inadequate instructions provided.

906. Defendants violated their duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, temperature inversion, migration, and drift of dicamba-containing products in amounts that would cause severe damage to crops, trees, and plants other than those grown from Xtend seeds.

907. Likewise, Defendants' violated their duty to provide adequate instructions for use of their products that would not lead to damage to non-target crops, trees, and plants.

908. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

909. Defendants' inadequate warnings were a proximate cause of the harm to Plaintiffs and the class.

910. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

911. Defendants were negligent in selling of products in areas that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given their physical proximity to non-dicamba resistant crops, trees, and plants, the timing of use of Defendants' products, the inadequate instructions provided, and the history of crop and plant damage occurring in these areas from the use of dicamba-containing products.

912. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

913. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXVIII**
**Strict Liability – Products Liability/Defective Design**
**(Under Missouri Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

914. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

915. Defendants designed, tested, developed, manufactured, marketed, distributed, and sold their dicamba-based products – including Defendant Monsanto's Xtend seeds, Defendant Monsanto's XtendiMax herbicide, Defendant BASF's Engenia herbicide and Defendant DuPont's FeXapan herbicide – in their ordinary course of business.

916. As described above, Defendants' dicamba-based products were in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe, non-defective herbicide, including Defendants XtendiMax and Engenia herbicides, was marketed by Defendants. Thus, Defendants' dicamba-based products were defective and unreasonably dangerous due to Defendants' inability to provide an herbicide reasonably safe for its intended use.

917. Defendants' dicamba-based products were used by farmers and applicators for the cultivation and protection of crops which was their reasonably anticipated use.

918. Plaintiffs and the class were damaged as a direct result of such defective condition which existed when these dicamba-based products were sold.

919. The damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

920. At all times, Defendants sold dicamba-based products and knew of the defective condition and danger of their dicamba-based products.

921. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

922. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXIX**
**Strict Liability – Ultrahazardous or**
**Abnormally Dangerous Activity**
**(Missouri Common Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

923. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

924. Monsanto and DuPont's testing, growing, selling, disposing, or otherwise disseminating Xtend products and BASF's selling, disposing, or otherwise disseminating Engenia continues to constitute an abnormally dangerous or ultrahazardous activity because such

activities created a high degree of risk of harm, the harm has been and will continue to be significant, the risk cannot be eliminated by the exercise of reasonable care, the value to the community is outweighed by its dangerous attributes, and the activity resulted in injuries and damages to Plaintiffs and the class.

925. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides confirms the herbicides were ultrahazardous, as was the entire crop system.

926. Further, dicamba itself is moderately toxic by ingestion and slightly toxic by inhalation or dermal exposure.

927. Given its proclivity to drift and volatilize, it poses a risk to people and animals; not just non-target crops, trees, and plants.

928. In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

929. The type of harm to Plaintiffs and the class's crops, trees, and plants suffered by Plaintiffs and the class is the kind of harm, or the possibility of such harm, which makes the activity abnormally dangerous.

930. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

931. As a direct and proximate result of Defendants' ultrahazardous or abnormally dangerous activities, Plaintiffs and the class have sustained, and will continue to sustain substantial injuries and damages, including those alleged above.

932. Defendants are therefore strictly liable to Plaintiffs and the class for all damages which have resulted or will result from their abnormally dangerous activities with respect to Monsanto and DuPont's testing, growing, storing, selling, disposing, or otherwise disseminating Xtend products and Monsanto, BASF and DuPont's selling, disposing, or otherwise disseminating of XtendiMax, Engenia and FeXapan.

933. In light of the surrounding circumstances, Defendants knew or should have known that their conduct would naturally or probably result in injuries to Plaintiffs and the class.

934. Nevertheless, Defendants continued such conduct in reckless disregard of or conscious indifference to those consequences.

935. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

936. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXX**
**Strict Liability – Failure to Warn**
**(Under Missouri Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

937. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

938. Defendants sold their dicamba-based products in their ordinary course of business.

939. As described above, Defendants' dicamba-based products were unreasonably dangerous at the time of sale. Defendants' dicamba-based products were unreasonably dangerous when put to their reasonably anticipated use without knowledge of purchasers and third-parties of their defective condition because no safe herbicide was marketed by Defendants.

940. Defendants did not give adequate warnings to purchasers or third-parties of the danger of their dicamba-based products.

941. Defendants' dicamba-based products used by farmers and applicators which was their reasonably anticipated use.

942. Plaintiffs and the class were damaged as a direct result of Defendants' dicamba-based products being sold without adequate warnings.

943. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

944. At all times, Defendants sold their dicamba-based products and knew of the danger of their dicamba-based products.

945. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

946. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXXI**
**Civil Conspiracy**
**(Under Missouri Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

947. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

948. Defendants, in a scheme to improperly market, sell, and expand the sales and profits for their dicamba-based products, as described above, conspired with each other to their mutual economic benefit to create a market for their dicamba-based products and profit from the ecological disaster caused by them.

949. The object of the conspiracy is to create an ecological disaster through the use of Defendants dicamba-based products that will force farmers to purchase their dicamba-based products out of self-defense and cause Defendants to reap great profits at the expense of innocent third-parties, like Plaintiffs, who have suffered damage.

950. Early on, Defendants formed partnerships and entered into written joint licensing agreement to share technologies in an effort to speed their dicamba-based products to market.

951. Indeed, Defendants are so intertwined that it is difficult to tell where one of their products ends and the next product begins. For example, Defendant Monsanto's XtendiMax is the same herbicide as Defendant BASF's Clarity herbicide only with Defendant Monsanto adding an additive to Clarity called VaporGrip.

952. Defendants share defective technology.

953. Defendants invested in their dicamba production facilities in preparation for the demand that would be created by the damage that their dicamba-based products would cause.

954. Defendants mutually developed and researched their dicamba-based products together, testing their dicamba-based products at Defendant Monsanto's research facilities.

955. From their testing, Defendants knew the risks and dangers posed to innocent third parties and non-dicamba resistant crops from their dicamba-based products and conspired to conceal this information, especially on volatility, from the public, federal and state regulatory authorities, state legislatures, farmers, their licensees, consumers, and Plaintiffs.

956. Defendants also conspired to inadequately train their employees, agents, distributors, farmers, growers, licensees, and applicators on how to use their dicamba-based herbicides and products to increase the damage and drive up demand for their dicamba-based products.

957. Defendants' agreed not to provide warnings, effective notices, and proper labels and use instructions for their dicamba-based products to increase the damage and drive up demand for their dicamba-based products.

958. Defendants conspired to advertise and market their dicamba herbicides as low volatility formulations of an inherently volatile herbicide, dicamba. Through these coordinated marketing efforts, Defendants created demand for their dicamba-based products before and after the damage caused by them required action by federal and state governments.

959. In 2015 and 2016, through their concerted activities, Defendants colluded in the release of Defendant Monsanto's Xtend seeds prior to Defendants receiving approval for their dicamba-based herbicides, with knowledge and certainty that farmers would use older dicamba herbicides, such as Defendant BASF's Banvel or Clarity, on Xtend seeds and all Defendants would profit in the short-term and long-term.

960. Defendants, through their agents and representatives, conspired to encourage legal and illegal spraying of their dicamba herbicides, regardless of how much damage it would cause.

961. Defendants' conspiracy required the illegal spraying of Defendants' older dicamba formulations on Defendant Monsanto's Xtend seeds to create fear in farmers – either use this technology or face the loss of their non-dicamba resistant crops – until farmers no longer had a choice.

962. Once the EPA approved XtendiMax and Engenia, Defendants jointly proceeded with a full-scale launch of their dicamba-based products, causing a wave of destruction to non-dicamba resistant crops, including Plaintiffs and the class's crops.

963. In response to the damage, Defendants issued coordinated public statements and offered identical stated causes for the damage, none of which had anything to do with Defendants' dicamba-based products, in order to ensure increased demand and profits for their dicamba-based products.

964. Since 2015, the damage caused by Defendants' dicamba-based products has forced non-dicamba resistant crop farmers to purchase and use Defendants' dicamba-based products out of self-defense – precisely as the conspiracy intended.

965. Defendants conspired to threaten, harass, and intimidate innocent landowners from complaining or seeking regulatory or legal assistance.

966. Defendants also conspired to suppress the level of control they had over their licensees who used their dicamba-based products.

967. Further, Defendants did not revoke any licenses with their licensees, including those farmers who used Defendants' dicamba-based products and caused damage to Plaintiffs and the class's crops. Defendants could have acted to prevent or stop the damage that their dicamba-based products cause, but chose not to. In fact, Defendants gave the green-light to illegal spraying by announcing they would take no action against licensees that sprayed illegally.

968. The unlawful actions of Defendants resulted in damages to Plaintiffs and the class, that have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

969. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

970. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXXII**
**Breach of Fiduciary Duty**
**(Missouri Common Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

971. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

972. Defendants owed a fiduciary duty to farmers in general, and thus the Plaintiffs and Class.

973. Defendants acknowledged such a duty existed in at least their stewardship pledges.

974.

975. Monsanto further reiterated its fiduciary duty to at least its "farmer-customers" in its Aug. 2, 2017 "Open Letter to Our Farmer-Customers," where its CTO wrote, "we want you to

know that we will be with you every step of the way this season" and "we will stand by you throughout the growing season." (emphasis added).

976. As fiduciaries to Plaintiffs and the class, Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

977. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

978. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

979. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;

b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;

c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;

d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;

e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,

f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;

g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and

h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

980. Further, each Defendant had a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

981. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

982. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products. The revisions to Defendants' labels in October 2017 confirm the prior labels and instructions were inadequate.

983. Despite their fiduciary relationship, Defendants released their Xtend products and Engenia, XtendiMax and FeXapan herbicides, knowing harm would result to Plaintiffs and the class.

984. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products.

985. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

986. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

987. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXXIII**
**Continuing Nuisance**
**(Under Missouri Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

988. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

989. Defendants' conduct has created a nuisance by causing widespread damage due to post-emergence applications of XtendiMax, Engenia, and FeXapan on Xtend crops.

990. The widespread and significant off target movement of XtendiMax, Engenia, and FeXapan constitutes an unreasonable and substantial interference with rights common to the general public.

991. This unreasonable interference was and is imposed on the Plaintiffs and the class. It arises from Defendants' manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging,

preparing for use and selling XtendiMax, Engenia, and FeXapan, and failing to adequately test and warn of the risks and dangers of dicamba as described herein.

992. Specifically, Defendants market XtendiMax, Engenia, and FeXapan with the knowledge that these herbicides are prone to volatize, move off target through temperature inversions, and move off target through spray drift, and will do so despite all mitigation efforts available to applicators.

993. Defendants introduced these products into the stream of commerce with the knowledge that their herbicides were highly toxic to non-dicamba resistant crops, trees, and plants and would cause severe damage to farmers who purchased and planted crops sold by Defendants' competitors.

994. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

995. Defendants have unreasonably interfered with the Plaintiffs and the class's right to grow and raise crops of their choosing, free of damage and toxic interference from Defendants' dicamba products.

996. Defendants' conduct, as described above, was reckless. Defendants risk the livelihoods of American farmers, including Plaintiffs, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages and injunctive relief.

997. By reason of the foregoing, Defendants are liable to Plaintiffs for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXXIV**
**Violation of Missouri Antitrust Act**
**(MO Revised Stat. 416.121)**
**On Behalf of Plaintiffs and Missouri Class**

998. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

999. Defendants have willfully engaged, and are engaging, in an agreed course of anticompetitive conduct, including destroying non-dicamba resistant soybean seed, tying and refusals to deal, among other acts, to obtain a monopoly in the soybean market or the dicamba resistant soybean market.

1000. Defendants, by contract, combination, or conspiracy as described above have unreasonably restrained trade or commerce in the soybean seeds market.

1001. Defendants have also established, maintained, used, or attempted to acquire monopoly power over soybean seeds in this state for the purpose of excluding competition.

1002. There is a dangerous probability that, unless restrained, Defendants will succeed in obtaining a monopoly in the soybean seed markets.

1003. Defendants have acted with the specific intent to monopolize and destroy effective competition in the markets for soybean seeds.

1004. Defendants' conduct has injured the Missouri Plaintiffs, the Missouri Class, consumers and competition.

1005. As a direct, foreseeable, and proximate result of Defendants' conduct, the Missouri Plaintiffs and Missouri Class have been and will continue to be damaged, in amounts to be proven at trial.

1006. The Missouri Plaintiffs' and Missouri Class's injuries are of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

1007. Unless the activities complained of are enjoined, the Missouri Plaintiffs and Missouri Class will suffer immediate and irreparable injury for which they are without an adequate remedy at law, including, but not limited to, the inability to purchase, plant, grow and harvest products that compete with Xtend soybeans or to plant non-GMO or organic soybeans.

1008. By reason of the foregoing, Defendants are liable to the Missouri Plaintiffs and Missouri Class for compensatory damages (trebled), in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXXV**
**Punitive Damages**
**(Under Missouri Law)**
**On Behalf of the Missouri Plaintiffs and the Missouri State Class**

1009. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1010. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the livelihood of American farmers, including Plaintiffs, for the primary purpose of increasing Defendants' profits from the sale and distribution of Xtend crops, XtendiMax, Engenia, and FeXapan, and the secondary purpose of dominating American farmers and dictating their purchasing decisions. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

1011. Prior to the manufacturing, sale, and distribution of XtendiMax, Engenia, and FeXapan, Defendants knew that these products were in a defective condition as previously described herein and knew that those who did not plant Xtend crops would experience and did experience severe crop injuries, and significant anxiety resulting from the potential loss of their livelihood. Further, Defendants, through their officers, directors, managers, and agents, knew that these herbicides presented a substantial and unreasonable risk of harm to the public, including Plaintiffs, and as such, Defendants unreasonably subjected innocent bystanders to harm by introducing these herbicides into the stream of commerce.

1012. The October 2017 reclassification of Defendants' over-the-top herbicides as Restricted Use Pesticides further confirms the herbicides were defective and ultrahazardous, as was the entire crop system.

1013. Defendants' ignoring of university research and their ongoing coverup of the damage caused by the volatility of their over-the-top dicamba formulations similarly shows knowing and deliberate actions on their part to place profits above the well-being of others.

1014. Despite their knowledge, Defendants, acting through their officers, directors, and managing agents, for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in XtendiMax, Engenia, and FeXapan, and failed to warn the public, including Plaintiffs, of the extreme risk of injury occasioned by said defects inherent in these herbicides. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of these herbicides knowing these actions would expose farmers to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

1015. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1016. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXXVI**
**Trespass**
**(Under Nebraska Law)**
**On Behalf of the Nebraska Plaintiffs and the Nebraska State Class**

1017. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1018. Defendants manufactured, distributed, and intentionally sold their dicamba-based products in the State of Nebraska.

1019. During the time of Defendants' trespass on Plaintiffs and the class's land and crops, Plaintiffs and the class were farmers engaged in the planting, cultivation, harvesting, and selling of crops, such as soybeans.

1020. Defendants manufactured, distributed, and intentionally sold their dicamba-based products in the State of Nebraska.

1021. Defendants directly, intentionally, and physically invaded Plaintiffs and the class's land and crops and harmed Plaintiffs and the class's land and crops.

1022. The damages sustained by Plaintiffs and the class include at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional

lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1023. The entry by Defendants upon Plaintiffs and the class's land and crops through the sale and use of their dicamba-based products and their users and licensees' use of dicamba-based products was unauthorized.

1024. Defendants' dicamba-based products consist of volatile herbicides that volatilized and moved off-target in the form of physical droplets, physical spray particles, and gas particles. These droplets and particles, all airborne, as a result of being sprayed by Defendants' users and licensees, volatilized or moved off-target and settled on Plaintiffs and the class's land and crops, causing substantial damage to Plaintiffs and the class's land and crops, as described above, rendering Plaintiffs and the class's land and crops unfit for Plaintiffs and the class's possession and interest in such land and crops.

1025. Defendants' dicamba-based products, including Defendant Monsanto's XtendiMax herbicide, Defendant BASF's Engenia herbicide and DuPont's FeXapan herbicide, have volatilized, drifted, and moved off target during or after the time of their use and intruded on Plaintiffs and the class's land and crops, interfering with Plaintiffs and the class's right to exclusive and actual possession of their property with substantial damage to crops growing on Plaintiffs and the class's property and the land where such crops are grown.

1026. Further, Defendants intentionally instructed and encouraged users and licensees of their herbicides to spray dicamba, including Defendants' XtendiMax and Engenia herbicides, on crops near Plaintiffs and the class's property where Defendants' dicamba-based products can volatilize and move off-target and cause substantial damage to Plaintiffs and the class's land and crops.

1027. Through a contractual relationship with their licensees, Defendants exercised control over their licensees and the use of Defendants' dicamba-based products that invaded Plaintiffs and the class's land and crops and caused substantial damage to Plaintiffs and the class's land and crops.

1028. In sum, Defendants have engaged in a chemical trespass to Plaintiffs and the class's land.

1029. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1030. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXXVII**
**Negligence**
**(Nebraska Common Law)**
**On Behalf of the Nebraska Plaintiffs and the Nebraska State Class**

1031. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1032. Defendants negligently designed and marketed the products at issue, failed to warn those to whom they had a duty to warn about the dangers of the products at issue and negligently trained those that purchased the products at issue.

1033. Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

1034. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

1035. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

1036. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;
b. Instituting a nonexistent, or at a minimum, careless and ineffective “stewardship” program;
c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;
d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;
e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,
f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others’ crops;
g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and
h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA’s approval of dicamba for over-the-top application on Xtend crops.

1037. Further, each Defendant has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

1038. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target

crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

1039. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products.

1040. Defendants' negligence is a direct and proximate cause of the injuries and damages sustained by the Plaintiffs and the class.

1041. The damages Plaintiffs and the class have suffered include but are not limited to reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1042. With respect to the release their products, Defendants had a duty to utilize their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Defendants' business.

1043. Defendants breached their duties by failing to exercise the requisite degree of care in selling and disseminating their products to prevent them from damaging non-target crops, trees, and plants.

1044. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products

1045. As alleged above, Defendants breached their duties and the requisite standard of care owed to all foreseeable Plaintiffs, and were therefore negligent.

1046. Plaintiffs and the class are thus entitled to an award of compensatory damages, prejudgment and post judgment interest.

1047. Defendants' conduct was grossly negligent and showed a complete indifference to or conscious disregard of the rights of others, including the Plaintiffs and the class. Punitive damages are thus warranted.

1048. In 2015 and 2016, Monsanto sold its Xtend products knowing that without a safe, approved herbicide there was a significant risk that farmers would use unapproved herbicides to protect their crops.

1049. Further, Defendants sold their products knowing there was a significant risk that use of even approved dicamba formulations would lead to damage to non-target crops, trees, and plants, especially in view of the inadequate instructions provided.

1050. Defendants violated their duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, temperature inversion, migration, and drift of dicamba-containing products in amounts that would cause severe damage to crops, trees, and plants other than those grown from Xtend seeds.

1051. Likewise, Defendants' violated their duty to provide adequate instructions for use of their products that would not lead to damage to non-target crops, trees, and plants.

1052. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

1053. Defendants' inadequate warnings were a proximate cause of the harm to Plaintiffs and the class.

1054. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

1055. Defendants were negligent in selling of products in areas that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given their physical proximity to non-dicamba resistant crops, trees, and plants, the timing of use of Defendants' products, the inadequate instructions provided, and the history of crop and plant damage occurring in these areas from the use of dicamba-containing products.

1056. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1057. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

## COUNT XXXVIII
## Strict Liability – Products Liability/Defective Design
## (Under Nebraska Law)
## On Behalf of the Nebraska Plaintiffs and the Nebraska State Class

1058. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1059. Defendants designed, tested, developed, manufactured, marketed, distributed, and sold their dicamba-based products – including Defendant Monsanto's Xtend seeds, Defendant Monsanto's XtendiMax herbicide, Defendant BASF's Engenia herbicide and DuPont's FeXapan herbicide – in their ordinary course of business.

1060. As described above, Defendants' dicamba-based products were in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe, non-defective herbicide, including Defendants XtendiMax and Engenia herbicides, was marketed by Defendants. Thus, Defendants' dicamba-based products were defective and unreasonably dangerous due to Defendants' inability to provide an herbicide reasonably safe for its intended use.

1061. Defendants' dicamba-based products were used by farmers and applicators for the cultivation and protection of crops which was their reasonably anticipated use.

1062. Plaintiffs and the class were damaged as a direct result of such defective condition which existed when these dicamba-based products were sold.

1063. Plaintiffs and the class's damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1064. At all times, Defendants sold dicamba-based products and knew of the defective condition and danger of their dicamba-based products.

1065. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1066. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XXXIX**
**Strict Liability – Ultrahazardous or Abnormally Dangerous Activity**
**(Nebraska Common Law)**
**On Behalf of the Nebraska Plaintiffs and the Nebraska State Class**

1067. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1068. Monsanto and DuPont's testing, growing, selling, disposing, or otherwise disseminating Xtend products and Monsanto, BASF and DuPont's selling, disposing, or otherwise disseminating of XtendiMax, Engenia and FeXapan continues to constitute an abnormally dangerous or ultrahazardous activity because such activities created a high degree of risk of harm, the harm has been and will continue to be significant, the risk cannot be eliminated by the exercise of reasonable care, the value to the community is outweighed by its dangerous attributes, and the activity resulted in injuries and damages to Plaintiffs and the class.

1069. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides confirms the herbicides were ultrahazardous, as was the entire crop system.

1070. Further, dicamba itself is moderately toxic by ingestion and slightly toxic by inhalation or dermal exposure.

1071. Given its proclivity to drift and volatilize, it poses a risk to people and animals; not just non-target crops, trees, and plants.

1072. In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

1073. The type of harm suffered by Plaintiffs and the class is the kind of harm, or the possibility of such harm, which makes the activity abnormally dangerous.

1074. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1075. As a direct and proximate result of Defendants' ultrahazardous or abnormally dangerous activities, Plaintiffs and the class have sustained, and will continue to sustain substantial injuries and damages, including those alleged above.

1076. Defendants are therefore strictly liable to Plaintiffs and the class for all damages which have resulted or will result from their abnormally dangerous activities with respect to Monsanto and DuPont's testing, growing, storing, selling, disposing, or otherwise disseminating Xtend products, and Monsanto, BASF and DuPont's selling, disposing, or otherwise disseminating XtendiMax, Engenia and FeXapan.

1077. In light of the surrounding circumstances, Defendants knew or should have known that their conduct would naturally or probably result in injuries to Plaintiffs and the class.

1078. Nevertheless, Defendants continued such conduct in reckless disregard of or conscious indifference to those consequences.

1079. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1080. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XL**
**Strict Liability – Failure to Warn**
**(Under Nebraska Law)**
**On Behalf of the Nebraska Plaintiffs and the Nebraska State Class**

1081. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1082. Defendants sold their dicamba-based products in their ordinary course of business.

1083. As described above, Defendants' dicamba-based products were unreasonably dangerous at the time of sale. Defendants' dicamba-based products were unreasonably dangerous when put to their reasonably anticipated use without knowledge of purchasers and third-parties of their defective condition because no safe herbicide was marketed by Defendants.

1084. Defendants did not give adequate warnings to purchasers or third-parties of the danger of their dicamba-based products.

1085. Defendants' dicamba-based products used by farmers and applicators which was their reasonably anticipated use.

1086. Plaintiffs and the class were damaged as a direct result of Defendants' dicamba-based products being sold without adequate warnings.

1087. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1088. At all times, Defendants sold their dicamba-based products and knew of the danger of their dicamba-based products.

1089. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1090. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XLI**
**Civil Conspiracy**
**(Under Nebraska Law)**
**On Behalf of the Nebraska Plaintiffs and the Nebraska State Class**

1091. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1092. Defendants, in a scheme to improperly market, sell, and expand the sales and profits for their dicamba-based products, as described above, conspired with each other to their mutual economic benefit to create a market for their dicamba-based products and profit from the ecological disaster caused by them.

1093. The object of the conspiracy is to create an ecological disaster through the use of Defendants dicamba-based products that will force farmers to purchase their dicamba-based products out of self-defense and cause Defendants to reap great profits at the expense of innocent third-parties, like Plaintiffs, who have suffered damage.

1094. Early on, Defendants formed partnerships and entered into written joint licensing agreement to share technologies in an effort to speed their dicamba-based products to market.

1095. Indeed, Defendants are so intertwined that it is difficult to tell where one of their products ends and the next product begins. For example, Defendant Monsanto's XtendiMax is

the same herbicide as Defendant BASF's Clarity herbicide only with Defendant Monsanto adding an additive to Clarity called VaporGrip.

1096. Defendants share defective technology.

1097. Defendants invested in their dicamba production facilities in preparation for the demand that would be created by the damage that their dicamba-based products would cause.

1098. Defendants mutually developed and researched their dicamba-based products together, testing their dicamba-based products at Defendant Monsanto's research facilities.

1099. From their testing, Defendants knew the risks and dangers posed to innocent third parties and non-dicamba resistant crops from their dicamba-based products and conspired to conceal this information, especially on volatility, from the public, federal and state regulatory authorities, state legislatures, farmers, their licensees, consumers, and Plaintiffs and the class.

1100. Defendants also conspired to inadequately train their employees, agents, distributors, farmers, growers, licensees, and applicators on how to use their dicamba-based herbicides and products to increase the damage and drive up demand for their dicamba-based products.

1101. Defendants' agreed not to provide warnings, effective notices, and proper labels and use instructions for their dicamba-based products to increase the damage and drive up demand for their dicamba-based products.

1102. Defendants conspired to advertise and market their dicamba herbicides as low volatility formulations of an inherently volatile herbicide, dicamba. Through these coordinated marketing efforts, Defendants created demand for their dicamba-based products before and after the damage caused by them required action by federal and state governments.

1103. In 2015 and 2016, through their concerted activities, Defendants colluded in the release of Defendant Monsanto's Xtend seeds prior to Defendants receiving approval for their dicamba-based herbicides, with knowledge and certainty that farmers would use older dicamba herbicides, such as Defendant BASF's Banvel or Clarity, on Xtend seeds and all Defendants would profit in the short-term and long-term.

1104. Defendants, through their agents and representatives, conspired to encourage legal and illegal spraying of their dicamba herbicides, regardless of how much damage it would cause.

1105. Defendants' conspiracy required the illegal spraying of Defendants' older dicamba formulations on Defendant Monsanto's Xtend seeds to create fear in farmers – either use this technology or face the loss of their non-dicamba resistant – until farmers no longer had a choice.

1106. Once the EPA approved XtendiMax and Engenia, Defendants jointly proceeded with a full-scale launch of their dicamba-based products, causing a wave of destruction to non-dicamba resistant crops, including Plaintiffs and the class's crops, in Nebraska and other states.

1107. In response to the damage, Defendants issued coordinated public statements and offered identical stated causes for the damage, none of which had anything to do with Defendants' dicamba-based products, in order to ensure increased demand and profits for their dicamba-based products.

1108. Since 2015, the damage caused by Defendants' dicamba-based products has forced non-dicamba resistant crop farmers to purchase and use Defendants' dicamba-based products out of self-defense – precisely as the conspiracy intended.

1109. Defendants conspired to threaten, harass, and intimidate innocent landowners from complaining or seeking regulatory or legal assistance.

1110. Defendants also conspired to suppress the level of control they had over their licensees who used their dicamba-based products.

1111. Further, Defendants did not revoke any licenses with their licensees, including those farmers who used Defendants' dicamba-based products and caused damage to Plaintiffs and the class's crops. Defendants could have acted to prevent or stop the damage that their dicamba-based products cause, but chose not to. In fact, Defendants gave the green-light to illegal spraying by announcing they would take no action against licensees that sprayed illegally.

1112. The unlawful actions of Defendants resulted in damages to Plaintiffs and the class, and thereby Plaintiffs and the class were harmed in the ways and manners described above.

1113. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1114. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1115. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XLII**
**Breach of Fiduciary Duty**
**(Nebraska Common Law)**
**On Behalf of the Nebraska Plaintiffs and the Nebraska State Class**

1116. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1117. Defendants owed a fiduciary duty to farmers in general, and thus the Plaintiffs and Class.

1118. Defendants acknowledged such a duty existed in at least their stewardship pledges.

1119. Monsanto further reiterated its fiduciary duty to at least its "farmer-customers" in its Aug. 2, 2017 "Open Letter to Our Farmer-Customers," where its CTO wrote, "we want you to know that we will be with you every step of the way this season" and "we will stand by you throughout the growing season." (emphasis added).

1120. As fiduciaries to Plaintiffs and the class, Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

1121. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

1122. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

1123. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;

b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;

c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;

d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;

e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,

f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;

g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and

h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

1124. Further, each Defendant had a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

1125. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

1126. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as

are necessary to permit the reasonably safe use of their products. The revisions to Defendants' labels in October 2017 confirm the prior labels and instructions were inadequate.

1127. Despite their fiduciary relationship, Defendants released their Xtend products and Engenia, XtendiMax and FeXapan herbicides, knowing harm would result to Plaintiffs and the class.

1128. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products.

1129. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1130. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1131. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XLIII**
**Continuing Nuisance**
**(Under Nebraska Law)**
**On Behalf of the Nebraska Plaintiffs and the Nebraska State Class**

1132. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1133. Defendants' conduct has created a nuisance by causing widespread damage due to post-emergence applications of XtendiMax, Engenia, and FeXapan on Xtend crops.

1134. The widespread and significant off target movement of XtendiMax, Engenia, and FeXapan constitutes an unreasonable and substantial interference with rights common to the general public.

1135. This unreasonable interference was and is imposed on the Plaintiffs and the class. It arises from Defendants' manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling XtendiMax, Engenia, and FeXapan, and failing to adequately test and warn of the risks and dangers of dicamba as described herein.

1136. Specifically, Defendants market XtendiMax, Engenia, and FeXapan with the knowledge that these herbicides are prone to volatize, move off target through temperature inversions, and move off target through spray drift, and will do so despite all mitigation efforts available to applicators.

1137. Defendants introduced these products into the stream of commerce with the knowledge that their herbicides were highly toxic to non-dicamba resistant crops, trees, and plants and would cause severe damage to farmers who purchased and planted crops sold by Defendants' competitors.

1138. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1139. Defendants have unreasonably interfered with the Plaintiffs and the class's right to grow and raise crops of their choosing, free of damage and toxic interference from Defendants' dicamba products.

1140. Defendants' conduct, as described above, was reckless. Defendants risk the livelihoods of American farmers, including Plaintiffs and the class, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages and injunctive relief.

1141. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1142. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XLIV**
**Punitive Damages**
**(Under Nebraska Law)**
**On Behalf of the Nebraska Plaintiffs and the Nebraska State Class**

1143. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1144. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the livelihood of American farmers, including Plaintiffs, for the primary purpose of

increasing Defendants' profits from the sale and distribution of Xtend crops, XtendiMax, Engenia, and FeXapan, and the secondary purpose of dominating American farmers and dictating their purchasing decisions. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

1145. Prior to the manufacturing, sale, and distribution of XtendiMax, Engenia, and FeXapan, Defendants knew that these products were in a defective condition as previously described herein and knew that those who did not plant Xtend crops would experience and did experience severe crop injuries, and significant anxiety resulting from the potential loss of their livelihood. Further, Defendants, through their officers, directors, managers, and agents, knew that these herbicides presented a substantial and unreasonable risk of harm to the public, including Plaintiffs, and as such, Defendants unreasonably subjected innocent bystanders to harm by introducing these herbicides into the stream of commerce.

1146. The October 2017 reclassification of Defendants' over-the-top herbicides as Restricted Use Pesticides further confirms the herbicides were defective and ultrahazardous, as was the entire crop system.

1147. Defendants' ignoring of university research and their ongoing coverup of the damage caused by the volatility of their over-the-top dicamba formulations similarly shows knowing and deliberate actions on their part to place profits above the well-being of others.

1148. Despite their knowledge, Defendants, acting through their officers, directors, and managing agents, for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in XtendiMax, Engenia, and FeXapan, and failed to warn the public, including Plaintiffs and the class, of the extreme risk of injury occasioned by said defects

inherent in these herbicides. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of these herbicides knowing these actions would expose farmers to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

1149. Defendants' conduct was despicable and so contemptible that they would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiffs and the class, entitling Plaintiffs and the class to exemplary damages.

**COUNT XLV**
**Violation of Nebraska Antitrust Act**
**(59-801)**
**On Behalf of Plaintiffs and Nebraska Class**

1150. Plaintiffs incorporate the above paragraphs as though fully set forth herein.

1151. Defendants have willfully engaged, and are engaging, in an agreed course of anticompetitive conduct, including destroying non-dicamba resistant soybean seed, tying and refusals to deal, among other acts, to obtain a monopoly in the soybean market or the dicamba resistant soybean market.

1152. Defendants, by contract, combination, or conspiracy as described above have unreasonably restrained trade or commerce in the soybean seeds market in Nebraska.

1153. Defendants have also monopolized, attempted to monopolize, combined or conspired with others to monopolize soybean seeds in this state for the purpose of excluding competition.

1154. There is a dangerous probability that, unless restrained, Defendants will succeed in obtaining a monopoly in the soybean seed markets.

1155. Defendants have acted with the specific intent to monopolize and destroy effective competition in the markets for soybean seeds.

1156. Defendants' conduct has injured the Nebraska Plaintiffs, the Nebraska Class, consumers and competition.

1157. As a direct, foreseeable, and proximate result of Defendants' conduct, the Nebraska Plaintiffs and Nebraska Class have been and will continue to be damaged, in amounts to be proven at trial.

1158. The Nebraska Plaintiffs' and Nebraska Class's injuries are of the type the antitrust laws are intended to prohibit and thus constitutes antitrust injury.

1159. Unless the activities complained of are enjoined, the Nebraska Plaintiffs and Nebraska Class will suffer immediate and irreparable injury for which they are without an adequate remedy at law, including, but not limited to, the inability to purchase, plant, grow and harvest products that compete with Xtend soybeans or to plant non-GMO or organic soybeans.

1160. By reason of the foregoing, Defendants are liable to the Nebraska Plaintiffs and Nebraska Class for compensatory damages (trebled), in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XLVI**
**Negligence**
**(Kansas Common Law)**
**On Behalf of the Kansas Plaintiffs and the Kansas State Class**

1161. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1162. Defendants negligently designed and marketed the products at issue, failed to warn those to whom they had a duty to warn about the dangers of the products at issue and negligently trained those that purchased the products at issue.

1163. Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

1164. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

1165. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

1166. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;
b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;
c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;
d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or competence to effectively prevent them from utilizing dicamba for over-the-top applications;
e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,
f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;
g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and
h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

1167. Further, each Defendant has a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from

unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

1168. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

1169. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products.

1170. Defendants' negligence is a direct and proximate cause of the injuries and damages sustained by the Plaintiffs and the class.

1171. The damages Plaintiffs and the class have suffered include but are not limited to reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1172. With respect to the release their products, Defendants had a duty to utilize their professional expertise and exercise that degree of skill and learning ordinarily used under the same or similar circumstances by a person or entity in Defendants' business.

1173. Defendants breached their duties by failing to exercise the requisite degree of care in selling and disseminating their products to prevent them from damaging non-target crops, trees, and plants.

1174. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products

1175. As alleged above, Defendants breached their duties and the requisite standard of care owed to all foreseeable Plaintiffs, and were therefore negligent.

1176. Plaintiffs and the class are thus entitled to an award of compensatory damages, prejudgment and post judgment interest.

1177. Defendants' conduct was grossly negligent and showed a complete indifference to or conscious disregard of the rights of others, including the Plaintiffs and the class. Punitive damages are thus warranted.

1178. In 2015 and 2016, Monsanto sold its Xtend products knowing that without a safe, approved herbicide there was a significant risk that farmers would use unapproved herbicides to protect their crops.

1179. Further, Defendants sold their products knowing there was a significant risk that use of even approved dicamba formulations would lead to damage to non-target crops, trees, and plants, especially in view of the inadequate instructions provided.

1180. Defendants violated their duty to give a reasonable and adequate warning of the dangers inherent and reasonably foreseeable in the use of their products, including the danger of causing significant and far-reaching off-target movement, temperature inversion, migration, and drift of dicamba-containing products in amounts that would cause severe damage to crops, trees, and plants other than those grown from Xtend seeds.

1181. Likewise, Defendants' violated their duty to provide adequate instructions for use of their products that would not lead to damage to non-target crops, trees, and plants.

1182. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

1183. Defendants' inadequate warnings were a proximate cause of the harm to Plaintiffs and the class.

1184. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides and revising the label/instructions confirm the prior labels/instructions were inadequate to protect non-target crops, trees, and plants from damage.

1185. Defendants were negligent in selling of products in areas that they knew or should have known that using dicamba-containing products posed an unreasonable risk of harm to nearby crops, given their physical proximity to non-dicamba resistant crops, trees, and plants, the timing of use of Defendants' products, the inadequate instructions provided, and the history of crop and plant damage occurring in these areas from the use of dicamba-containing products.

1186. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1187. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

## COUNT XLVII
## Strict Liability – Products Liability/Defective Design

**(K.S.A. § 60-3301, et seq.)**
**On Behalf of the Kansas Plaintiffs and the Kansas State Class**

1188. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1189. Pursuant to K.S.A. § 60-3301, et seq. of the Kansas Code, a supplier of a product is liable for harm to another person or his property if: (1) The supplier is engaged in the business of manufacturing, selling, or distributing the product; (2) the product was supplied by him in a defective condition that rendered it unreasonably dangerous; and (3) the defective condition was a proximate cause of the harm to person or to property.

1190. Defendants have a partnership, joint-venture and joint-enterprise for the dicamba-crop system for supplying to the marketplace in Kansas, and other states, genetically modified seeds represented as dicamba-tolerant, which require a compatible dicamba-tolerant herbicide associated with the same genetic traits.

1191. The Defendants are engaged in the business of variously manufacturing, selling, and distributing the dicamba-tolerant crop system and are each a "product seller" and "manufacturer" of the dicamba-tolerant crop system for the purpose of K.S.A. § 60-3302 of the Kansas Code.

1192. Defendants designed, tested, developed, manufactured, marketed, distributed, and sold their dicamba-based products – including Defendant Monsanto's Xtend seeds, Defendant Monsanto's XtendiMax herbicide, Defendant BASF's Engenia herbicide and DuPont's FeXapan herbicide – in their ordinary course of business.

1193. As described above, Defendants' dicamba-based products were in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe, non-defective herbicide, including Defendants XtendiMax and Engenia herbicides, was marketed

by Defendants. Thus, Defendants' dicamba-based products were defective and unreasonably dangerous due to Defendants' inability to provide an herbicide reasonably safe for its intended use.

1194. Defendants' dicamba-based products were used by farmers and applicators for the cultivation and protection of crops which was their reasonably anticipated use.

1195. Plaintiffs and the class were damaged as a direct result of such defective condition which existed when these dicamba-based products were sold.

1196. Plaintiffs and the class's damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1197. At all times, Defendants sold dicamba-based products and knew of the defective condition and danger of their dicamba-based products.

1198. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1199. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT XLVIII**
**Strict Liability – Ultrahazardous or**
**Abnormally Dangerous Activity**
**(Kansas Common Law)**
**On Behalf of the Kansas Plaintiffs and the Kansas State Class**

1200. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1201. Monsanto and DuPont's testing, growing, selling, disposing, or otherwise disseminating Xtend products and Monsanto, BASF and DuPont's selling, disposing, or otherwise disseminating of XtendiMax, Engenia and FeXapan continues to constitute an abnormally dangerous or ultrahazardous activity because such activities created a high degree of risk of harm, the harm has been and will continue to be significant, the risk cannot be eliminated by the exercise of reasonable care, the value to the community is outweighed by its dangerous attributes, and the activity resulted in injuries and damages to Plaintiffs and the class.

1202. Defendants October 2017 reclassification of their over-the-top herbicides as Restricted Use Pesticides confirms the herbicides were ultrahazardous, as was the entire crop system.

1203. Further, dicamba itself is moderately toxic by ingestion and slightly toxic by inhalation or dermal exposure.

1204. Given its proclivity to drift and volatilize, it poses a risk to people and animals; not just non-target crops, trees, and plants.

1205. In addition, the activity was unduly dangerous and inappropriate for the places where it was conducted.

1206. The type of harm suffered by Plaintiffs and the class is the kind of harm, or the possibility of such harm, which makes the activity abnormally dangerous.

1207. This harm has manifested itself as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and

ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1208. As a direct and proximate result of Defendants' ultrahazardous or abnormally dangerous activities, Plaintiffs and the class have sustained, and will continue to sustain substantial injuries and damages, including those alleged above.

1209. Defendants are therefore strictly liable to Plaintiffs and the class for all damages which have resulted or will result from their abnormally dangerous activities with respect to Monsanto and DuPont's testing, growing, storing, selling, disposing, or otherwise disseminating Xtend products, and Monsanto, BASF and DuPont's selling, disposing, or otherwise disseminating XtendiMax, Engenia and FeXapan.

1210. In light of the surrounding circumstances, Defendants knew or should have known that their conduct would naturally or probably result in injuries to Plaintiffs and the class.

1211. Nevertheless, Defendants continued such conduct in reckless disregard of or conscious indifference to those consequences.

1212. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1213. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT IL**
**Strict Liability – Failure to Warn**
**(K.S.A. § 60-3301, et seq.)**
**On Behalf of the Kansas Plaintiffs and the Kansas State Class**

1214. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1215. Defendants sold their dicamba-based products in their ordinary course of business.

1216. As described above, Defendants' dicamba-based products were unreasonably dangerous at the time of sale. Defendants' dicamba-based products were unreasonably dangerous when put to their reasonably anticipated use without knowledge of purchasers and third-parties of their defective condition because no safe herbicide was marketed by Defendants.

1217. Defendants did not give adequate warnings to purchasers or third-parties of the danger of their dicamba-based products.

1218. Defendants' dicamba-based products used by farmers and applicators which was their reasonably anticipated use.

1219. Plaintiffs and the class were damaged as a direct result of Defendants' dicamba-based products being sold without adequate warnings.

1220. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1221. At all times, Defendants sold their dicamba-based products and knew of the danger of their dicamba-based products.

1222. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others,

were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1223. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT L**
**Civil Conspiracy**
**(Under Kansas Law)**
**On Behalf of the Kansas Plaintiffs and the Kansas State Class**

1224. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1225. Defendants, in a scheme to improperly market, sell, and expand the sales and profits for their dicamba-based products, as described above, conspired with each other to their mutual economic benefit to create a market for their dicamba-based products and profit from the ecological disaster caused by them.

1226. The object of the conspiracy is to create an ecological disaster through the use of Defendants dicamba-based products that will force farmers to purchase their dicamba-based products out of self-defense and cause Defendants to reap great profits at the expense of innocent third-parties, like Plaintiffs, who have suffered damage.

1227. Early on, Defendants formed partnerships and entered into written joint licensing agreement to share technologies in an effort to speed their dicamba-based products to market.

1228. Indeed, Defendants are so intertwined that it is difficult to tell where one of their products ends and the next product begins. For example, Defendant Monsanto's XtendiMax is the same herbicide as Defendant BASF's Clarity herbicide only with Defendant Monsanto adding an additive to Clarity called VaporGrip.

1229. Defendants share defective technology.

1230. Defendants invested in their dicamba production facilities in preparation for the demand that would be created by the damage that their dicamba-based products would cause.

1231. Defendants mutually developed and researched their dicamba-based products together, testing their dicamba-based products at Defendant Monsanto's research facilities.

1232. From their testing, Defendants knew the risks and dangers posed to innocent third parties and non-dicamba resistant crops from their dicamba-based products and conspired to conceal this information, especially on volatility, from the public, federal and state regulatory authorities, state legislatures, farmers, their licensees, consumers, and Plaintiffs and the class.

1233. Defendants also conspired to inadequately train their employees, agents, distributors, farmers, growers, licensees, and applicators on how to use their dicamba-based herbicides and products to increase the damage and drive up demand for their dicamba-based products.

1234. Defendants' agreed not to provide warnings, effective notices, and proper labels and use instructions for their dicamba-based products to increase the damage and drive up demand for their dicamba-based products.

1235. Defendants conspired to advertise and market their dicamba herbicides as low volatility formulations of an inherently volatile herbicide, dicamba. Through these coordinated marketing efforts, Defendants created demand for their dicamba-based products before and after the damage caused by them required action by federal and state governments.

1236. In 2015 and 2016, through their concerted activities, Defendants colluded in the release of Defendant Monsanto's Xtend seeds prior to Defendants receiving approval for their dicamba-based herbicides, with knowledge and certainty that farmers would use older dicamba

herbicides, such as Defendant BASF's Banvel or Clarity, on Xtend seeds and all Defendants would profit in the short-term and long-term.

1237. Defendants, through their agents and representatives, conspired to encourage legal and illegal spraying of their dicamba herbicides, regardless of how much damage it would cause.

1238. Defendants' conspiracy required the illegal spraying of Defendants' older dicamba formulations on Defendant Monsanto's Xtend seeds to create fear in farmers – either use this technology or face the loss of their non-dicamba resistant – until farmers no longer had a choice.

1239. Once the EPA approved XtendiMax and Engenia, Defendants jointly proceeded with a full-scale launch of their dicamba-based products, causing a wave of destruction to non-dicamba resistant crops, including Plaintiffs and the class's crops, in Kansas and other states.

1240. In response to the damage, Defendants issued coordinated public statements and offered identical stated causes for the damage, none of which had anything to do with Defendants' dicamba-based products, in order to ensure increased demand and profits for their dicamba-based products.

1241. Since 2015, the damage caused by Defendants' dicamba-based products has forced non-dicamba resistant crop farmers to purchase and use Defendants' dicamba-based products out of self-defense – precisely as the conspiracy intended.

1242. Defendants conspired to threaten, harass, and intimidate innocent landowners from complaining or seeking regulatory or legal assistance.

1243. Defendants also conspired to suppress the level of control they had over their licensees who used their dicamba-based products.

1244. Further, Defendants did not revoke any licenses with their licensees, including those farmers who used Defendants' dicamba-based products and caused damage to Plaintiffs and the class's crops. Defendants could have acted to prevent or stop the damage that their dicamba-based products cause, but chose not to. In fact, Defendants gave the green-light to illegal spraying by announcing they would take no action against licensees that sprayed illegally.

1245. The unlawful actions of Defendants resulted in damages to Plaintiffs and the class, and thereby Plaintiffs and the class were harmed in the ways and manners described above.

1246. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1247. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1248. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT LI**
**Breach of Fiduciary Duty**
**(Kansas Common Law)**
**On Behalf of the Kansas Plaintiffs and the Kansas State Class**

1249. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1250. Defendants owed a fiduciary duty to farmers in general, and thus the Plaintiffs and Class.

1251. Defendants acknowledged such a duty existed in at least their stewardship pledges.

1252. Monsanto further reiterated its fiduciary duty to at least its "farmer-customers" in its Aug. 2, 2017 "Open Letter to Our Farmer-Customers," where its CTO wrote, "we want you to know that we will be with you every step of the way this season" and "we will stand by you throughout the growing season." (emphasis added).

1253. As fiduciaries to Plaintiffs and the class, Defendants owed a duty of at least reasonable care to its stakeholders, including Plaintiffs and the class, in the timing, scope, and terms under which they commercialized their Xtend products and their dicamba formulations.

1254. Defendants also owed a duty to prevent the exact harm they caused here to non-target crops, trees, and plants.

1255. Defendants commercialized their products without taking sufficient steps to avoid the foreseen consequences of dicamba application, including temperature inversion, volatilization, and destructive drift.

1256. Defendants breached their duty by acts and omissions including but not limited to:

a. Commercializing Xtend and their dicamba formulations on a widespread basis without reasonable or adequate safeguards;

b. Instituting a nonexistent, or at a minimum, careless and ineffective "stewardship" program;

c. Failing to enforce or effectively monitor their stewardship program and/or providing an inadequate stewardship program;

d. In 2015 and 2016, selling Xtend products to thousands of farmers with knowledge that they lacked the mechanisms, experience, ability and /or

competence to effectively prevent them from utilizing dicamba for over-the-top applications;

e. Utilizing inadequate and difficult if not impossible, to follow labels and instructions,

f. Failing to adequately warn and instruct farmers on the dangers of utilizing dicamba would lead to others' crops;

g. Prior to and including the 2016 soybean and cotton season, distributing misleading information about the EPA approval of dicamba formulations for Xtend crops; and

h. Prior to and including the 2016 soybean and cotton season, distributing misleading information regarding the timing of the EPA's approval of dicamba for over-the-top application on Xtend crops.

1257. Further, each Defendant had a duty to use ordinary care in the design and in the selection of the materials used in its products to protect those who are in the area of its use from unreasonable risk of harm. Given the toxicity of dicamba to certain crops, it was negligent to design, formulate, manufacture, and sell a dicamba-resistant seed and over-the-top dicamba formulations in the subject area. Each Defendant, therefore, failed to use ordinary care in the design and selection of materials in its products.

1258. Defendants also had a duty to test their products, including allowing independent testing, to determine the extent to which over-the-top dicamba application would injure off target crops, and to provide reasonable instructions and take other appropriate measures as are necessary to prevent such non-target damage. Defendants failed to adequately test their products or to take appropriate steps to prevent such damage.

1259. Defendants also have a duty to give reasonable and adequate warnings of dangers inherent or reasonably foreseeable in the use of their products and to provide such instructions as are necessary to permit the reasonably safe use of their products. The revisions to Defendants' labels in October 2017 confirm the prior labels and instructions were inadequate.

1260. Despite their fiduciary relationship, Defendants released their Xtend products and Engenia, XtendiMax and FeXapan herbicides, knowing harm would result to Plaintiffs and the class.

1261. The damages incurred by Plaintiffs and class members were or should have been foreseen by Defendants as they understood the risks of releasing their products.

1262. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1263. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1264. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT LII**
**Public/Private Nuisance**
**(Under Kansas Law)**
**On Behalf of the Kansas Plaintiffs and the Kansas State Class**

1265. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1266. Defendants' conduct has created a nuisance by causing widespread damage due to post-emergence applications of XtendiMax, Engenia, and FeXapan on Xtend crops.

1267. The widespread and significant off target movement of XtendiMax, Engenia, and FeXapan constitutes an unreasonable and substantial interference with rights common to the general public.

1268. This unreasonable interference was and is imposed on the Plaintiffs and the class. It arises from Defendants' manufacturing, designing, formulating, distributing, compounding, producing, processing, assembling, inspecting, distributing, marketing, labeling, packaging, preparing for use and selling XtendiMax, Engenia, and FeXapan, and failing to adequately test and warn of the risks and dangers of dicamba as described herein.

1269. Specifically, Defendants market XtendiMax, Engenia, and FeXapan with the knowledge that these herbicides are prone to volatize, move off target through temperature inversions, and move off target through spray drift, and will do so despite all mitigation efforts available to applicators.

1270. Defendants introduced these products into the stream of commerce with the knowledge that their herbicides were highly toxic to non-dicamba resistant crops, trees, and plants and would cause severe damage to farmers who purchased and planted crops sold by Defendants' competitors.

1271. These damages have manifested themselves as at least reduced yield, application of additional chemicals to compensate for dicamba damage, replanting, additional lost time and money and ultimately a loss of sales. Further, for those growing crops for seed, Defendants' actions have led to damage to the next generation of crops as well.

1272. Defendants have unreasonably interfered with the Plaintiffs and the class's right to grow and raise crops of their choosing, free of damage and toxic interference from Defendants' dicamba products.

1273. Defendants' conduct, as described above, was reckless. Defendants risk the livelihoods of American farmers, including Plaintiffs and the class, with knowledge of the severe dangers of off target movement and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn, or inform the unsuspected public. Defendants' reckless conduct warrants an award of punitive damages and injunctive relief.

1274. The actions of Defendants and the injuries inflicted against Plaintiffs and the class as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs and the class to a recovery of punitive damages against Defendants in a fair and reasonable amount.

1275. By reason of the foregoing, Defendants are liable to Plaintiffs and the class for compensatory and punitive damages, in amounts to be proved at trial, together with interest, costs of suit, attorneys' fees, injunctive relief, and all such other relief as the Court deems proper.

**COUNT LIII**
**Punitive Damages**
**(Under Kansas Law)**
**On Behalf of the Kansas Plaintiffs and the Kansas State Class**

1276. Plaintiffs incorporate by reference the above paragraphs as though fully set forth herein.

1277. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the livelihood of American farmers, including Plaintiffs, for the primary purpose of increasing Defendants' profits from the sale and distribution of Xtend crops, XtendiMax, Engenia, and FeXapan, and the secondary purpose of dominating American farmers and dictating their purchasing decisions. Defendants' outrageous and unconscionable conduct

warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

1278. Prior to the manufacturing, sale, and distribution of XtendiMax, Engenia, and FeXapan, Defendants knew that these products were in a defective condition as previously described herein and knew that those who did not plant Xtend crops would experience and did experience severe crop injuries, and significant anxiety resulting from the potential loss of their livelihood. Further, Defendants, through their officers, directors, managers, and agents, knew that these herbicides presented a substantial and unreasonable risk of harm to the public, including Plaintiffs, and as such, Defendants unreasonably subjected innocent bystanders to harm by introducing these herbicides into the stream of commerce.

1279. The October 2017 reclassification of Defendants' over-the-top herbicides as Restricted Use Pesticides further confirms the herbicides were defective and ultrahazardous, as was the entire crop system.

1280. Defendants' ignoring of university research and their ongoing coverup of the damage caused by the volatility of their over-the-top dicamba formulations similarly shows knowing and deliberate actions on their part to place profits above the well-being of others.

1281. Despite their knowledge, Defendants, acting through their officers, directors, and managing agents, for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in XtendiMax, Engenia, and FeXapan, and failed to warn the public, including Plaintiffs and the class, of the extreme risk of injury occasioned by said defects inherent in these herbicides. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of these herbicides

knowing these actions would expose farmers to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

1282. Defendants' conduct was despicable and so contemptible that they would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiffs and the class, entitling Plaintiffs and the class to exemplary damages.

## PRAYER FOR RELIEF

Plaintiff, on behalf of itself and all others similarly situated, requests:

A. Entry of preliminary and permanent injunctions providing that Monsanto and DuPont shall be enjoined from selling, marketing, distributing, or otherwise disseminating Xtend products;

B. Entry of judgment ordering Monsanto, BASF and DuPont to take affirmative steps to remediate the damage caused by over-the-top application of dicamba on Xtend products;

C. For an order certifying this lawsuits as a class action under Fed. R. Civ. Pro. 23, appointing counsel herein as class counsel and named Plaintiffs as class representatives;

D. Entry of judgment finding:

   i. Defendants falsely advertised Xtend products, Engenia and FeXapan under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

   ii. Defendants' release of Xtend products and Engenia constitutes a public nuisance;

iii. Defendants' release of Xtend products and Engenia and use of over-the-top dicamba formulations constitute a trespass to chattels;

iv. Defendants' release of Xtend products and Engenia were negligent;

v. Defendants are strictly liable for damages done by the release of Xtend products and Engenia;

vi. Defendants engaged in illegal, monopolistic acts to corner the soybean market,

vii. Defendants engaged in an illegal attempt to monopolize the soybeans market,

viii. Defendants breached their fiduciary duties to Plaintiffs,

ix. Defendants breached their express and implied warranties to Arkansas plaintiffs, and

x. Defendants engaged in conspiracy to illegally increase sales of Xtend products and Engenia to the detriment of non-dicamba resistant crops.

E. Monetary damages including compensatory relief to which Plaintiffs and the proposed class members are entitled and will be entitled at the time of trial, in an amount exceeding $75,000;

F. Disgorgement of Defendants' profits for their sale of Xtend products, XtendiMax, Engenia and FeXapan;

G. Punitive damages against Defendants;

H. A trebling of damages;

I. Prejudgment interest;

J. The attorneys' fees for the costs of this action;

K. The costs of this action; and

L. Such other and further relief as the Court deems proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs request a jury trial on all issues so triable.

Dated: November 3, 2017

Respectfully submitted,

PEIFFER ROSCA WOLF ABDULLAH
CARR & KANE APLC

By: /s/ Paul A. Lesko
Paul A. Lesko - #51914
Brandon M. Wise - #67242
818 Lafayette Avenue
Second Floor
St. Louis, MO 63010
Telephone: (314) 833-4826
Telephone: (314) 833-4825
plesko@prwlegal.com
bwise@prwlegal.com

Paul J. James (*pro hac vice)*
JAMES, CARTER & PRIEBE, LLP
500 Broadway, Suite 400
Little Rock, AR 72201
Telephone: 501-372-1414
pjj@jamescarterlaw.com

Michael G. Smith (*pro hac vice*)
DOVER DIXON HORNE, PLLC
425 West Capitol Avenue, Suite 3700
Little Rock, AR 72201
Telephone: 501-375-9151
msmith@ddh-ar.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 3rd day of November 2017, the foregoing was filed via the ECF/CM system with the Clerk of the Court and which will serve Notice of Electronic Filing upon counsel of record via electronic mail.

By: /s/ Paul A. Lesko
Paul A. Lesko - #51914